# EXHIBIT B

**[Singapore Trial Court Decision]**



**Joseph P. Goldberg**
Direct Dial: 646.218.7615
*jgoldber@hodgsonruss.com*

January 23, 2024

<u>VIA NYSCEF</u>

Honorable Joel M. Cohen
New York State Supreme Court
60 Centre Street, Room 570
New York, NY 10007

> Re:   J.G. Jewelry PTE. Ltd. et al. v. Shree Ramkrishna Exports Pvt. et al., <u>Index No. 651469/2018</u>

Dear Justice Cohen,

I write on behalf of the defendants to provide the Court with an update of recent developments in the above matter (the "New York Action").

At the conference held on November 6, 2023, the parties jointly agreed to a temporary stay of the New York Action pending the issuance of a decision in a related action: SRK et al. v. JGJ et al., Case Nos. 418 & 475/2018 (Hight Court of the Republic of Singapore) (the "Singapore Action").

On or about January 18, 2024, Judge Ming of the Singapore High Court issued a 128 page decision, a copy of which is attached.

The parties and their counsel are in the process of reviewing the decision and deciding on next steps. It is also expected that counsel will confer to determine if they can reach an agreement as to how the New York Action should proceed in light of the Singapore decision. Accordingly, the parties jointly request that the upcoming conference on January 25, 2024 at 10:00 a.m. be adjourned until February 27 or 28, or a date otherwise convenient for the Court.

Respectfully submitted,

/s/ Joseph P. Goldberg
Joseph P. Goldberg

cc: Greg Fleesler, Esq.

With Enclosure

**IN THE GENERAL DIVISION OF
THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**

**[2024] SGHC 10**

Suit No 418 of 2018

Between

Shree Ramkrishna Exports Pvt
Ltd

… *Plaintiff*

And

JG Jewelry Pte Ltd

… *Defendant*

Counterclaim

Between

JG Jewelry Pte Ltd

… *Plaintiff in counterclaim*

And

(1)    Shree Ramkrishna Exports Pvt
        Ltd
(2)    The Jewelry Company
(3)    TJC Jewelry, Inc
(4)    Govind Dholakia
(5)    Rahul Dholakia
(6)    Nirav Narola
(7)    Amit Shah
(8)    Ashish Shah

… *Defendants in counterclaim*

Suit No 475 of 2018

Between

Shaileshkumar Manubhai Khunt

… *Plaintiff*

And

(1)   Michael Bernard Kriss
(2)   David Miles Kriss
(3)   JG Jewelry Pte Ltd

… *Defendants*

Counterclaim

Between

JG Jewelry Pte Ltd

… *Plaintiff in counterclaim*

And

Shaileshkumar Manubhai Khunt

… *Defendant in counterclaim*

---

# JUDGMENT

---

[Contract — Formation — Certainty of terms]

[Restitution — Unjust enrichment — Failure of consideration — Counter-
restitution]
[Companies — Oppression — Minority shareholders]
[Companies — Directors — Duties]

**TABLE OF CONTENTS**

**INTRODUCTION**..................................................................................................1

**PARTIES IN S 418 AND S 475**........................................................................2

**BACKGROUND FACTS** ....................................................................................4

    EVENTS AFTER THE COLLABORATION WAS TERMINATED ..............................12

**PARTIES' CASES IN S 418** ...........................................................................16

    SRK'S CLAIM.....................................................................................................16

    JGJ'S COUNTERCLAIM .....................................................................................20

    TJCI'S COUNTERCLAIM ...................................................................................21

**ISSUES IN S 418** ............................................................................................22

**WHETHER THE SRK ENTITIES AND THE JDM ENTITIES ENTERED INTO THE JV OR THE BA**.....................................................22

    THE 13 JANUARY MEMO WAS ALL ABOUT A JOINT VENTURE........................22

    CORRESPONDENCE BETWEEN THE PARTIES SHOW THAT THE PARTIES PROCEEDED ON THE BASIS OF A JOINT VENTURE............................................25

        *Amit's, Nirav's and Rahul's explanations for the use of the term "JV"*.........................................................................................................32

        *Credibility of Amit, Nirav and Rahul as witnesses* ..................................33

    JGJ WAS INCORPORATED PURSUANT TO THE JV ...........................................33

    TRANSFER OF BACK-OFFICE FUNCTIONS OF JDM ENTITIES AND JGJ TO INDIA ...................................................................................................................36

    JDM'S AND JGJ'S ACCOUNTS IN IDBNY WERE CONTROLLED BY REPRESENTATIVES FROM JDM AND SRK.....................................................39

    THE JV WAS ANNOUNCED OR MADE KNOWN TO THIRD PARTIES....................42

i

INSURANCE POLICIES WERE COMBINED ..........................................................44

PARTIES ENGAGED ADVAITA LEGAL TO DRAFT A JOINT VENTURE
AGREEMENT ...................................................................................................45

THE VOLUME REBATE AGREEMENTS ARE CONSISTENT WITH THE JV ...........46

BALANCE SHEETS WERE PREPARED ON THE BASIS OF THE JV ........................47

PARTIES ENGAGED KPMG'S AND BSR'S SERVICES WITH RESPECT TO
THE JV ..........................................................................................................52

AMIT APPOINTED A CFO FOR THE JV ............................................................55

THE BA IS A CONCOCTION .............................................................................55

**WHETHER TJCNY WAS PARTY TO THE JV ......................................57**

**WHETHER THERE WAS A LEGALLY ENFORCEABLE JVA ...........61**

JGJ FAILS TO PROVE THAT THE JV/JVA WAS ENTERED INTO ON 13
JANUARY 2015 AS PLEADED ..........................................................................61

*JGJ's application to amend its pleadings ..................................................63*

JGJ FAILED TO PROVE MATERIAL TERMS OF THE JV AS PLEADED ..................64

NO AGREEMENT ON MANNER IN WHICH PROFITS WOULD BE
DISTRIBUTED .................................................................................................65

**WHETHER JGJ HAS STANDING TO ENFORCE THE JVA ...............67**

**WHAT IS JGJ'S LIABILITY AND/OR CLAIM IN RESPECT OF
THE 23M INVOICES, 42M INVOICES AND 2.2M INVOICES .............67**

NO AGREEMENT TO PAY THE INVOICED AMOUNTS ........................................67

SRK'S AND TJCI'S CLAIM FOR PAYMENT OF REASONABLE
COMPENSATION ..............................................................................................73

*JGJ was enriched at the expense of SRK and TJCI ...............................75*

*The "unjust factor" ...................................................................................76*

*Defence of estoppel ...................................................................................77*

*Defence of change of position*.....................................................*79*

*Defence of counter-restitution* ..................................................*80*

*Defence of unclean hands* .........................................................*81*

EXPERT CALCULATIONS IN RESPECT OF THE 23M INVOICES, 42M INVOICES AND 2.2M INVOICES.....................................................81

JGJ'S LIABILITY IN RESPECT OF THE 23M INVOICES AND THE 2.2M INVOICES ....................................................................................85

**WHETHER THE S 418 COUNTERCLAIM DEFENDANTS ARE LIABLE TO JGJ FOR INDUCING BREACHES OF THE JVA**.............85

**WHETHER THE S 418 COUNTERCLAIM DEFENDANTS ARE LIABLE TO JGJ FOR CONSPIRACY TO INJURE JGJ**........................85

**SUMMARY OF MY FINDINGS AND CONCLUSIONS IN S 418**..........87

**PARTIES' CASES IN S 475** ................................................................88

SHAILESH'S CLAIM.....................................................................88

JGJ'S COUNTERCLAIM ...............................................................92

**THE ISSUES IN S 475**.......................................................................93

**WHETHER SHAILESH IS SRK'S NOMINEE SHAREHOLDER IN JGJ** ...............................................................................................93

**WHETHER SHAILESH HAS STANDING TO BRING A CLAIM UNDER S 216 CA** .................................................................................102

**WHETHER SHAILESH CAN CLAIM HIS LEGITIMATE EXPECTATIONS AS PLEADED**................................................................105

**THE FIRST RESOLUTION**.................................................................107

**THE SECOND RESOLUTION**.............................................................110

**JGJ'S 2016 FS** .................................................................................112

iii

COMMISSION REBATE ADJUSTMENT ............................................................113

ACCOUNTS PAYABLE REDUCTION ADJUSTMENT ........................................114

SRK PAYABLE ADJUSTMENT.....................................................................114

CAPITAL REPAYMENT ADJUSTMENT...........................................................115

FAILURE TO PROVIDE DOCUMENTS AND EXPLANATIONS TO JGJ'S AUDITORS .................................................................................................116

FAILURE TO PROVIDE INFORMATION TO OR ENGAGE SHAILESH..................117

**JGJ'S COUNTERCLAIM AGAINST SHAILESH IN S 475..................119**

REFUSING/FAILING TO SIGN OR TO ABSTAIN FROM VOTING ON THE FIRST, SECOND AND THIRD RESOLUTIONS .................................................119

*The First Resolution*.................................................................120

*The Second Resolution* .............................................................121

*The Third Resolution*................................................................122

SHAILESH'S REQUEST FOR INFORMATION AND DOCUMENTS.......................122

**SUMMARY OF MY FINDINGS AND CONCLUSIONS IN S 475........124**

**RELIEFS IN S 475....................................................................125**

**CONCLUSION .........................................................................125**

**ANNEX 1: INDEX OF ENTITIES, TRADE NAMES AND PERSONS REFERRED TO IN THIS JUDGMENT ...............................128**

> **This judgment is subject to final editorial corrections approved by the court and/or redaction pursuant to the publisher's duty in compliance with the law, for publication in LawNet and/or the Singapore Law Reports.**

# Shree Ramkrishna Exports Pvt Ltd
v
# JG Jewelry Pte Ltd and another suit

### [2024] SGHC 10

General Division of the High Court — Suit Nos 418 of 2018 and 475 of 2018
Chua Lee Ming J
14–17, 20–24, 27–28 February, 1–2, 6–10, 14–15, 21 March, 27 April 2023

18 January 2024                                             Judgment reserved.

**Chua Lee Ming J:**

**Introduction**

1       These proceedings involve two related actions – HC/S 418/2018 ("S 418") and HC/S 475/2018 ("S 475"). The company at the heart of the disputes is incorporated in Singapore but the other parties to the disputes hail from India, the United States and Hong Kong.

2       S 418 involves a claim for the price of diamonds and diamond jewellery sold and delivered to the Singapore company, and a counterclaim alleging that the Singapore company was incorporated pursuant to a joint venture agreement and that the diamonds and diamond jewellery represented contributions towards capital pursuant to the agreement. The joint venture agreement is disputed.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*              [2024] SGHC 10

3       S 475 involves an oppression claim by a shareholder (and director) of the Singapore company and a counterclaim for breach of director's duties. One of the issues is whether the plaintiff in S 475 is a nominee shareholder and director for the plaintiff in S 418, and if so, how that affects the oppression claim.

4       It is alleged that the joint venture agreement was concluded by a handshake and the utterance of the word "*mazal*", which is a recognised practice of entering into contracts in the diamond industry. The traditional phrase used is "*mazal and bracha*" but "*mazal*" or "*mazel*" is used for short. Sealing a deal with an uttered "*mazal*" may have the appealing ring of a time-honoured practice. However, it is no substitute for a properly drafted agreement, all the more so when the transaction is a complex one (as it was in this case). Ignoring the need for proper legal documentation in this case was just poor management of the legal risks.

**Parties in S 418 and S 475**

5       The parties in S 418 are as follows:

(a)      Shree Ramkrishna Exports Pvt Ltd ("SRK") is the plaintiff, and the first defendant in counterclaim. SRK is a company incorporated in India. It is in the business of manufacturing and trading in jewellery and precious stones including cut and polished diamonds and/or polished natural diamonds and/or diamond studded jewellery and/or diamond and coloured stone studded jewellery.

(b)      JG Jewelry Pte Ltd ("JGJ") is the defendant, and the plaintiff in counterclaim. It is a company incorporated in Singapore and is in the business of trading jewellery and precious stones.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

(c)      The Jewelry Company ("TJCI") is the second defendant in counterclaim and the plaintiff in its own counterclaim against JGJ. It is a partnership registered in India and is in the business of manufacturing, sales and marketing of diamond studded jewellery.

(d)      TJC Jewelry, Inc ("TJCNY") is the third defendant in counterclaim. It is a company incorporated in the US and is in the business of sales and marketing of jewellery, including diamonds.

(e)      Mr Govind Dholakia ("Govind") is the fourth defendant in counterclaim. He is an Indian national and is the founder, Chairman and a director of SRK.

(f)      Mr Rahul Dholakia ("Rahul") is the fifth defendant in counterclaim. He is an Indian national and is a Managing Director of SRK and a partner of TJCI. Rahul is Govind's nephew.

(g)      Mr Nirav Narola ("Nirav") is the sixth defendant in counterclaim. He is an Indian national and is an employee of SRK and a partner of TJCI. Nirav is Govind's grandson and Rahul's nephew.

(h)      Mr Amit Shah ("Amit") is the seventh defendant in counterclaim. He is an Indian national and is the Chief Executive Officer ("CEO") and a partner of TJCI.

(i)      Mr Ashish Shah ("Ashish") is the eighth defendant in counterclaim. Ashish is a US national and is the sole shareholder and President of TJCNY.

6      The parties in S 475 are as follows:

3

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

(a)      Mr Shaileshkumar Manubhai Khunt ("Shailesh") is the plaintiff and also the defendant in counterclaim. He is an Indian national who is resident in Hong Kong and is a shareholder and director of JGJ.

(b)      Mr Michael Bernard Kriss ("Michael") is the first defendant. He is a US national and is a shareholder and director of JGJ.

(c)      Mr David Miles Kriss ("David") is the second defendant. He is a US national and is a shareholder and director of JGJ. David is Michael's younger brother.

(d)      JGJ is the third defendant and the plaintiff in counterclaim.

**Background facts**

7      SRK operates, among other things, a sales office for its loose diamonds business at the Bharat Diamond Bourse in Mumbai ("SRK-BDB") and a jewellery manufacturing factory in Sachin, which is near Surat, India ("SRK-Sachin").[1]

8      TJCI operates a jewellery manufacturing factory in the Santacruz Electronic Export Processing Zone ("SEEPZ") in Mumbai, India. SEEPZ is a special economic zone with tax incentives for factory sales.[2] TJCI is the jewellery arm of SRK and is known in the market as a company within the SRK group.[3]

---

[1]      NE, 14 February 2023, at 122:1–14, 124:25–125:12.

[2]      NE, 14 February 2023, at 128:10–15.

[3]      NE, 14 February 2023, at 93:25–94:2, 125:15–22.

4

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

9        TJCNY is the marketing affiliate of TJCI and helps to market the latter's products in the US.[4]

10       In this judgment, I shall refer to SRK-Sachin, TJCI and TJCNY as the "SRK Entities". It is worth emphasising that although SRK-Sachin and SRK-BDB are just different businesses of the same entity (SRK), for present purposes, SRK-BDB is not part of the SRK Entities.

11       Michael and David (together, the "Kriss Brothers") own and control the following entities in the US (the "JDM Entities"):

       (a)     JDM Import Co Inc ("JDM");

       (b)     MG Worldwide LLC ("MG Worldwide");

       (c)     Miles Bernard, Inc ("Miles Bernard"); and

       (d)     Asia Pacific Jewelry, LLC ("AP Jewelry").

The JDM Entities operate a New York family-owned jewellery business, selling jewellery wholesale to major retailers in New York and elsewhere in the US, Canada, United Kingdom and Australia. The business was established by Michael's and David's father. Michael and David are Co-Presidents of the JDM Entities.

12       The JDM Entities operate under the trade name "Instock Programs" (or "Instock" for short) and sell to major jewellery retailers in New York and around

---

[4]       NE, 14 February 2023, at 94:3–20.

5

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

the US; their clients include Macy's, Zales and Sterling Jewelers (which owns Kay Jewelers).[5]

14    Shailesh worked for SRK from 2005 to 2007.[6] He is now a director of S Goldi (Asia) Limited ("S Goldi"), a company incorporated in Hong Kong. S Goldi is the marketing arm of SRK.[7] The other director is one Mr Mansukhbhai Bhikhabhai Budheliya ("Mansukhbhai"), who is also the sole shareholder of the company.[8]

14    Since around 2000, the Kriss Brothers had been purchasing diamonds, diamond studded jewellery and diamond and coloured stone jewellery from SRK.

15    In December 2014, the Kriss Brothers met with Rahul. The details of what was discussed are in dispute. Michael claims that Rahul proposed a joint venture between the JDM Entities and the SRK Entities (the "JV") in which the JDM Entities and the SRK Entities would contribute selected assets, liabilities and activities to the JV.[9] Michael also claims that during one of the meetings, Rahul shook hands with David and him, uttering "*mazel*".[10] Rahul claims that the Kriss Brothers proposed a closer partnership in which SRK would benefit from the Kriss Brothers' experience and marketing network in the US, and the

---

[5]     Michael's AEIC in S 418, at para 15.

[6]     NE, 21 February 2023, at 87:7–17, 89:8–11.

[7]     NE, 14 February 2023, at 66:10–13.

[8]     11 JCB 20 and 24.

[9]     Michael's AEIC in S 418, at paras 34–35.

[10]    Michael's AEIC in S 418, at para 38.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd* [2024] SGHC 10

JDM Entities would have a more stable production line.[11] Rahul denies uttering "*mazal*" and says that they merely decided to explore the opportunity.[12]

16    In early January 2015, Nirav, Amit and Ashish met up with the Kriss Brothers for further discussions in New York. Michael claims that it was agreed pursuant to these discussions that the operation of the JV would commence on 1 April 2015.[13]

17    On 13 January 2015, Amit sent an email[14] to the Kriss Brothers, attaching a document dated the same day and titled "Joint Venutre [*sic*] Between JDM Group and The Jewelry Co. (SRK Group)" (the "13 January Memo").[15] The effect of this document is in dispute.

18    The Kriss Brothers made a trip to Mumbai, India on 27–28 January 2015 and met with, among others, Govind. Michael claims that the purpose of the trip was to visit Govind to obtain his "blessings" for the joint venture.[16] However, Govind claims that he was only introduced to the Kriss Brothers as a matter of courtesy.[17]

19    On 31 March 2015, JGJ was incorporated in Singapore with an issued share capital of US$100 comprising 100 ordinary shares.[18]

---

[11]    Rahul's AEIC in S 418, at paras 10–11.

[12]    NE, 20 February 2023, at 13:16–19; Rahul's AEIC in S 418, at para 12.

[13]    Michael's AEIC in S 418, at para 41.

[14]    1 JCB 34.

[15]    1 JCB 35–36.

[16]    Michael's AEIC in S 418, at para 39.

[17]    Govind's AEIC in S 418, at para 23.

[18]    11 JCB 13–16.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd* [2024] SGHC 10

> (a)     Shailesh holds 50 shares; Michael and David hold 25 shares each.
>
> (b)     Mr Ng Chee Wooi Michael ("Ng") was appointed as a director of JGJ on 31 March 2015.
>
> (c)     Shailesh, Michael and David were appointed as directors on 15 April 2015.

20     Ng is a nominee resident director of JGJ. A Resident Director Indemnity Agreement dated 1 April 2015 (the "RDI Agreement") states that Shailesh and the Kriss Brothers requested Ng to act as the resident director.[19] The RDI Agreement also provides that Ng is to act upon the instructions of Mr Jim Goldsborough ("Jim") as the Authorized Person designated by Shailesh and the Kriss Brothers. Jim was the Chief Financial Officer ("CFO") of JDM.

21     In April 2015,

> (a)     SRK purchased a 26% stake in TJCI through its subsidiary, Ramkrishna Goldi Pvt Ltd;[20]
>
> (b)     TJCNY moved to the JDM Entities' office in New York and operated from there until 8 October 2017;[21] and
>
> (c)     the bookkeeping, accounting and other back-office functions of JGJ and the JDM Entities (to the extent the functions could be carried out in India) were transferred to and undertaken by a team employed by

---

[19]     10 JCB 533–536.

[20]     Amit's AEIC in S 418, at para 7.

[21]     Ashish's AEIC in S 418, at para 38.

8

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

TJCI; whether this team reported to Amit or to the Kriss Brothers is in dispute.

22      In May 2015, JGJ opened a bank account with the Israel Discount Bank in New York ("JGJ's IDBNY Account"). The signatories of this account were Amit, Ashish, Jim, David and Michael; any one of them could authorise payments to be made from the account.[22] At all material times, JGJ did not have a bank account in Singapore.

23      It is not disputed that with effect from 1 April 2015, there was some form of business collaboration between the JDM Entities and the SRK Entities. However, the parties dispute the nature of the collaboration. JGJ and the Kriss Brothers say that the collaboration was pursuant to a joint venture agreement entered into on 13 January 2015 (the "JVA") under which, among other things, the diamonds and jewellery supplied by the SRK Entities to JGJ were to be treated as capital in the JV. The SRK Entities say that the collaboration was a business arrangement ("BA") under which, among other things, SRK sold diamonds and jewellery to JGJ while they concurrently negotiated with the Kriss Brothers on the terms of the JV.

24      On 11 May 2016, S Goldi transferred US$500,000 to Shailesh.[23] In turn, Shailesh transferred US$200,000 and US$300,000 to JGJ on 11 May 2016 and 13 May 2016 respectively.[24] On 19 May 2016, S Goldi transferred another US$200,000 to Shailesh.[25] On the same day, Shailesh transferred US$200,000

---

[22]      Michael's AEIC in S 418, at para 59.

[23]      10 JCB 96.

[24]      10 JCB 97–98.

[25]      10 JCB 99.

9

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

to JGJ.[26] In the remittance forms, the moneys transferred by Shailesh to JGJ were described as "Capital Introduction". Whether the total sum of US$700,000 was an injection of funds into JGJ by Shailesh or SRK is in dispute.

25      Issues arose from an accounting exercise in 2016. The reason for the accounting exercise is in dispute. JGJ's case is that the accounting exercise was an accounting reconciliation conducted pursuant to the JVA. However, SRK's case is that the accounting exercise was to test and determine whether the BA was a success, and if so, whether it could be replicated in a potential joint venture as envisaged by the Kriss Brothers.[27]

26      In September 2016, JGJ engaged KPMG (an Indian partnership and member of the KPMG international network) to carry out the accounting exercise.[28] KPMG started work on its engagement in November 2016 and eventually withdrew in October 2017, citing difficulties in getting "the required support / data from the [finance] team."[29]

27      By August 2017, the collaboration between the SRK Entities and the JDM Entities had lost whatever sparkle it may have had. During a meeting in August 2017, Rahul, Amit and Nirav informed the Kriss Brothers of SRK's decision to terminate the collaboration.[30] The collaboration was terminated on 31 August 2017.

---

[26]      10 JCB 103.

[27]      Rahul's AEIC in S 418, at para 19.

[28]      4 JCB 443.

[29]      7 JCB 321–322.

[30]      Nirav's AEIC in S 418, at para 33.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

28      By then, SRK had supplied diamonds and diamond jewellery to JGJ in respect of which the invoiced amounts totalled US$66,394,768.91. SRK issued the invoices to JGJ but the goods were shipped by SRK directly to the JDM Entities or other entities directed by them. Of the invoices:

> (a)      between October 2015 and August 2017, JGJ paid a total amount of US$42,994,312.66 on invoices issued between 15 September 2015 and 14 April 2017 (the "42M Invoices");[31] and

> (b)      a total amount of US$23,400,456.25 remains unpaid on invoices issued between 2 September 2016 and 2 August 2017 (the "23M Invoices").[32]

29      SRK's claim in S 418 is for the amount unpaid on the 23M Invoices. It is not disputed that all of the diamonds and diamond jewellery in the 42M Invoices and the 23M Invoices were received by the JDM Entities. There is also no dispute over the quality of the goods.

30      Separately, TJCI had supplied diamond jewellery and associated services to JGJ and a total amount of US$2,211,077.91 remains unpaid on invoices issued between 8 October 2016 and 1 August 2017 (the "2.2M Invoices"). TJCI claims this amount against JGJ in TJCI's counterclaim in S 418. Again, it is not disputed that the goods and services were delivered; there is also no dispute over the quality of the goods and services.

---

31      Exhibit P6.

32      Statement of Claim (Amendment No 1) in S 418 ("S 418 SOC"), Annex 1. The invoice dated 2 September 2016 is at s/n 31 of Annex 1.

11

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

***Events after the collaboration was terminated***

31      After the collaboration was terminated, Ashish's access to the JDM Entities' office was terminated.[33]

32      On 28 December 2017, TJCNY commenced action in New York against the JDM Entities to, among other things, recover loose diamonds and fine jewellery that were stored in the JDM Entities' vault at their office (the "2017 US Proceedings").[34] Ashish claimed the goods belong to TJCNY whilst the JDM Entities claimed that the goods were subject to the claims of the JV.

33      On 12 January 2018, Michael sent to JGJ's auditors, M/s AT Adler ("AT Adler"), a copy of JGJ's revised financial statements for FY 2016 (the "2016 FS").[35] Michael explained that the initial copy of the financial statements did not correctly reflect the financial position of the company. Jim sent a copy of the letter to Shailesh via email on the same day. Shailesh claims that he did not see Jim's email until sometime in or around April 2018.[36]

34      On 22 January 2018, the Kriss Brothers signed a JGJ directors' resolution (the "First Resolution") authorising them to commence and manage legal proceedings against TJCNY on behalf of JGJ to recover an amount of US$3,733,503.43 owing by TJCNY (the "TJCNY Debt").[37]

---

[33]     Ashish's AEIC in S 418, at para 72.

[34]     Michael's AEIC in S 418, at para 198 and Exhibit MBK-43; 298 AB 110–124.

[35]     7 JCB 358–361.

[36]     Shailesh's AEIC in S 475, at para 95.

[37]     7 JCB 362.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

35      Shailesh did not sign the First Resolution. By way of a letter dated 6 February 2018 from his solicitors to the Kriss Brothers, Shailesh objected to the First Resolution because, among other things, it was not supported by relevant background documents or information.[38]

36      On 15 February 2018, the Kriss Brothers and Ng signed a JGJ directors' resolution authorising the Kriss Brothers to commence and manage legal proceedings against SRK and TJCI to recover excessive charges that the Kriss Brothers believed were the responsibility of SRK or one of its affiliates (the "Second Resolution").[39] The preamble in the Second Resolution referred to Shailesh as SRK's nominee director in JGJ, holding his shares in JGJ on behalf of SRK and alleged SRK and TJCI of manipulating the pricing of goods billed to JGJ.

37      Shailesh did not sign the Second Resolution. By way of a letter dated 21 February 2018 from his solicitors to the Kriss Brothers, Shailesh objected to the Second Resolution.[40] Shailesh alleged that the allegations that he was SRK's nominee and that SRK/TJCI had manipulated the prices were baseless.

38      Thereafter, the Kriss Brothers' solicitors (M/s Wong Tan & Molly Lim LLC) responded to Shailesh's solicitors (M/s Collyer Law LLC) in relation to Shailesh's objections to the First and Second Resolutions.[41] Shailesh's solicitors also traded barbs with Ng's solicitors, M/s David Ong and Partners.

---

[38]      7 JCB 371–373.

[39]      7 JCB 374–375.

[40]      7 JCB 379–381.

[41]      7 JCB 382–384, 438–441.

13

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

39      On 1 March 2018, SRK's lawyers in India, M/s K Ashar & Co ("K Ashar"), wrote to JGJ to demand payment of the outstanding invoices plus interest.[42] On 8 March 2018, JGJ's US solicitors, M/s Moses & Singer LLP ("Moses & Singer"), replied to K Ashar, setting out JGJ's case based on the JV; an identical letter dated 11 March 2018, with a Notary's stamp, was also sent.[43]

40      On 5 March 2018, Shailesh received an email from AT Adler enclosing the draft 2016 FS, an earlier email dated 1 March 2018, and directors' resolutions approving the 2016 FS and the calling of an Annual General Meeting ("AGM").[44] The email dated 1 March 2018 pointed out the "Disclaimer of Opinion" and the "Basis of Disclaimer of Opinion" in the 2016 FS. In brief, the auditors did not express an opinion on the 2016 FS as they had not been able to obtain sufficient appropriate audit evidence to provide a basis for an audit opinion. The auditors also noted the disagreements between the directors and shareholders.

41      The Kriss Brothers and Ng signed a JGJ directors' resolution dated 6 March 2018 (the "Third Resolution") approving JGJ's audited accounts for FY 2016 and resolving that the Second AGM be convened.[45]

42      On 8 March 2018, K Ashar issued a letter of demand on behalf of TJCI for US$2,211,079.91 (see [30] above).

43      On 27 March 2018, JGJ and the JDM Entities commenced action in New York against the SRK Entities for, among other things, damages in excess of

---

[42]      7 JCB 395–404.

[43]      7 JCB 451–462.

[44]      7 JCB 405–434.

[45]      7 JCB 436–437.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

US$40 million arising from their failure to transfer assets and profits to JGJ in breach of the JVA, the TJCNY Debt (US$3,733,503), and damages in excess of US$20 million arising from the SRK Entities' failure to contribute equally to the JV (the "2018 US Proceedings").[46]

44      On 4 April 2018, notice was given that an AGM of JGJ would be held on 19 April 2018 to adopt the 2016 FS.[47] Shailesh objected to the 2016 FS.

45      On 11 April 2018, Shailesh received a copy of the Third Resolution.[48] Shailesh did not sign the Third Resolution.

46      The AGM was held on 19 April 2018 and the 2016 FS was adopted.[49] Shailesh did not attend the AGM, whether by himself or by proxy.

47      On 23 April 2018, SRK filed S 418.

48      On 30 April 2018, Jim sent a JGJ Board resolution to Shailesh for his signature (the "Fourth Resolution").[50] The Fourth Resolution sought, among other things, to appoint solicitors to act for JGJ and to authorise the Kriss Brothers to act on behalf of JGJ in relation to S 418. Shailesh did not sign the Fourth Resolution. In an email dated 3 May 2018 to the Kriss Brothers and Ng, Shailesh protested against the Fourth Resolution, giving various reasons.[51]

---

[46]      Michael's AEIC in S 475, at para 135 and Exhibit MBK-67; 298 AB 129–160.

[47]      7 JCB 466.

[48]      Michael's AEIC in S 475, at para 153 and Exhibit MBK-74; 235 AB 345–346.

[49]      Michael's AEIC in S 475, at para 163 and Exhibit MBK-79; 10 JCB 413–416.

[50]      8 JCB 307–309.

[51]      8 JCB 315–316.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

49      On 4 May 2018, Shailesh filed S 475.

**Parties' cases in S 418**

*SRK's claim*

50      SRK's case is that:

(a)      The diamonds and diamond jewellery set out in the 23M Invoices were sold to JGJ at the prices stated in the invoices and JGJ had agreed to these prices. Therefore, JGJ is liable to pay the sum of US$23,400,456.25 that is still outstanding on the 23M Invoices.

(b)      Alternatively, SRK is entitled to a restitutionary claim for payment of reasonable compensation.

51      JGJ's pleaded defence is that the JDM Entities, the SRK Entities and JGJ entered into the JVA on 13 January 2015. The alleged agreed terms of the JVA were as follows:[52]

(a)      The shares in JGJ would be held equally between the JDM Entities and the SRK Entities.

(b)      All income and expenses generated by each of the JDM Entities and the SRK Entities pursuant to the JV were to be for the account of the JV.

(c)      Any and all jewellery and/or other goods supplied by the SRK Entities and/or the JDM Entities pursuant to the JV would be treated as capital in the JV. The supplying party would issue an invoice to JGJ with

---

[52]      Defence and Counterclaim (Amendment No 1) in S 418 ("S 418 D&CC"), at para 10.

16

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

the goods priced at cost plus a specified mark-up to cover other related costs (*eg*, marketing, duties and taxes) and some profit (the "Cost-Plus Pricing"). The Cost-Plus Pricing was for the purposes of complying with any applicable tax requirements (including transfer pricing treatment) as well as to enable the parties to maintain proper records of the goods supplied. The invoices were not intended to create any liability on the part of JGJ to pay on the invoices. The invoices were also necessary to enable SRK to export and ship the goods out of India.

(d)      The SRK Entities would carry out a full accounting reconciliation at the end of each year (the "Accounting Reconciliation"). This would involve:

   (i)      adjustments being made where necessary to the aggregate values of the goods supplied as between the parties to reflect the Cost-Plus Pricing;

   (ii)     the net profits or losses being determined and apportioned equally between the SRK Entities and the JDM Entities; and

   (iii)    valuing the goods supplied to the JV at cost for the purposes of determining the net profits or losses under the JV.

(e)      The JDM Entities and the SRK Entities would each maintain a capital account with the JV. The contributions by the JDM Entities and the SRK Entities to the JV, including cash injections and goods supplied to the JV (valued at cost) would go into their respective capital accounts. The JDM Entities and the SRK Entities may make cash withdrawals from the JV with the knowledge and/or consent of the other party. Such

17

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

cash withdrawals would reduce the balance in the relevant capital account.

(f)      From the second year of the JV (*ie*, from 1 April 2016), if either of the SRK Entities' or the JDM Entities' equity in their respective capital accounts is more than 50% of the combined sum in the capital accounts, the party that contributed more than 50% would be entitled to payment of a monthly interest of 1% of the equity surplus, from the other party.

(g)      The backroom and accounting responsibilities of JGJ would be undertaken by the SRK Entities at their back-office in India. To this end, SRK's representatives, Amit and Ashish, were appointed as authorised signatories to JGJ's IDBNY Account and were authorised to review and approve transactions and to release payments under the IDBNY Account.

52      According to JGJ, it was incorporated pursuant to the JV.

53      JGJ's case is that the SRK Entities failed to conduct the Accounting Reconciliation during the course of the JV. Alternatively, JGJ says that following the termination of the JV and JVA, it was understood between the parties that there was to be a final reconciliation and settlement of accounts to be carried out (the "Termination Settlement Exercise"). JGJ says that it is not liable to pay on the 23M Invoices until either the Termination Settlement Exercise or the Accounting Reconciliation has been conducted.

54      JGJ further claims that even if there is no JV or the terms of the JVA do not address how the goods under the 23M Invoices are to be dealt with, SRK is not entitled to claim reasonable compensation in respect of the 23M Invoices

18

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*   [2024] SGHC 10

because (a) SRK is estopped from doing so, (b) JGJ has changed its position, (c) JGJ is entitled to counter-restitution and/or (d) SRK has come to court with unclean hands.

55   SRK denies the JV/JVA. SRK's case is that the parties entered into negotiations on the terms of the JV which did not materialise. Concurrently, the parties agreed to enter into the BA, the key features of which were as follows:[53]

(a)   The book-keeping and accounting for the sale of diamonds and diamond jewellery pursuant to the BA would be kept in India and administered by persons reporting to and taking instructions from the Kriss Brothers and their representatives.

(b)   SRK would sell diamonds and diamond jewellery to JGJ and JGJ would in turn sell the same to companies controlled and/or owned by the Kriss Brothers.

(c)   A two-step process would be implemented to ensure timely payment of invoices issued by SRK/TJCI to JGJ (the "Two-Step Payment Process"). The Two-Step Payment process involved:

(i)   the Kriss Brothers' representative setting up payment requests on IDBNY's web portal for payments to be made to SRK; and

(ii)   one of the parties holding the security tokens issued by IDBNY, *ie*, Amit, Ashish, Jim, David and Michael (see [22] above), would subsequently release the payments.

---

[53]   Reply and Defence to Counterclaim (Amendment No 1) in S 418 ("S 418 R&DCC"), at paras 12e–12i; Nirav's AEIC in S 418, at para 15.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*        [2024] SGHC 10

(d)   TJCI's marketing affiliate, TJCNY, would operate out of the JDM Entities' office in New York.

56    SRK claims that JGJ was incorporated pursuant to the BA and was for the Kriss Brothers' personal tax benefit as well as to consolidate purchases from SRK/TJCI.[54]

*JGJ's counterclaim*

57    JGJ claims as follows:

(a)   The SRK Entities acted wrongfully and in breach of the JVA by:[55]

(i)   issuing the 23M Invoices and the 42M Invoices at prices that were not based on Cost-Plus Pricing;

(ii)   procuring JGJ to pay the 42M Invoices; and

(iii)   demanding payment of the 23M Invoices.

(b)   One or more of TJCNY, TCJI, Govind, Rahul, Nirav, Amit and/or Ashish (the "S 418 Counterclaim Defendants") induced the breaches of the JVA set out in (a) above.[56]

(c)   One or more of the S 418 Counterclaim Defendants conspired, through lawful or unlawful means, to injure JGJ and procured:[57]

---

[54]    S 418 R&DCC, at para 12f; Nirav's AEIC in S 418, at para 11.

[55]    S 418 D&CC, at paras 11 and 20.

[56]    S 418 D&CC, at paras 23–24.

[57]    S 418 D&CC, at paras 27 and 32.

20

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd* [2024] SGHC 10

(i) SRK to issue the 23M Invoices and the 42M Invoices at prices that were not based on Cost-Plus Pricing (see [51(c)] above); and

(ii) JGJ to pay the 42M Invoices and SRK to demand payment of the 23M Invoices, despite knowing that JGJ was not liable to make payment on the 42M Invoices and 23M Invoices.

58 The S 418 Counterclaim Defendants deny JGJ's counterclaim. The case for the S 418 Counterclaim Defendants (*other than* TJCNY and Ashish) is as set out in [55]–[56] above. In addition, they argue that in any event, JGJ has no standing to make a counterclaim based on the JVA because JGJ is not a party to the JVA, and JGJ cannot rely on the Contracts (Rights of third Parties) Act 2001 (2020 Rev Ed).

59 The case for TJCNY and Ashish is that TJCNY was not a party to the alleged JV and that their roles were to facilitate and assist administratively in the commercial arrangement between SRK/TJCI and the JDM Entities.

### *TJCI's counterclaim*

60 TJCI's counterclaim is similar to SRK's claim. TJCI claims the amount of US$2,211,077.91 based on the 2.2M Invoices. Further or in the alternative, TJCI claims that it is entitled to a restitutionary claim for payment of a reasonable compensation.

61 JGJ's defence relies on the JV/JVA and is similar to its defence against SRK's claim on the 23M Invoices.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

**Issues in S 418**

62     The issues in S 418 are as follows:

(a)     Whether the SRK Entities and the JDM Entities entered into the JVA or the BA, and if a JVA, whether

(i)     TJCNY was a party to the JVA; and

(ii)     there was a concluded and legally enforceable JVA?

(b)     Whether JGJ has standing to enforce the JVA?

(c)     What is JGJ's liability and/or claim in respect of the 23M Invoices, 42M Invoices and 2.2M Invoices?

(d)     Whether the S 418 Counterclaim Defendants are liable to JGJ for inducing breaches of the JVA?

(e)     Whether the S 418 Counterclaim Defendants are liable to JGJ for conspiracy to injure JGJ?

**Whether the SRK Entities and the JDM Entities entered into the JV or the BA**

63     In my judgment, the evidence overwhelmingly proves that the collaboration between the SRK Entities and the JDM Entities was based on the JV and that the BA was a concoction by Amit, Nirav and Rahul.

*The 13 January Memo was all about a joint venture*

64     In December 2014, the Kriss Brothers and Rahul met and discussed a collaboration. This led to Nirav, Amit and Ashish meeting up with the Kriss Brothers in New York in early January 2015 for further discussions.

22

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

Subsequently, Amit sent the 13 January Memo to the Kriss Brothers.[58] The 13 January Memo is clear evidence that the parties had agreed to enter into a joint venture:

(a)     The title of the 13 January Memo was "Joint Venutre [*sic*] Between JDM Group and the Jewelry Co. (SRK Group)".

(b)     The 13 January Memo stated the following:

…

The Jewelry Co. (TJC) & JDM *have agreed* to enter into a joint venture to produce and sell Jewelry worldwide.

The SRK management has given their blessings …

…

[emphasis added]

(c)     The 13 January Memo contained "General Terms" and "Partnership Terms" as well as matters to be discussed, all of which could only refer to a joint venture, and not the alleged BA. In particular, it contained the following "General Terms" and "Partnership Terms":

**General Terms:**

1) The suggested date of the JV of 1st March should be re considered as it would be too soon for the JV to bear the current expenses. …

2) Till the date of final JV JDM to reduce back office expenses & transfer back office work to India in a phased manner.

3) JDM to transfer products suitable to be manufacture by TJC immediately.

4) TJC to add manpower & staff required to support JDM back office immediately.

…

---

58      1 JCB 35–36.

23

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*　　　　　[2024] SGHC 10

6) All excess inventory can be purchased by new co. from both old co. based on requirement and market value.

7) JV co. will keep office size of 3K – 4K sq. ft. TJC NY operation will be moved to new JV co.

8) All current salaries & expenses to be relooked and renegotiated.

…

**<u>Partnership Terms:</u>**

1) 50% TJC & 50% JDM partnership with 50-50% investment.

…

3) Balance sheet & profit calculated once a year …

65　　In his oral testimony, Amit claimed that he used the term "JV" without knowing what it meant.[59] However, this is inconsistent with his evidence in his affidavit of evidence-in-chief ("AEIC") that the 13 January Memo was prepared in anticipation of the contemplated JV.[60] I have no doubt that Amit knew what the term "JV" meant. He was an experienced businessman involved in a business that was international. Further, the contents of the 13 January Memo are self-explanatory and show that Amit must have known what the term "JV" meant.

66　　Amit also claimed that:[61]

(a)　　only points 2, 3, 4 and 7 of the "General Terms" in the 13 January Memo were implemented as part of the BA; and

---

[59]　　NE, 14 February 2023, at 122:6–9.

[60]　　Amit's AEIC in S 418, at para 12a.

[61]　　Amit's AEIC in S 418, at para 12a.

24

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*        [2024] SGHC 10

(b)     key terms of the JV, including those set out under "Partnership Terms), *eg*, the term "50% TJC & 50% JDM partnership with 50-50% investment", were not implemented.

67     I reject Amit's claims. I find that the BA is a concoction (see [155] below). Further, points 2 and 4 of the "General Terms" deal with the transfer of JGJ's and the JDM Entities' back-office functions to India. I find that the transfer of the back-office functions to India was consistent with the JV but not the BA (see [102]–[106] below). Finally, the balance sheet template and balance sheets that were prepared in 2016 and 2017 are consistent with the equal partnership between the JDM Entities and the SRK Entities (see [134]–[147] below).

***Correspondence between the parties show that the parties proceeded on the basis of a joint venture***

68     There are numerous contemporaneous emails that show that the parties intended and proceeded on the basis of a joint venture. Nothing in these emails support the alleged BA.

69     On 15 January 2015 (two days after sending the 13 January Memo), Amit wrote to the Kriss Brothers, raising questions including how to "announce the JV to customers".[62] Amit first explained that this was a reference to a potential JV in the future, and subsequently said that his use of the term "JV" referred to a "close business relationship".[63] As stated earlier, I find that Amit understood what a "JV" was.

---

[62]     1 JCB 39.

[63]     NE, 14 February 2023, at 161:22–162:19.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

70      On 23 January 2015, Amit sent an email to the Kriss Brothers, attaching a document titled "Agenda in Mumbai" for the Kriss Brothers' visit to Mumbai on 27–28 January 2015.[64] The items in the Agenda included the following:

- Discuss and finalize JV Name
- How to Announce to Clients/Industry about JV
- Decide on Vegas Show
  …
- Discuss and finalize legal composition of JV
- Discuss and finalize Diamond qualities and pricing. Full and Single Cuts
  …

71      On the same day, Mr Divyesh Patel ("Divyesh"), an employee of TJCI, sent an email to the Kriss Brothers, copied to Amit. The email attached a proposed itinerary of the Kriss Brothers' schedule in Mumbai on 27–28 January 2015.[65] The itinerary included a two-hour slot on 27 January 2015 for a meeting with Govind and a tour of SRK's diamond factory. Seen in the light of the agenda referred to above and Govind's status, it is more likely that the meeting with Govind was to obtain his blessings for the JV (as Michael claimed) rather than just a matter of courtesy (as Govind claimed).

72      On 29 January 2015, Michael sent an email to Amit and David in which he wanted to begin the discussion about "capital investment needed to finance the JV."[66] On 30 January 2015, Amit sent Michael an email setting out his estimates of the capital investment needed.[67] Amit noted that his estimates were very similar to Michael's. These emails could not have been referring to the BA since the BA did not involve any capital investment.

---

[64]      1 JCB 45–46.

[65]      1 JCB 47–48.

[66]      1 AB 62.

[67]      1 JCB 51–52.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*        [2024] SGHC 10

73      On 30 March 2015, Michael sent an email to Amit and David, attaching a list of points relating to sales, "memos" (*ie*, consignments), repairs, credit rebill, returns, expenses and capital.[68] These issues were relevant to the JV but not the BA. It is telling that even on 30 March 2015, the email made no reference to the BA.

74      On 30 June 2015, Jim emailed Michael *and Amit* about the billing procedure between JGJ and the JDM Entities.[69] The inclusion of Amit is consistent with the JV. Under the purported BA, SRK was simply selling to JGJ; there would be no reason for Amit to be involved in the billing procedure between JGJ and the JDM Entities.

75      On 6 July 2015, Ashish sent an organisation chart of SRK's and TJCI's teams that handled the operational aspects of the business to several Instock (*ie*, JDM) personnel.[70] The organisation chart was relevant to JDM's personnel under the JV but not under the purported BA.

76      On 14 July 2015, one of the TJCI employees assigned to handle JDM's back-office functions in India, Mr Vikas Ashokkumar Padhya ("Vikas"), sent Amit the "JDM work schedule".[71] The JDM work schedule was relevant to Amit under the JV but not under the purported BA.

77      On 4 August 2015, Amit sent Ashish an email (copying David) in which he instructed Ashish to streamline a list of work/processes in New York.[72]

---

[68]      1 JCB 112–114.

[69]      1 JCB 304–305.

[70]      1 JCB 445–446.

[71]      1 JCB 457–458.

[72]      1 JCB 469.

27

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

Neither Amit nor Ashish had any reason to streamline the work processes in New York under the purported BA.

78      In August 2015, Amit discussed the roles and responsibilities of all the key individuals of the JV with Michael and David. On 25 August 2015, Amit sent Michael and David a draft paper setting out the roles and responsibilities of Amit, Nirav, David and Michael; Amit expressed the view that "this clarity will help all of us run the company more efficiently and smoothly".[73] It is clear that the parties were already operating on the basis of a joint venture.

79      On the same day, Amit sent an email to Jim and David, saying that "we need to have meetings with all our NY staff" and "[w]e need to re align everyone's roles and responsibilities".[74] But for the JV, Amit would not have referred to JDM's staff in New York as "our NY staff" or had any need to meet them to realign the roles and responsibilities.

80      On 9 March 2016, Amit sent the Kriss Brothers and Nirav a document entitled "JV Sales Apr to Feb".[75] The document set out the sales made to each customer by each of the JDM Entities and the SRK Entities. The reference to "JV sales" is self-explanatory. This document had nothing to do with the purported BA.

81      On 11 March 2016, Amit asked Jim for a provisional balance sheet as he wanted to "go over the financials of each company to see the profit/loss for the year."[76] There was no necessity for this under the purported BA. The tone of

---

[73]      1 JCB 478–483.

[74]      1 JCB 476–477.

[75]      2 JCB 234–236.

[76]      2 JCB 323.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

Amit's email also shows that he was not asking for the financials simply for purposes of considering whether to enter into a joint venture with the JDM Entities.

82      On 17 May 2016, Rahul wrote to the Kriss Brothers and said:[77]

> The last couple of weeks have been full of confusions and emotions for us *as joint venture partners.*
>
> … there is/was no intention on my/SRK part to cause any confusion or misunderstanding on the operation and *functioning of the JV …*
>
> [emphasis added]

The contents of Rahul's email are self-explanatory.

83      On 16 June 2016, Mr Vibhor Jain ("Vibhor") emailed various persons from TJCI, SRK and Instock, complaining that he had not "received any data for 31st March 2016 for any of the JV entity till date".[78] Amit and Nirav were also copied on this email. It appears that Vibhor was formally employed by SRK as its CFO but was known to the JDM Entities as TJCI's CFO. Vibhor introduced himself to the JDM employees as the new CFO for TJCI.[79] It is not disputed that Vibhor handled mainly JGJ's and the JDM Entities' accounts.[80] The fact that Vibhor was asking for financial information of not just the JDM Entities, but of TJCI and SRK as well, showed that the parties were operating on the basis of a joint venture and not the purported BA.

---

[77]      2 JCB 541–542.

[78]      2 JCB 640.

[79]      2 JCB 197.

[80]      NE, 14 February 2023, at 93:5–13; NE, 28 February 2023, at 55:24–56:12.

29

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

84     In an email dated 5 July 2016:[81]

   (a)     Michael referred to the "new joint venture" being in place; and

   (b)     Michael told Nirav, Amit and David that "[o]ur [b]ank line at [IDBNY] has expired" and that the bank wanted them to sign a letter to extend the line with David and Michael guaranteeing the line; Michael asked to "have a conversation and decide" what needed to be done.

85     On 6 July 2016, Amit replied as follows:[82]

> We MUST keep the bank line ... for future ... always good for opportunity buys/expansions etc.
>
> We do not mind sharing the responsibility of the line ... as it's a *joint liability*.
>
> ...
>
> [emphasis added]

Amit's reply is clear evidence that the parties were operating on the basis of the JV. Under the purported BA, there would be no reason why the JDM Entities' banking facilities should be shared with the SRK Entities.

86     On 8 July 2016, one Vinay Vaghani (from TJCI) reported to the Kriss Brothers, Nirav and Amit, the "per gram labour for the month of June".[83] Amit's reply complimenting the factory's performance was also copied to the Kriss Brothers. The fact that the Kriss Brothers were copied on the emails is consistent with the JV; there was no reason to copy the Kriss Brothers about the

---

[81]     3 JCB 218.

[82]     3 JCB 218.

[83]     3 JCB 427–428.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

performance of TJCI's factory if the parties' relationship was merely that of partners under the BA.

87      On 31 August 2016, Vibhor emailed the Kriss Brothers, Amit and Nirav and said that "[a]nother issue is we have set the credit limits on *the whole JV group (JDM+SRK)* but Receivables are maintained in separate individual systems for JDM & SRK so it is very difficult to track the total JV outstanding manually at the time of each order processing" [emphasis added].[84] This email again shows that the parties were operating on the basis of the JV.

88      On 7 September 2016, Vikas informed Jim and Ajay Matta (the Financial Controller of JDM) that SRK required US$500,000 to buy gold.[85] Ajay Matta then asked Michael if it was "ok to borrow" if the funds requested were not available.[86] At Michael's request, Ajay Matta sent him the projected dates of payments from customers.[87] In his reply (which was copied to Amit and Nirav), Michael asked for an explanation for the shortfall in funding.[88] Michael also said that they needed to make a joint decision as they had decided it should not be necessary to obtain financing from the bank, and pointed out that it had been agreed that "Amit would manage all the day to day credit in accordance with [their] joint meetings, and if things change significantly he would bring it to the table with our partners/board". These exchanges regarding the financing arrangements between SRK and JDM show that the parties were operating on the basis of the JV.

---

[84]        4 JCB 254–255.

[85]        4 JCB 395–396.

[86]        4 JCB 394–395.

[87]        4 JCB 393–394.

[88]        4 JCB 393.

31

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

89      On 13 September 2016, Vibhor sent minutes of a meeting earlier that morning to Michael and Amit.[89] The minutes referred to "Diamond Bank of JDM Group which has been taken earlier into balance sheet" and to "SRK/TJC old goods [having] been taken into JV". These references evidenced the parties' contributions to the capital of the JV. The minutes also stated that 50% of the "[s]everance pay to terminated employees in JDM after 01 Apr 2015" was to "be debited to JDM Capital as prior period expenses" and the remaining 50% was to "be treated as JV Expenses". The fact that 50% of the severance (paid to JDM employees who were terminated as a result of the back-office functions being transferred to India) was to be treated as "JV expenses" is clear evidence that the parties were operating on the basis of the JV.

*Amit's, Nirav's and Rahul's explanations for the use of the term "JV"*

90      Amit claimed that he used the terms "joint venture" or "JV" loosely and that he used these terms to refer to either the BA or the potential JV.[90] I find Amit's claim that the term "JV" could refer to the BA to be unbelievable. Amit was, and is, an experienced businessman. He must have understood what a joint venture meant. The BA was clearly not a joint venture.

91      Rahul claimed that he understood a "little bit" of English and that he spoke to his assistant in Gujarati and his assistant translated and typed his messages in his emails in English.[91] In my view, Rahul understated his ability to understand English. Although he chose to give his oral testimony through a Gujarati interpreter, I noticed that he was nodding in response to some of the

---

[89]     4 JCB 428–429.

[90]     Amit's AEIC in S 418, at para 13.

[91]     NE, 20 February 2023, at 11:15–22.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

questions before they were translated.[92] He was also able to give an answer – "business associate" – in English.[93] I have no doubt that Rahul understood the term "JV".

*Credibility of Amit, Nirav and Rahul as witnesses*

92      Amit, Nirav and Rahul claimed that they were not aware of the significance of the word "*mazal*". I find this very hard to believe given their experience in the diamond industry. It is not disputed that the use of the word "*mazal*" to conclude a deal is an established and well-recognised practice in the diamond industry. Govind himself testified that this word is used in practice in the diamond business when agreement is reached on a deal.[94] Govind also testified that "this is what we do, we shake hands and say '*mazal*'" and that Rahul should know about this practice.[95]

93      Amit's, Nirav's and Rahul's claim that they were not aware of the significance of the word "*mazal*" served only to tarnish their credibility as witnesses.

**JGJ was incorporated pursuant to the JV**

94      On 31 March 2015, JGJ was incorporated in Singapore. The evidence shows that JGJ was incorporated pursuant to the JV.

95      According to Michael, JGJ was incorporated as a tax efficient vehicle through which capital flow and eventual profit distribution could be effected to

---

[92]     NE, 20 February 2023, at 3:21–4:2.

[93]     NE, 20 February 2023, at 27:11–12.

[94]     NE, 15 March 2023, at 45:20–46:2.

[95]     NE, 15 March 2023, at 46:5–16.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

the joint venture partners; in addition, it was a convenient vehicle to handle joint venture purchases from non-joint venture parties.[96] Michael explained that JGJ would be tax-free because all of the business was being done offshore.[97]

96      Rahul and Nirav alleged that the Kriss Brothers incorporated JGJ for their personal tax reasons and to consolidate purchases from SRK/TJCI.[98]

97      I accept Michael's evidence that JGJ was incorporated as a tax efficient vehicle *for the JV* for several reasons. First, Michael's evidence is supported by Amit's email to the Kriss Brothers dated 2 February 2015, attaching a summary of decisions made during the Kriss Brothers' visit to Mumbai.[99] One of the decisions made in Mumbai was to "set up a JV" in Hong Kong; Michael was to check with his friend in Hong Kong on the legal composition of the JV. Michael's unchallenged testimony was that, eventually, they could not set up the JV vehicle in Hong Kong because Amit said that SRK's nominee was in Hong Kong.[100]

98      Second, Amit was concerned about the tax status of JGJ. The exchange of emails in February 2016 between Vikas and AT Adler (JGJ's auditors) regarding JGJ's tax liabilities were copied not only to Jim but also to Amit.[101] Amit was not just a passive participant either. He expressly asked AT Adler to "send a recap confirmed *our* tax liability in Singapore" [emphasis added].[102]

---

[96]      Michael's AEIC in S 418, at para 4.

[97]      NE, 28 February 2023, at 16:22–17:2.

[98]      Rahul's AEIC in S 418, at para 13; Nirav's AEIC in S 418, at para 11.

[99]      1 JCB 53–54.

[100]      NE, 27 February 2023, at 55:14–21.

[101]      2 JCB 219–224.

[102]      2 JCB 221.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

Amit's interest in JGJ's tax liabilities shows that JGJ was set up pursuant to the JV. There would be no reason for Amit to be concerned about JGJ's tax liabilities if JGJ was simply a buyer of diamonds and diamond jewellery from SRK/TJCI or if JGJ was incorporated solely for the Kriss Brothers' own purposes.

99      Third, I accept Michael's testimony that the letters "J" and "G" in JGJ's name stand for "JDM" and "Jewel Goldi" respectively, to reflect the association between both the JDM Entities and the SRK Entities.[103] This is supported by an email dated 27 March 2015 between Michael and Ms Juliana Ng (who was assisting with setting up JGJ).[104] An article by the Diamond World News Service dated 11 January 2012 described Jewel Goldi as SRK's dedicated manufacturing arm.[105] I also note that the name of SRK's subsidiary (which bought a stake in TJCI) is Ramkrishna Goldi Pvt Ltd (see [21(a)] above). Michael explained that the Goldi Group of companies (the "Goldi Group") is part of the SRK Group's global network of companies.[106] The explanation for JGJ's name is consistent with the JV. There would have been no reason for the name "Goldi" to feature in JGJ's name if the basis for the collaboration was merely the BA.

100     Fourth, in his email dated 5 July 2017, Jim asked Amit to comment on matters relating to what to tell AT Adler (JGJ's auditors) in relation to JGJ's accounts for FY2016, and on whether JGJ could be classified as a procurement

---

[103]      Michael's AEIC in S 418, at para 25.

[104]      I JCB 65.

[105]      10 JCB 513.

[106]      Michael's AEIC in S 418, at para 24; see also 10 JCB 513.

35

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

company rather than a trading company.[107] On 6 July 2017, Jim told a tax consultant, Jeffrey Sacks ("Sacks") that he had spoken to Amit and that Amit had no problems with control being located in Bangkok and JGJ being classified as a procurement company.[108] Amit's involvement in the decisions relating to JGJ supports the fact that JGJ was asset up pursuant to the JV.

101     Fifth, in August 2017, Rahul told the Kriss Brothers that he was terminating the JV (see [27] above). Himanshu S. Mehta ("Himanshu"), a consultant to the JDM Entities, attended the meeting as a translator for the Kriss Brothers.[109] Himanshu testified that there was a heated discussion and Rahul said "we can just bankrupt [JGJ]".[110] I accept Himanshu's evidence. His evidence was not shaken during cross-examination. Rahul's statement showed that he treated JGJ as a company under the JV; there was no reason for him to make that statement if JGJ were merely a company set up by the Kriss Brothers for their own purposes.

*Transfer of back-office functions of JDM Entities and JGJ to India*

102     In April 2015, the bookkeeping, accounting and other back-office functions (collectively, the "back-office functions") of JGJ and the JDM Entities (to the extent the functions could be carried out in India) were transferred to and undertaken by a team employed in India by TJCI. The team was based in TJCI's premises. Approximately 40% of the employees of the JDM Entities in New

---

[107]    6 JCB 329–331.

[108]    6 JCB 328.

[109]    Himanshu's AEIC in S 418, at para 7.

[110]    Himanshu's AEIC in S 418, at paras 11–12; NE, 8 March 2023, at 48:12–23.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

York, with accounting and/or managerial responsibilities, were terminated in connection with this move.[111]

103    I reject the SRK Entities' claim that the transfer of JGJ's and the JDM Entities' back-office functions to a team employed by TJCI was done pursuant to the BA. Under the purported BA, SRK was simply a seller of diamonds and diamond jewellery to JGJ. TJCI was (and remains) a company within the SRK group. It is illogical that, in the context of the purported BA, the Kriss Brothers would have agreed to the back-office functions (which included the accounts) of not only JGJ, but the JDM Entities as well, being undertaken by a team employed by TJCI in India.

104    The transfer of the JDM Entities' and JGJ's back-office functions to India was an imposition on TJCI. TJCI had to employ and provide premises for the employees handling the back-office functions. TJCI even re-deployed its employees to work specifically on the back-office functions.[112] TJCI did not charge the JDM Entities for the costs of at least three of the employees assigned to handle JDM's back-office.[113] By his own admission, Amit also had to supervise the team.[114] It is not disputed that the reason for moving the back-office functions to India was to reduce costs. In my view, TJCI would not have agreed to all the impositions but for the JV because it was only under the JV that TJCI would benefit from the reduction in costs.

---

[111]    Michael's AEIC in S 418, at para 68.

[112]    Amit's AEIC in S 418, at para 36; NE, 14 February 2023, at 170:4–9.

[113]    NE, 14 February 2023, at 92:7–9.

[114]    Amit's AEIC in S 418, at para 30.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

105   Whether the team handling the back-office functions in India reported to and took instructions from the Kriss Brothers or Amit was disputed. I find that the team reported to and took instructions from Amit for the following reasons:

(a)   Vikas was employed by TJCI as an accountant for the JV after being interviewed by Amit and Rahul; he confirmed that he took instructions from Amit and Nirav, and subsequently from Vibhor (after Vibhor was appointed as CFO).[115]

(b)   In an email dated 30 January 2017, Vikas sought Amit's approval for the payment of a bill from KPMG.[116] The fact that Vikas sought Amit's approval is all the more significant because the bill was sent to Vikas by a JDM employee.

(c)   When Amit instructed one Mr Tetsu Takahashi (a JDM employee) to add JGJ to the JDM system so that orders could be processed and goods could be shipped to JGJ, he also instructed Vikas to provide the address.[117]

106   In any event, it still does not make commercial sense for the Kriss Brothers to have agreed to the back-office functions being handled by *TJCI employees in India* even if they took instructions from the Kriss Brothers, unless the parties were operating on the basis of the JV.

---

[115]   Vikas' AEIC in S 418, at paras 10–11.

[116]   5 JCB 381–382.

[117]   1 JCB 115; NE, 14 February 2023, at 168:9–169:11.

38

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

### *JDM's and JGJ's accounts in IDBNY were controlled by representatives from JDM and SRK*

107    The setting up of JGJ's IDBNY Account and the persons who were authorised to operate JDM's and JGJ's IDBNY accounts point to the existence of the JV rather than the BA.

108    It is common ground that the collaboration between the parties started on 1 April 2015. On 14 May 2015, Jim sent documents to the Israel Discount Bank in New York for the opening of JGJ's IDBNY Account. His email said "J.G. Jewelry, Inc. is a 50/50 venture between Michael & David Kriss and SRK Diamonds".[118] Although the email referred to "J.G. Jewelry, Inc.", it is clear that Jim was referring to JGJ; the email attached corporate resolutions of JGJ.[119]  It is also clear that the reference to a venture between the Kriss Brothers and SRK was a reference to the JV.

109    In May 2015, JGJ's IDBNY Account was set up. The authorised signatories comprised representatives of the SRK Entities and the JDM Entities. They were Amit, Ashish, Jim, David and Michael; any one of them could authorise payments to be made from the account. The Kriss Brothers could not have agreed to Amit and Ashish being given the authority to make payments from the account to the SRK Entities unless the parties were operating on the basis of the JV. Under the purported BA, JGJ was just a buyer of diamonds and diamond jewellery from SRK. It is unthinkable that in the context of the purported BA, the buyer (JGJ) would have authorised representatives of the seller (SRK) to make payments from the buyer's account to the seller.

---

[118]      1 JCB 291.

[119]      1 JCB 294–296.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*        [2024] SGHC 10

110    Nirav's explanation was that one of the key features of the purported BA was a two-step process for the payment of the invoices issued by SRK/TJCI to JGJ (the "Two-Step Payment Process").[120] According to him, the Two-Step Payment Process worked as follows:[121]

(a)    Vikas would review invoices from SRK/TJCI. Upon his approval, Vikas would set up a payment request for payment of the invoices to be made from JGJ's IDBNY Account.

(b)    After the payment request was set up, the payment could be released by any one of the holders of the security tokens issued by IDBNY. The holders of the tokens were Amit, Ashish, the Kriss Brothers, Jim, Ajay Matta, Vikas and Brady D'Elia ("Brady"). Brady was the manager of MG Worldwide.

111    Nirav claimed that the purpose of the Two-Step Payment Process was twofold – first, to ensure timely payments of SRK's and/or TJCI's invoices, and second, to ensure that the Kriss Brothers or their representatives had their desired degree of control over the payments to be made by JGJ to SRK/TJCI.[122]

112    Amit adopted Nirav's evidence relating to the Two-Step Payment process.[123] Rahul disclaimed any involvement in or knowledge of the details of the payment mechanism concerning the purported BA.[124]

---

[120]    Nirav's AEIC in S 418, at para 15(b).

[121]    Nirav's AEIC in S 418, at para 19.

[122]    Nirav's AEIC in S 418, at para 20.

[123]    Amit's AEIC in S 418, at para 21.

[124]    Rahul's AEIC in S 418, at para 27.

40

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

113     I reject Nirav's and Amit's claims relating to the Two-Step Payment Process. In my view, the claims are contrived.

> (a)     First, Vikas testified that generally, he would prepare the payment instructions under the direction of Amit and/or Nirav.[125] Vikas' testimony contradicted Nirav's claim that Vikas would set up the payment instruction after reviewing and approving the invoices from SRK/TJCI. I have no reason to doubt Vikas' testimony.

> (b)     Second, the persons who held the tokens for JGJ's IDBNY Account were Amit, Ashish, the Kriss Brothers and Jim.[126] Contrary to Nirav's assertion, Ajay Matta, Vikas and Brady did not hold tokens for JGJ's IDBNY Account.

> (c)     Third, Nirav's assertion that the Two-Step Payment Process was to ensure timely payment is illogical. Under the alleged Two-Step Payment Process, Vikas had to review and approve the invoices. This meant that the timeliness of payment on SRK's and TJCI's invoices was dependent on Vikas. Timely payment could not be ensured since, according to Amit, Vikas was a representative of the Kriss Brothers and/or the JDM Entities.[127]

> (d)     Fourth, there was no reason for JGJ (as the buyer) to authorise representatives of the seller to release payments from JGJ's account to the seller.

---

[125]     Vikas' AEIC in S 418, at para 15; NE, 7 March 2023, at 107:15–20.

[126]     Vikas' AEIC in S 418, at para 14.

[127]     Amit's AEIC in S 418, at para 22.

41

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*       [2024] SGHC 10

114     Vikas also testified that when he received a request from Amit for funds, he had to first initiate a payment from JDM's account in IDBNY to JGJ's IDBNY Account; the payment from JDM's account to JGJ's IDBNY Account would be approved by Ashish.[128] Ashish also approved payments to be made from JGJ's IDBNY Account.[129]

115     The fact that Vikas took instructions from Amit/Nirav to prepare payment instructions and that Ashish could approve payments from JDM's and JGJ's accounts can only be explained if the parties were operating on the basis of the JV instead of the BA.

### *The JV was announced or made known to third parties*

116     On 15 January 2015, Amit sent the Kriss Brothers an email (copied to Nirav and Ashish), saying that they should start having a conversation on, among other things, how to "announce the JV to customers".[130]

117     On 30 January 2015, Amit sent an email to the Kriss Brothers, attaching draft announcements to customers and the industry.[131] The draft announcements referred to JDM having "tied up with … SRK in a Joint Venture", and to TJCI/SRK having "tied up with … Instock Programs and entered into a Joint Venture with them."

---

[128]     NE, 7 March 2023, at 107:6–108:20 and 109:23–110:7.

[129]     1 JCB 468; 2 JCB 539–540.

[130]     1 JCB 39.

[131]     1 JCB 49–50.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

118     In his AEIC, Amit asserted that while he used the term "joint venture", this was in fact a reference to the BA.[132] I do not believe Amit's assertion. His assertion is inconsistent with his own description of the draft announcement as one of the documents that was prepared in anticipation of the potential JV. Further, the contents of the draft announcement clearly did not reflect the terms of the BA (see [55] above).

119     On 18 February 2015, Amit sent an email to one Ms Stephanie Lawler informing her that "TJC and SRK group have recently entered into a joint venture with Instock programs".[133] Ms Lawler was from Zales, a major jewellery retailer that was also a client of the JDM Entities.

120     On 8 June 2015, one Julius Kassar from TJCNY wrote to Ms Rachel B Leinwand and Ms Jelena Stojanovic, stating that Instock and TJCNY "now are a merged company".[134] Ms Leinwand and Ms Stojanovic represented buyers who were customers of TJCNY.[135] Subsequently, Amit was copied in the chain of emails.[136] On 9 June 2015, Amit wrote to Ms Leinwand and Ms Stojanovic stating that "we have just recently entered into a joint venture with Instock".[137]

121     On 22 July 2015, Ashish sent an email to one George DeAngelis of "gilbertdisplays" stating: "In-stock & TJC Jewelry are now *one entity* – we will

---

[132]     Amit's AEIC in S 418, at para 12(c).

[133]     1 JCB 56.

[134]     1 JCB 302.

[135]     NE, 14 February 2023, at 180:7–11.

[136]     1 JCB 301.

[137]     1 JCB 300–301.

43

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

have a joint booth space next year" [emphasis added].[138] Amit was also copied on the email and he did not correct Ashish's email.

122    On 12 October 2016, a team comprising representatives from the JDM and SRK Entities (including Amit and Nirav) made a joint presentation to Signet Jewelers, which is one of the world's largest retailers of diamond jewellery. The PowerPoint presentation showed the logos of SRK, Instock Programs, MG Worldwide, and TJCI on the very first slide, and showcased these entities. In addition, one of the topics covered was "Corporate Organization / JV".[139]

123    Amit, Nirav and Rahul claimed that they had used the term "joint venture" or "JV" in their emails and documents loosely and that they meant to refer to the BA.[140] I find these claims too incredible to be believed. Further, as will be seen later, I find that the BA is a concoction (see [155] below).

### *Insurance policies were combined*

124    On 19 April 2016, Jim emailed Amit stating that JDM's insurance policy ("JDM's Jeweler's Block Policy") would now also cover routine consignment shipments from SRK to TJCNY; Amit confirmed the coverage value of US$10m.[141] Jim also liaised with the JDM Entities' insurers for credit insurance to add certain SRK and/or TJCI sales onto the portfolio from 2016 onwards.[142]

---

138    1 JCB 467.

139    4 JCB 464–524.

140    Amit's AEIC in S 418, at paras 12(c) and 13; Nirav's AEIC in S 418, at para 36; Rahul's AEIC in S 418, at para 24.

141    2 JCB 376–377.

142    2 JCB 380–386.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

125    Credit insurance was obtained on a combined policy basis for the JDM Entities and the SRK Entities, after Amit gave his approval on 8 January 2017, after having run it by Rahul.[143]

126    There was no reason for the combined policies or for Amit/Rahul to approve the same unless the parties were operating on the basis of the JV. Certainly, there was no reason for the combined policies under the purported BA.

### *Parties engaged Advaita Legal to draft a joint venture agreement*

127    The parties engaged a law firm in India, Advaita Legal, to prepare a joint venture agreement. On 30 June 2016, Advaita Legal sent an engagement letter to JGJ in which it stated that JGJ "ha[d] approached [Advaita Legal] for assistance in drafting a Joint Venture Agreement or a Shareholders' Agreement".[144]

128    On 19 July 2016, Advaita Legal sent the "first draft of the JV agreement" to Amit and Michael.[145] The draft agreement listed the Kriss Brothers, Amit, Nirav as "JV Parties" and JGJ as "the Company".[146] It is not clear why Advaita Legal listed the individuals but it is not disputed that the intention was for the entities (rather than the individuals) to be the parties to the JV.

---

[143]    5 JCB 359–360; 4 JCB 564–565; 56 AB 243.

[144]    3 JCB 205–213.

[145]    3 JCB 441–486.

[146]    3 JCB 449.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

***The Volume Rebate Agreements are consistent with the JV***

129    On 22 February 2017, Jim informed Vibhor, Amit and the Kriss Brothers that the then practice of "billing the NY entities at 90% of the sale price" was not sufficient to cover the expenses of the New York companies, and that they needed to "decide on how to recoup a significant amount of funds from [JGJ]" before JGJ's financials were presented to the accountant.[147] Jim also said that he had spoken to Sacks, who saw no problem in JGJ reporting a loss. As an interim measure, Jim proposed volume rebate agreements between the parties that would reduce the amounts that the JDM Entities had to pay JGJ.

130    By 27 February 2017, Volume Rebate Agreements had been signed between JGJ and JDM, MG Worldwide, AP Jewelry and TJCNY.[148]

131    On 1 March 2017, Vibhor sent an email to Jim; one of the points that he raised was his belief that the adjustment "will only be for the purpose of statutory filings in NY for accounting books and no effect will be given in the system inventory valuation, otherwise it may impact to our MIS profitability also".[149] "MIS" referred to the management information system.[150]

132    There was no reason for Jim to involve Vibhor and Amit on the intercompany billings between JGJ and the JDM Entities or the proposal to improve the bottom lines of the New York companies by charging operating expenses to JGJ, unless the parties were operating on the basis of the JV.

---

[147]    5 JCB 485–486.

[148]    5 JCB 484 and 488–495.

[149]    5 JCB 483.

[150]    NE, 15 February 2023, at 97:14–15.

46

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

133     Further, if SRK and TJCI were merely selling diamonds and diamond jewellery to JGJ, the Volume Rebate Agreements would surely have caused Amit concern since they negatively impacted JGJ's financial position and ability to make payment. Yet, Amit raised no objections to the Volume Rebate Agreements. In his oral testimony, Amit claimed not to be aware that the Volume Rebate Agreements resulted in credit notes being given to the JDM Entities and TJCNY.[151] I do not believe Amit's denial of knowledge. Jim's email dated 22 February 2017 (see [129] above) was addressed to Amit as well and Amit remained copied in the subsequent email chain.[152] Further, a Volume Rebate Agreement was also entered into with, and a credit note issued to, TJCNY. Amit must have been aware of this.

*Balance sheets were prepared on the basis of the JV*

134     On 2 May 2016, Vibhor sent Michael (copying Amit and Nirav) the following documents:[153]

(a)     An "Accounting Manual/Understanding description for JV Accounting As on 30-4-2015" (the "Accounting Manual").

(b)     A balance sheet template showing, among other things, capital balances of the parties.[154] The explanatory note in the Accounting Manual for the capital balances stated as follows:

> O. **Capital Balances:**
>
> Cash capital introduced as on 1st April 2015 will be taken as opening capital of Partners. Apart from that if

---

[151]     NE, 15 February 2023, at 40:23–41:1, 173:10–18.

[152]     5 JCB 483–486.

[153]     2 JCB 400–408.

[154]     2 JCB 408.

47

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

> any partner has introduced any capital in kind e.g. in assets/inventory mode then the opening capital will include the same for particular partner's capital. Both the capital accounts of Partners (SRK & JDM) will be adjusted with the below transactions happened during the period –
>
> …

135    The Accounting Manual recognised that contributions to capital could be in cash or by way of contributions in kind, *eg*, "assets/inventory".[155] The balance sheet template was intended to contain information relating to (among other things) capital balances. This template was used for various balance sheets that were circulated subsequently.[156]

136    On 6 July 2016, Vibhor sent Jim the balance sheets for "the JV entities" for his review.[157] The balance sheets included:

(a)    A "Consolidated Joint Venture Balance Sheet" as of 31 March 2016, which showed the capital balances of the "SRK Group" and the "JDM Group" at US$10,609,207.38 and US$22,908,945.38 respectively.

(b)    Balance sheets as of 31 March 2016 for entities within the "SRK Group" and the "JDM Group".

137    On 1 August 2016, Vibhor sent to Jim and Michael, copying Nirav and Vikas, the "Draft Consolidated MIS Balance Sheet as on 31 Mar 2016" and the balance sheets for the various entities, for Michael's and Jim's review.[158] The

---

[155]    Accounting Manual at "O".

[156]    See, *eg*, 3 JCB 626–638, 645, 647.

[157]    3 JCB 219–403.

[158]    3 JCB 623–4 JCB 114.

48

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

consolidated balance sheet shows the capital balances of the "SRK Group" and the "JDM Group" at USD2,416,091.30 and USD21,785,920.93 respectively.

138    On 12 May 2017, Vibhor sent updated estimated balance sheets of various entities as of 14 October 2016 to Vikas and Jim, copying Amit, Nirav and Michael.[159] Jim used these balance sheets to prepare a document titled "Equity Input to JV by Michael & David Kriss".[160] The document recorded the sum of US$7,744,446.60 being due to each of Michael and David.

139    On 11 September 2017, Vikas sent SRK's financial data (which he received from Amit/Nirav) to Michael for his review.[161] Nirav confirmed that the data was prepared by Mr Rajiv Shah ("Rajiv")) on his instructions.[162] Rajiv was SRK's CFO.[163] The attachments sent by Vikas comprised the following:

(a)    The opening balance sheet as of 1 April 2015 for TJCNY, TJCI and SRK, and transactions for the capital account during the period from 1 April 2015 to 21 August 2017.[164]

(b)    The balance sheet as of 31 August 2017 for TJCNY, TJCI, SRK and JGJ, and the transactions for the capital account during the period from 31 May 2017 to 21 August 2017.[165]

---

[159]    6 JCB 66–76.

[160]    6 JCB 68.

[161]    7 JCB 270–274.

[162]    NE, 17 February 2023, at 101:20–102:6.

[163]    Nirav's AEIC in S 418, at para 42.

[164]    7 JCB 273–274.

[165]    7 JCB 271–272.

49

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*                    [2024] SGHC 10

The balance sheets show the "capital balances" for each of the entities in both their regular accounts as well as their "B" books. Ajay Matta explained that the "B" books were in respect of cash trades that did not appear in the regular accounts.[166] Transactions for the capital accounts included capital injections and withdrawals/transfers. In particular, the capital injections confirm that the SRK Entities were injecting capital into the JV.

140     On 27 September 2017, Ajay Matta sent an email to Mr Anish Mehta ("Anish").[167] Anish was from BSR & Associates LLP ("BSR"), an external consultant firm engaged to provide tax and regulatory services (see [151] below). The subject of the email was "JV Summary Sheet". The documents attached to the email (the "JV Computations") included the following table:[168]

| PARTICULARS | $(IN MILLION) | BALANCE | |
|---|---|---|---|
| JGJ LOSS | -$6.00 | -$6.00 | |
| SRK GROUP PROFITS, NEED TO PAY JGJ-APPROX | $20.50 | $20.50 | |
| TJC NEED TO PAY JGJ | $4.00 | $24.50 | |
| JDM GROUP TO PAY JGJ | $18.00 | $42.50 | |
| SRK GROUP A/P     . | -$25.62 | $16.88 | |
| OTHER PAYABLE | -$0.53 | $16.35 | BALANCE BELONGS TO MBK/DMK |
| | | | |
| $538,405 1% STOCKING FEES TO BE EXCLUDED FROM CAPITAL | | | |

141     The fact that "SRK Group Profits" were to be paid to JGJ is proof that the parties were operating on the basis of the JV since the SRK Group was sharing its profits with JGJ. Also attached to the email was a computation of

---

166     NE, 10 March 2023, at 59:10–60:2.

167     7 JCB 306–310.

168     7 JCB 307.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

SRK's profits in its "A" and "B" books, of which a total amount of about US$20.5m was described as "JV Profit[s]".[169] This supported the amount of US$20.5m to be paid to JGJ from "SRK Group Profits" in the table above.

142     The deduction of US$25.62m attributed to "SRK Group A/P" meant that SRK Group's accounts payable were credited to the SRK Group as its contribution to the JV. I agree with JGJ's submission that this shows that SRK's goods were supplied as capital.

143     The table above shows that (according to the JDM Entities) a net balance of US$16.35m was due to the Kriss Brothers. Rajiv (SRK's CFO) made various adjustments to the computations and on 5 October 2017, Rajiv sent to Anish and Nirav the "final working along with reconciliation of profit claimed by JGJ group" and asked Anish to forward it "for their review".[170]

144     Rajiv's computations show a net balance amount of US$5.91m as "Balance belongs (sic) to SRK Group towards capital introduced".[171] Nirav confirmed that he added the words "Balance belongs to SRK Group towards capital introduced" and that this was the "capital balance for SRK".[172] Rajiv did not dispute the inclusion of "SRK Group Profits" or "SRK Group A/P" in the JV Computations. In fact, Rajiv reduced the amount of "SRK Group Profits" (payable to JGJ) from US$20.51m to US$17.19m. As discussed earlier, the fact that SRK Group profits were payable to JGJ is proof that the parties were

---

[169]     7 JCB 308.

[170]     7 JCB 315–318.

[171]     7 JCB 317.

[172]     NE, 17 February 2023, at 44:16–45:7.

51

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

operating on the basis of the JV, and the inclusion of SRK Group's accounts payable in the computations shows that SRK's goods were supplied as capital.

145     As requested by Rajiv, Anish forwarded Rajiv's computations to Ajay Matta, describing the computations as a "re-working of profit of JV".[173] Anish also explained that Rajiv's computations included (among other things) TJCI's losses, differences in exchange rates used, addition of closing stock, change in valuation of closing stock form book value to market value and "[c]apital introduction by Singapore JV Partner …".

146     Ajay Matta replied, enclosing his calculations which stated that the net amount payable to SRK was US$0.58m.[174]

147     The balance sheets and the JV Computations prove that the parties were operating on the basis of the JV. Nirav also confirmed that the JV Computations showed the amount that JDM had to pay to SRK "[f]or goods we supplied".[175] Nirav's evidence confirms that the goods supplied by SRK to JGJ were not meant to be paid as invoiced. Although Nirav claimed that the goods were supplied under the purported BA, he eventually conceded that the computations were not consistent with the purported BA.[176]

*Parties engaged KPMG's and BSR's services with respect to the JV*

148     On 20 January 2016, Amit sent an email to KPMG stating that he had discussed with Michael and David and they needed "help in inventory

---

[173]     13 JCB 437–441.

[174]     7 JCB 311–314.

[175]     NE, 17 February 2023, at 43:4–11.

[176]     NE, 17 February 2023, at 43:12–23.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

management process".[177] Amit asked KPMG for a proposal for inventory flow and management, including "[h]ow to separate old co inventory with new co" and processes to "easily identify and reconcile the inventory separately". As JGJ submits, this shows that the parties had merged their inventory and were seeking KPMG's help to properly account for the inventory that had been injected into the JV.

149      On 16 March 2016, Vibhor sent KPMG the names of the entities to be incorporated in the engagement letter.[178] These entities include the JDM Entities, the SRK Entities and JGJ (which the Kriss Brothers claim to be the parties to the JV) and Jewel-Lux Mfg. Group Co. Ltd ("Jewel-Lux"). Jewel-Lux was a factory in Bangkok that Michael used for research and development. According to Michael, Jewel-Lux was a contractor to the JV and was not a party to the JV.[179]

150      KPMG prepared a Management MIS Memo dated March 2016 (the "MIS Memo").[180] The contents of the MIS Memo are consistent with the JV. KPMG understood the collaboration to have been effective from 1 April 2015 and that the purpose of the collaboration was to "derive the benefit from all new sales effected during the year".[181] The MIS Memo also stated that "since each entity would add a markup and sell the inventory to the next entity, all the markup would need to be eliminated on the year-end inventory to show the

---

[177]      1 JCB 670.

[178]      2 JCB 178–179.

[179]      NE, 27 February 2023, at 58:18–59:7.

[180]      2 JCB 185–191.

[181]      Para 2 of the MIS Memo.

53

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

correct profit figures."[182] This is consistent with JGJ's case that all goods supplied by the SRK Entities and the JDM Entities pursuant to the JV were to be treated as capital in the JV and that for purposes of determining the net profits or losses under the JV, the goods supplied to the JV were to be valued at cost (see [51(c)] and [51(d)(ii)] above).

151     Amit and Michael asked BSR to (among other things) undertake a "jurisdiction evaluation of Hong Kong vis a vis Dubai in comparison to Singapore" and an "evaluation of shareholder structure of such proposed HK/Dubai Company". The evaluation of the shareholder structure was to include an evaluation as to whether the shareholder of the HK/Dubai company "should be US Shareholder directly or through existing Singapore/UK Company."[183]

152     On 25 October 2016, BSR sent to JGJ an engagement letter for tax and regulatory services.[184] Paragraph 2.1.2 of the letter described part of BSR's work as "undertaking jurisdiction analysis of the preferred jurisdiction (i.e. UAE and HK) considering the commercial and business aspect, in compare [*sic*] to Singapore JV structure". Michael's unchallenged explanation was that this was about a restructuring of the JV because SRK had a tax problem.[185]

---

[182]     Para 2.3 of the MIS Memo.

[183]     558 AB 671–672.

[184]     4 JCB 573–586.

[185]     NE, 28 February 2023, at 61:20–65:23.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*        [2024] SGHC 10

### *Amit appointed a CFO for the JV*

153    On 26 February 2016, Vibhor sent an email to various Instock personnel and Ashish to introduce himself.[186] In his email, Vibhor said he joined "TJC SEEPZ Mumbai" on 15 February 2016 as CFO. Amit testified that Vibhor was part of the team handling the back-office functions of JGJ and the JDM Entities.[187]

154    Amit claimed that it was Michael who hired Vibhor.[188] Michael testified that Vibhor was hired by Amit as CFO for the JV.[189] I accept Michael's version. It is more probable that Amit was the one who hired Vibhor. After all, although he handled the back-office functions, Vibhor was formally employed as CFO of SRK and he was paid by SRK. Further, in his email to the Kriss Brothers dated 25 August 2015, Amit had attached a draft of the roles and responsibilities of "KEY individuals of the JV". In that draft, one of Amit's roles was to appoint a CFO for the JV.[190]

### *The BA is a concoction*

155    I find that the BA is nothing more than a concoction by the SRK Entities.

156    First, SRK has adduced no evidence of when the negotiations for the BA took place. There is also no discussion of the BA or its terms in the correspondence between the parties. Amit tried to explain that he only started using the expression "business arrangement" after learning, as a result of S 418,

---

[186]    2 JCB 197.

[187]    NE, 14 February 2023, at 93:5–13; NE, 15 February 2023, at 82:1–83:8.

[188]    NE, 15 February 2023, at 82:5.

[189]    NE, 28 February 2023, at 55:24–56:20.

[190]    1 JCB 478–483 (at 480).

55

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

that the expression "joint venture" could have legal implications.[191] However, Amit's evidence does not explain why the correspondence between the parties referred to or were consistent with terms of the JV rather than terms of the purported BA.

157     Second, Rahul confirmed that the invoices issued by the SRK Entities were issued pursuant to the purported BA.[192] Yet, the demand letter dated 1 March 2018 from SRK's lawyers, K Ashar and Co, to JGJ for payment of the invoices made no mention whatsoever of the BA.[193]

158     Third, under the purported BA, SRK was to sell diamonds and diamond jewellery to JGJ and JGJ would in turn sell the same to companies controlled and/or owned by the Kriss Brothers (see [55(b)] above). Yet, in SRK's invoices, SRK was charging JGJ based on prices that were discounted against the end customer's selling prices.[194] In other words, SRK invoiced JGJ at prices discounted against the JDM Entities' selling price to their customers ("Sell-Minus Pricing"). This pricing approach is completely incompatible with the alleged BA, which involved a straightforward sale by SRK to JGJ. It is illogical that in a straightforward sale, SRK sell its goods to JGJ at prices that are discounted against the JDM Entities' selling price to their customers.

159     Fourth, the balance sheets show capital balances for the SRK Entities and the JDM Entities (see [134], [137], [139] above). There would have been no contributions to capital under the purported BA. The JV Computations show

---

[191]     NE, 14 February 2023, at 106:25–107:15.

[192]     NE, 21 February 2023, at 53:25–54:10.

[193]     7 JCB 395–404.

[194]     NE, 14 February 2023, at 34:1–5.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

that SRK's and TJCI's profits were to be shared with the JDM Entities (see [140]–[144] above). The purported BA would not have involved any such sharing of profits as Nirav also confirmed.[195]

160     Fifth, moving the back-office functions of JGJ and the JDM Entities to India to be handled by persons employed by TJCI did not make sense if the parties' relationship was just that of partners in the purported BA (see [102]–[106] above).

**Whether TJCNY was party to the JV**

161     I find that TJCNY was a party to the JV. I reject Ashish's claim that his role in the JV was purely to provide administrative assistance, mainly in (a) releasing payments from JGJ's IDBNY Account, (b) facilitating communication between the persons involved in the JV who were based in India and the US, and (c) miscellaneous matters on an ad-hoc basis.[196] The evidence does not bear out Ashish's claim.

162     First, it is not disputed that Ashish attended the meeting at the JDM Entities' office in New York in early January 2015. Ashish admitted that "to some extent" he was pulled into this meeting because the collaboration would involve TJCNY.[197]

163     Second, Ashish highlighted the fact that he was not copied on the email that attached the 13 January Memo.[198] Whilst technically true, it was misleading.

---

[195]     NE, 17 February 2023, at 33:12–15.

[196]     Ashish's AEIC in S 418, at para 42.

[197]     NE, 14 March 2023, at 41:24–42:6.

[198]     Ashish's AEIC in S 418, at para 29(a).

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

Amit intended to copy Ashish on the email but he forgot to include Ashish in the copy list. Ashish did receive a copy of the email two days later. On 15 January 2015, Amit sent a copy of the email containing the 13 January Memo to Ashish, saying that he "forgot to cc" Ashish.[199] Ashish admitted that Amit sent the 15 January Memo to him because it affected TJCNY.[200]

164     Third, in April 2015, TJCNY gave up its lease and moved its operations to the JDM Entities' premises. Ashish claimed that Amit requested him to make the move so that he could assist as and when required.[201] I find this unbelievable. Ashish was already in New York. He could have provided the alleged administrative assistance without moving TJCNY's operations to the JDM Entities' premises. I find it unbelievable that TJCNY would have done so if it was simply providing administrative assistance and was not a party to the JV.

165     Fourth, Ashish admitted that prior to the collaboration with JDM, TJCNY were competitors but after TJCNY moved to JDM's premises, they were no longer competitors; TJCNY and the JDM Entities would not compete with each other in going after the same customers.[202] The degree of collaboration between TJCNY and the JDM Entities shows that TJCNY was a party to the JV.

166     Fifth, Ashish's involvement was more than just administrative:

(a)     Ashish was authorised to approve payments to be made from JDM's and JGJ's accounts in IDBNY (see [114] above).

---

[199]     1 JCB 41–44.

[200]     NE, 14 March 2023, at 42:12–14.

[201]     Ashish's AEIC in S 418, at para 37.

[202]     NE, 14 March 2023, at 42:18–43:2, 44:17–45:23.

58

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

(b)      In his email dated 30 January 2015, Amit sought feedback on a proposed announcement about the JV to customers and the industry.[203] Ashish was one of those whom Amit sought feedback from.

(c)      On 1 July 2015, Amit sent an email to various Instock personnel instructing them to copy Ashish in "*all* communications between India and NY" [emphasis added].[204] Ashish's involvement could not have been just to facilitate communications.

(d)      On 4 August 2015, Amit instructed Ashish to streamline a list of work/processes in New York as soon as possible.[205] The list included determining whether certain work processes in New York could be handled by the team in India and streamlining pricing and quotes from customers. These were clearly not administrative in nature.

167      Sixth, on 1 August 2016, Vibhor sent draft balance sheets of various entities (including JGJ, SRK, TJCI and *TJCNY*) as at 31 March 2016 to Jim and Michael for their review; Nirav and Vikas were copied.[206] In addition, in September 2017, Vikas received SRK's financial data from Amit/Nirav; the data included data relating to *TJCNY* (see [139] above). The fact that TJCNY's balance sheet and financial data were included shows that TJCNY was part of the JV.

---

[203]      1 JCB 49–50.

[204]      1 JCB 306.

[205]      1 JCB 469.

[206]      3 JCB 623–709; 4 JCB 23–114.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

168     Seventh, *David* and Amit decided on the commission structure of Julie Kassar who was an employee of TJCNY.[207] Julie Kassar also asked Amit and *David* for more accounts to work with.[208]

169     Eighth, TJCNY was one of the entities that signed a Volume Rebate Agreement with JGJ in February 2017 (see [130] above). The Volume Rebate Agreement reduced the amount that TJCNY had to pay JGJ. If TJCNY was not party to the JV, TJCNY's profitability would not have been of any concern to Jim and there would have been no reason for Jim to include TJCNY in the arrangement involving the volume rebates.

170     Ninth, TJCNY entered into a Consignment Agreement with Sherwood Management Co. Inc ("Sherwood") in July 2017. Although Ashish signed the agreement on behalf of TJCNY, it was Jim who sent the agreement to Sherwood for Sherwood's signature, with the comment that all the changes that Sherwood requested had been incorporated.[209] Jim's involvement shows that TJCNY was a party to the JV.

171     Tenth, the JV needed TJCNY because TJCNY had customers in the US who were not customers of the JDM Entities. TJCNY had vendor numbers with clients that the JDM Entities did not have, such as Fred Meyer which was one of the prominent retailers in the jewellery business.[210] As such, with TJCNY's involvement, the JV could sell to Fred Meyer.[211]

---

[207]     5 JCB 339–341.

[208]     5 JCB 340.

[209]     6 JCB 314–323.

[210]     NE, 14 March 2023, at 58:12–17.

[211]     NE, 2 March 2023, at 23:3–6.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

**Whether there was a legally enforceable JVA**

172    I have found that the collaboration between the JDM Entities and the SRK Entities was on the basis of the JV. However, in my judgment, JGJ has failed to prove that there was a legally enforceable JVA because:

(a)    JGJ has failed to prove that the JV/JVA was entered into on 13 January 2015 as pleaded;

(b)    JGJ has failed to prove material terms of the JVA as pleaded; and

(c)    There was no agreement on the manner in which the JV's profits were to be distributed.

*JGJ fails to prove that the JV/JVA was entered into on 13 January 2015 as pleaded*

173    In its defence and counterclaim, JGJ pleaded that the JV was entered into between the SRK Entities, the JDM Entities *and JGJ* "in or around the first quarter of 2015".[212] In particulars served pursuant to an order of court, JGJ then pleaded that the JV was entered into on 13 January 2015 and confirmed via Amit's email dated 13 January 2015 attaching the 13 January Memo.[213]

174    In my judgment, JGJ has failed to prove its pleaded case that the JV/JVA (which included JGJ as one of the parties) was concluded on 13 January 2015. First, the JV/JVA could not have been entered on 13 January 2015 because JGJ was incorporated only on 31 March 2015.

---

[212]    S 418 D&CC, at para 10.

[213]    Particulars served pursuant to Order of Court dated 12 January 2021 in S 418, answer to question 3.

61

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

175     Second, the 13 January Memo (which JGJ relies on) does not show that an agreement had been concluded as of 13 January 2015. The 13 January Memo referred to its contents as "suggested … key points" and "guidelines" and invited the Kriss Brothers to "make suggestions". In particular, the "legal framework of the companies" had not been concluded and was to be decided after consulting lawyers. Further, all "current salaries & expenses [were] to be relooked & renegotiated".[214] I agree with SRK that at best, the 13 January Memo recorded an agreement to agree, which is not legally enforceable.

176     Third, JGJ claims that the agreed terms of the JV/JVA included terms to the effect that (a) goods supplied by the SRK Entities or the JDM Entities pursuant to the JV would be treated as capital in the JV, and (b) invoicing would be based on "cost-plus pricing".[215] However, there is nothing in the 13 January Memo reflecting these terms.

177     Fourth, JGJ's pleaded case is that one of the terms of the JV/JVA was that the parties would invoice for goods supplied pursuant to the JV at "Cost-Plus Pricing", which included "some profit". However, Michael's oral testimony was that the parties agreed on the inclusion of "some profit" after 13 January 2015.[216]

178     Fifth, as of 23 January 2015, the legal composition of the JV had not yet been finalised. It was one of the items to be discussed and finalised during the Kriss Brothers' visit to Mumbai on 27–28 January 2015 (see [70] above).

---

[214]     1 JCB 35–36.

[215]     S 418 D&CC, at para 10(2)(c).

[216]     NE, 27 February 2023, at 47:17–24.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

179     Sixth, under cross-examination, both Michael and David testified that the JV was concluded only after JGJ was incorporated on 31 March 2015.[217]

*JGJ's application to amend its pleadings*

180     On 21 March 2023, JGJ indicated that it intended to apply to amend its pleadings in relation to the date of the JV and confirmed that the amendments would be based on the witness testimonies that had been given. I heard the application on 27 March 2023. Essentially, the proposed amendment sought to plead that the "formation of the [JV] and [JVA] were concluded between the SRK Entities, the JDM Entities and JGJ on 31 March 2015".[218]

181     The distinction sought to be drawn between the formation of the JV and the JVA was dubious. It cannot be said that the JV was binding unless there was a binding JVA. Leaving that aside, I agree with SRK and the counterclaim defendants that it was far too late in the day for the amendments and dismissed JGJ's application. In their opening statement on the very first day of trial, SRK and the counterclaim defendants emphasised that the burden was on JGJ to establish its pleaded case that the JV was entered into on 13 January 2015.[219] JGJ did not seek to amend its case then. Instead, it let SRK and the counterclaim defendants proceed with the trial on the basis of its case as pleaded. SRK and the counterclaim defendants adduced their evidence and cross-examined JGJ's witnesses on that basis. Allowing JGJ's amendment at such a late stage would have prejudiced SRK and the counterclaim defendants.

---

[217]     NE, 2 March 2023, at 141:15–23; NE, 6 March 2023, at 16:4–18:22.

[218]     Letter dated 22 March 2023 from JGJ's lawyers (LVM Chambers) to the Court.

[219]     NE, 14 February 2023, at 35:22–36:2.

182     Further, JGJ's amendment application testified to the lack of clarity on JGJ's part as to when the JV/JVA was entered into.

### JGJ failed to prove material terms of the JV as pleaded

183     Regardless of the date that the JV was entered into, JGJ also failed to prove two of the material terms that JGJ alleged had been agreed.

184     JGJ's pleaded case is that the material terms of the JV included the following:

(a)     The goods supplied pursuant to the JV would be invoiced at "Cost-Plus Pricing", *ie*, "the cost price of the goods plus *a specified mark-up* required to cover any other costs including marketing, duties and taxes, and *some profit*" [emphasis added].[220] At the end of each year, a "full accounting reconciliation" of the JV would be conducted, "which would involve and require, *inter alia*, adjusting (where necessary and appropriate) the aggregate value of the goods supplied … to correctly/accurately reflect the Cost-Plus Pricing".[221]

(b)     Goods supplied by the SRK Entities and the JDM Entities were to be valued at cost for the purposes of their respective equity contributions to the JV.[222]

185     With respect to the invoicing, JGJ has failed to prove what was the "specified mark-up" or "some profit" that had been agreed, if at all. Yet, these

---

[220]     S 418 D&CC, at para 10(2)(c).

[221]     S 418 D&CC, at para 10(2)(d).

[222]     S 418 D&CC, at para 10(2)(e).

64

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

were necessary to determine what the Cost-Plus Pricing was and for the full accounting reconciliation to be conducted.

186     Further, Michael testified that the parties agreed that the goods would be invoiced based on Sell-Minus Pricing, more specifically, at a 19% discount off the final selling price of the goods and that the discount would be adjusted regularly.[223] This was very different from Cost-Plus Pricing.

187     As for the valuation of the goods supplied for the purposes of the parties' equity contributions to the JV, Michael testified that only the goods supplied by SRK were valued at cost for this purpose; the JDM Entities had a "build-up of inventory …, so cost wasn't relevant" and "[m]arket became cost".[224] Again, this was different from what had been pleaded.

### No agreement on manner in which profits would be distributed

188     No agreement has been reached on the manner in which the profits made by the JV would be distributed to the JV entities. Given the structure of the JV, this was not a straightforward matter.

189     Goods supplied by the SRK Entities to the JDM Entities via JGJ had to be recorded in the respective entities' books as sales by the SRK Entities to JGJ and by JGJ to the JDM Entities. Each entity's book would reflect its own profit and loss. However, for purposes of the JV, the supply of goods by the SRK Entities was to constitute their contributions towards the capital of the JV and profits made by the JV entities were to constitute profits of the JV.

---

[223]     NE, 2 March 2023, at 38:16–40:1.

[224]     NE, 27 February 2023, at 32:22–33:9.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

190    The manner of distributing the JV profits to the JV entities involved tax and regulatory considerations. This is supported by the fact that in February 2016, Amit and Michael sought professional tax and regulatory advice on the distribution of profits by the JV.[225] Michael also confirmed that JGJ was a "place to keep the profits" for tax reasons and that accountants were hired to "figure out exactly the book transactions" for the JV profits to be distributed through JGJ.[226]

191    Tax was clearly an important consideration for the parties. In October 2016, Michael and Amit (representing JGJ) again sought professional tax and regulatory advice, this time involving an evaluation of the United Arab Emirates and Hong Kong as potential preferred jurisdictions compared to Singapore.[227] The analysis was to include:

(a)    withholding implications for payments to shareholders and availability of foreign tax credits for taxes withheld by the customer/subsidiary;

(b)    transfer pricing regulations;

(c)    tax analysis from the perspective of shareholders from the US, Singapore and UK; and

(d)    tax and regulatory implications for transactions between US entities and the JV company.

---

[225]    2 JCB 24–31.

[226]    NE, 2 March 2023, at 160:16–20; NE, 28 February 2023, at 18:3–8.

[227]    4 JCB 573–586.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

192     Clearly, the manner of distribution of the JV's profits was a material term of the JV/JVA since it involved tax and regulatory considerations. However, it is also clear that how this was to be done had not been worked out, much less agreed.

**Whether JGJ has standing to enforce the JVA**

193     As the JVA is not legally enforceable, the question of JGJ's standing to enforce the JVA does not arise. In any event, it would appear that JGJ cannot enforce the JVA because it is not a party to it. JGJ's pleaded case is that the JVA was entered into on 13 January 2015; JGJ could not have been a party to the JVA then. JGJ's pleaded case does not state how or when it subsequently became a party to the JVA.

**What is JGJ's liability and/or claim in respect of the 23M Invoices, 42M Invoices and 2.2M Invoices**

*No agreement to pay the invoiced amounts*

194     I have found that the collaboration between the SRK Entities and the JDM Entities was on the basis of the JV. Under the terms of the JV/JVA,

> (a)     goods supplied by the parties pursuant to the JV would be treated as equity contributions to the JV and valued at cost for this purpose; and

> (b)     the invoices were not intended to create any liability to pay on the invoices.

195     It follows from the above that there was no agreement by JGJ to pay for the goods supplied by SRK and TJCI based on the amounts stated in the 23M Invoices, 42M Invoices or 2.2M Invoices. The amounts on the invoices were to comply with tax and regulatory requirements (including transfer pricing). My

67

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

finding that there was no legally enforceable JVA means that JGJ cannot rely on its defence that it is not liable to pay on the invoices until either the Termination Settlement Exercise or the Accounting Reconciliation has been concluded. However, it does not change the fact that there was no agreement by JGJ to pay the invoice amounts.

196     My finding that there was no agreement to pay the invoiced amounts is supported by Vikas' testimony. Vikas (who was employed by TJCI as the accountant for the JV) testified that he was not concerned about the due dates on invoices issued by the SRK Entities because he acted on requests from Amit; the invoices were the "mechanisms for the transfer of funds from one JV party to other JV party."[228] Vikas' testimony supports JGJ's case that JGJ had no legal obligation or liability to pay on the invoices and that SRK had no expectation of receiving payment under the invoices. Using the invoices in this manner was both convenient and practical since the payment to SRK had to be recorded in both JGJ's and SRK's books.

197     Counsel for SRK and the counterclaim defendants prepared a table setting out various requests for payment and matching the payments (made pursuant to each request) to the 42M Invoices ("Exhibit P6"). In my view, Exhibit P6 supported Vikas' evidence that payments were made to SRK based on requests for funds and that the invoices were the "mechanisms for the transfer of funds".

198     First, there were several requests by SRK for funds from JGJ for the express and specific purpose of *purchasing gold*. Payments were then made pursuant to these requests, purportedly as payment of invoices. It is clear that

---

[228]     NE, 7 March 2023, at 117:17–23.

68

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

the invoices were just the mechanism by which the payments for the purchase of gold were effected.

(a)   A request was made on 28 June 2016 for the amount of US$270,000.[229] This amount was paid to SRK on 29 June 2016, purportedly as payment in full of two invoices dated 4 and 7 December 2015, and as part-payment of two invoices dated 4 and 8 December 2015.[230]

(b)   A request was made on 31 August 2016 for the amount of US$400,000.[231] This amount was paid on 1 September 2016, purportedly as payment in full of two invoices dated 8 and 12 January 2016, and as part-payment of two invoices dated 30 December 2015 and 15 January 2016.[232]

(c)   A request was made on 8 September 2016 for the amount of US$290,000.[233] This amount was paid on 9 September 2016, purportedly in part-payment of an invoice dated 15 January 2016.[234]

(d)   A request was made on 13 September 2016 for the amount of US$500,000.[235] This amount was paid on 14 September 2016, purportedly as part-payment of an invoice dated 15 January 2016 (which had been part-paid on 9 September 2016 – see (c) above) and an invoice

---

[229]   3 JCB 197; Exhibit P6, PR Ref A13.

[230]   Exhibit P6, s/n 23–26.

[231]   4 JCB 264; Exhibit P6, PR Ref A16.

[232]   Exhibit P6, s/n 37–40.

[233]   4 JCB 405; Exhibit P6, PR Ref A17.

[234]   Exhibit P6, s/n 40.

[235]   4 JCB 426; Exhibit P6, PR Ref A18.

69

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*        [2024] SGHC 10

dated 22 January 2016, and payment in full of two invoices dated 18 and 22 January 2016.[236]

(e)      A request was made on 30 January 2017 for the amount of US$310,558.48.[237] This amount was paid on the same day, purportedly as part-payment of an invoice dated 3 May 2016.[238]

199    Second, Exhibit P6 also shows that there were several requests by SRK to JGJ for payment of lump sums that were in round numbers and had no direct link to any invoice. Payment was again then made pursuant to these requests, purportedly as payment of invoices. For example:

(a)      A request was made on 5 May 2015 for the amount of US$100,000.[239] This amount was paid on 6 May 2015, purportedly as payment in full of an invoice dated 27 October 2015, and as part-payment of an invoice dated 30 October 2015.[240]

(b)      A request was made on 18 August 2016 for the amount of US$450,000.[241] This amount was paid on 20 August 2016, purportedly as payment in full of two invoices dated 21 December 2018, and as part-payment of two invoices dated 18 and 30 December 2015.[242]

---

[236]      Exhibit P6, s/n 40–41 and 43–44.

[237]      5 JCB 383; Exhibit P6, PR Ref A34.

[238]      Exhibit P6, s/n 82.

[239]      2 JCB 412; Exhibit P6, PR Ref A8.

[240]      Exhibit P6, s/n 13–14.

[241]      4 JCB 237; Exhibit P6, PR Ref A15.

[242]      Exhibit P6, s/n 34–37.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

(c)      A request was made on 17 November 2016 for the amount of US$700,000.[243] This amount was paid on 18 November 2016, purportedly as payment in full of three invoices dated 23, 23 and 24 February 2016, and part-payment of two invoices dated 19 and 26 February 2016.[244]

(d)      A request was made on 27 April 2017 for an amount of US$585,000.[245] This amount was paid on 27 April 2017, purportedly as payment in full of two invoices dated 16 and 19 August 2016, and part-payment of an invoice dated 19 August 2016.[246]

200      Third, if payments made by JGJ to SRK were truly payment of outstanding invoices, one would expect that the invoices would be paid in chronological order, *ie*, older invoices would be paid first. However, Exhibit P6 shows that the invoices selected for payment pursuant to requests for funds were not always selected in chronological order. Exhibit P6 shows the following:

(a)      An amount of US$170,781.92 was paid on 30 September 2015,[247] purportedly as payment in full of an invoice dated 18 September 2015.[248] An earlier unpaid invoice dated 15 September 2015 was ignored.[249] The earlier invoice was subsequently purportedly paid on

---

[243]      4 JCB 628; Exhibit P6, PR Ref A25.

[244]      Exhibit P6, s/n 54–58.

[245]      5 JCB 597; Exhibit P6, PR Ref A50.

[246]      Exhibit P6, s/n 121–123.

[247]      14 AB 528; Exhibit P6, PR Ref A129.

[248]      Exhibit P6, s/n 2.

[249]      Exhibit P6, s/n 1.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

15 October 2015 using part of the funds transferred pursuant to a request made on 14 October 2015 for the amount of US$30,619.05.[250]

(b)    On 15 October 2015, the balance of the funds transferred pursuant to the request made on 14 October 2015 (see (a) above) was paid purportedly as payment in full of an invoice dated 13 October 2015.[251] Five earlier unpaid invoices were ignored.[252] These earlier invoices were subsequently purportedly paid between 26 February 2016 and 6 April 2016 using funds transferred pursuant to requests made between 25 February 2016 and 5 April 2016.[253]

(c)    A request was made on 17 March 2016 for the amount of US$252,564.66.[254] On 18 March 2016, part of this amount was paid purportedly as payment in full of an invoice dated 23 November 2015.[255] Several earlier unpaid invoices dated between 9 October 2015 and 20 November 2015 were ignored.[256] These earlier invoices were subsequently purportedly paid between 23 March 2016 and 9 June 2016 using funds transferred pursuant to requests made between 22 March 2016 and 8 June 2016.[257]

---

[250]    1 JCB 522; Exhibit P6, PR Ref A1 and s/n 1.

[251]    Exhibit P6, s/n 8.

[252]    Exhibit P6, s/n 3–7.

[253]    Exhibit P6, PR Ref A2–A5 and s/n 3–7.

[254]    2 JCB 329; Exhibit P6, PR Ref A3.

[255]    Exhibit P6, s/n 20.

[256]    Exhibit P6, s/n 7, 9–19.

[257]    Exhibit P6, PR Ref A4–A11 and s/n 7, 9–19.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

201     The 23M Invoices (which SRK is seeking payment of in S 418) include invoices dated in 2016. Exhibit P6 shows that payments of the 42M Invoices, include payments of invoices that were dated in 2017.[258] Again, this shows that invoices were not selected for payment chronologically.

202     The manner in which payments were made purportedly as payment of invoices confirms Vikas' testimony that the invoices were just the mechanism for the transfer of funds to SRK.

### SRK's and TJCI's claim for payment of reasonable compensation

203     Both SRK and TJCI submit, in the alternative, that they are entitled to reasonable compensation for the goods that they have supplied. There is no dispute that the goods under the 23M Invoices, 42M Invoices and 2.2M Invoices were received and there is also no dispute over the quality of the goods. In this regard, SRK and TJCI plead a claim in "restitutionary *quantum meruit*".[259]

204     For the following reasons, I find that SRK and TJCI succeed in their claims for payment of reasonable compensation.

205     The basis for recovery under a claim based on restitutionary *quantum meruit* is that of unjust enrichment. The claimant must show the following three things: (a) a benefit had been received or the defendants had been enriched; (b) this benefit or enrichment was at his expense; and (c) the enrichment was "unjust". If these three elements are satisfied, the further question to consider is

---

[258]     Exhibit P6, s/n 735–753.

[259]     S 418 SOC, at paras 9–11; 2nd and 7th defendants in counterclaim's Defence to Counterclaim and 2nd defendant in counterclaim's Counterclaim to Defendant's Counterclaim (Amendment No 3) in S 418 ("S 418 CC – 2D&7D Def & 2D CC"), at para 24B; SRK and others' Aide-Memoire for Oral Closing Submissions, at para 24.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*                [2024] SGHC 10

whether there are any defences to the claim: *Higgins, Danial Patrick v Mulacek, Philippe Emanuel and others and another suit* [2016] 5 SLR 848 at [54]; *Eng Chiet Shoong and others v Cheong Soh Chin and others and another appeal* [2016] 4 SLR 728 at [33]. Unconscionability, or a general reference to unconscionability, is neither the test for unjust enrichment nor an unjust factor. There is no freestanding claim in unjust enrichment on the abstract basis that it is "unjust" for the defendant to retain the benefit – there must be a particular recognised unjust factor or event which gives rise to a claim: *Wee Chiaw Sek Anna v Ng Li-Ann Genevieve (sole executrix of the estate of Ng Hock Seng, deceased) and another* [2013] 3 SLR 801 ("*Wee Chiaw Sek Anna*") at [100] and [134]. The list of "unjust factors" includes: mistake, duress, undue influence, failure of consideration/basis, and illegality: *Wee Chiaw Sek Anna* at [132]–[133]. The categories of unjust enrichment are not closed, but the courts are generally cautious not to recognise new grounds of recovery too freely: *Singapore Swimming Club v Koh Sin Chong Freddie* [2016] 3 SLR 845 at [93].

206     During its oral opening, JGJ accepted that if the JVA is not legally enforceable and there was no agreement to pay the prices as invoiced, then it would be liable for the reasonable value of the goods subject to its claim for "counter restitution", *ie*, recovery of the excess paid on the 42M Invoices.[260]

207     However, in its closing submissions, JGJ takes a different position and submits that SRK's claim in unjust enrichment fails for the following reasons:

        (a)     JGJ was not enriched as JGJ never received the goods;[261]

---

[260]        NE, 14 February 2023, at 37:5–23.

[261]        JGJ's Closing Submissions, at paras 381–382.

74

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

(b)      SRK and TJCI have failed to plead and prove a valid unjust factor;[262]

(c)      SRK and TJCI are estopped from seeking recovery under unjust enrichment;[263]

(d)      JGJ has *bona fide* changed its position;[264]

(e)      JGJ is entitled to counter-restitution;[265] and

(f)      SRK and TJCI have come to court with unclean hands.[266]

208     I disagree with JGJ's submissions and find that SRK and TJCI have valid unjust enrichment claims in respect of the goods supplied under the 23M Invoices and the 2.2M Invoices respectively.

*JGJ was enriched at the expense of SRK and TJCI*

209     I reject JGJ's submission that it was not enriched as it never received the goods.

(a)      This was not part of JGJ's pleaded case.[267]

(b)      The thrust of JGJ's argument is that the goods were shipped directly to the JDM Entities and TJCNY. I agree with SRK and TJCI

---

[262]    JGJ's Closing Submissions, at paras 374–380.

[263]    JGJ's Closing Submissions, at paras 173, 383.

[264]    JGJ's Closing Submissions, at paras 173, 384.

[265]    JGJ's Closing Submissions, at paras 386–388.

[266]    JGJ's Closing Submissions, at para 389.

[267]    NE, 27 April 2023, 72:7–10.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*        [2024] SGHC 10

that this is a "technical" argument,[268] and the whole three-way arrangement must be looked at as a whole. The arrangement involved a sale by SRK/TJCI to JGJ and a corresponding sale by JGJ to the JDM Entities and TJCNY. JGJ invoiced the JDM Entities and TJCNY for the goods at a profit. The goods were shipped directly to the JDM Entities and TJCNY with JGJ's agreement. In my view, JGJ did receive a benefit from or was enriched by the arrangement. Whether the JDM Entities and TJCNY have paid JGJ is irrelevant.

210    JGJ's enrichment from the goods delivered under the 23M Invoices and the 2.2M Invoices was clearly at the expense of SRK and TJCI since they have not received any compensation.

*The "unjust factor"*

211    SRK and TJCI have pleaded "total and/or partial failure of consideration" as the "unjust factor".[269] The core underlying idea of failure of consideration as an unjust factor is simple: benefit has been conferred on the joint understanding that the recipient's right to retain it is conditional. If the condition is not fulfilled, the recipient must return the benefit. The inquiry thus has two parts: first, what was the basis for the transfer in respect of which restitution is sought; and second, did that basis fail? See *Benzline Auto Pte Ltd v Supercars Lorinser Pte Ltd and another* [2018] 1 SLR 239 at [46]. Where an agreement is reached under which an individual provides money and services in return for a legal but unenforceable promise which the promissor, after the money has been paid and the services provided, refuses to carry out, the

---

[269]    S 418 SOC, at para 9; S 418 CC – 2D&7D Def & 2D CC, at para 24B.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

individual would be entitled to a restitutionary remedy. The consideration in return for which the money was paid and the services were provided would have wholly failed: *Yeoman's Row Management Ltd and another v Cobbe* [2008] UKHL 55 at [43]; *MacInnes v Gross* [2017] EWHC 46 (QB) ("*MacInnes*") at [79], [168]. In *MacInnes*, the court found that the terms of the alleged contract were both too complex and too uncertain to be enforceable and there was no agreement on the critical issue as to the nature of the claimant's remuneration; yet, there was a possible claim in unjust enrichment on a *quantum meruit* basis against the defendant that benefited from the claimant's services.

212   In the present case, I have found on the available evidence that the parties did conduct themselves on the basis of the JV (see [63] above). SRK and TJCI supplied the goods to JGJ, by way of direct shipment to the JDM Entities and TJCNY, on the basis of the JV. As I have found that the JVA is unenforceable (see [172] above), the basis for the supply of the goods has failed. Therefore, I find and hold that there was total failure of consideration.

213   I turn next to the defences raised by JGJ.

*Defence of estoppel*

214   JGJ contends that SRK and TJCI are estopped from seeking recovery under unjust enrichment. JGJ's pleaded case is that:[270]

---

[270]   S 418 D&CC, at para 15F; Reply to 2nd and 7th defendants in counterclaim's Defence to Counterclaim and 2nd defendant in counterclaim's Counterclaim to Defendant's Counterclaim (Amendment No 2) in S 418 ("S 418 Reply to 2CCD&7CCD Def & 2CCD CC"), at para 17.

77

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

(a)     SRK and TJCI did not demand payment of the invoices as and when they fell due but treated the goods supplied under the invoices as the SRK Entities' equity contribution to the JV;

(b)     by their conduct SRK and TJCI represented to JGJ that the invoices issued would not create any liability on the part of JGJ to make payment;

(c)     in reliance thereon, JGJ dealt with the goods on the premise that there was a joint venture between the SRK Entities, the JDM Entities and JGJ, and the goods were shipped directly to the JDM Entities and TJCNY.

215    To successfully raise the defence of estoppel by representation, three elements must be satisfied: representation, reliance and detriment: *United Overseas Bank Ltd v Bank of China* [2006] 1 SLR(R) 57 at [18]. It must be demonstrated that a party was encouraged to act to his detriment by the representation such that it would be unconscionable for the party making the representation to insist upon his strict legal rights: *Yokogawa Engineering Asia Pte Ltd v Transtel Engineering Pte Ltd* [2009] 2 SLR(R) 532 at [18].

216    In my view, JGJ's defence of estoppel fails. The parties had simply conducted themselves on the basis of the JVA, which now turns out to be legally unenforceable. The alleged representation (that the invoices would not create a liability to pay) was a term of the JVA and reflected the parties' common understanding of their relationship. It was not a representation by SRK and/or TJCI. The fact that the JVA is not legally enforceable cannot turn a mutually agreed term in the JVA into a representation by SRK and/or TJCI.

78

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

*Defence of change of position*

217     JGJ contends that it had *bona fide* changed its position. JGJ argues that it dealt with the goods supplied under the 23M Invoices and 2.2M Invoices on the basis of the JV/JVA and as such, it did not receive or retain any payment or other benefit for the goods supplied under the 23M Invoices and 2.2M Invoices, which it would otherwise have had if it were or were regarded as the seller of the said goods.[271]

218     To rely on the *bona fide* change of position defence, the following requirements must be met: (a) the person enriched had changed his position; (b) the change was *bona fide*; and (c) it would be inequitable to require the person enriched to make restitution: *Management Corporation Strata Title Plan No 473 v De Beers Jewellery Pte Ltd* [2002] 1 SLR(R) 418 at [35].

219     In my view, JGJ's defence of change of position also fails. JGJ did not change its position; it merely conducted itself on the basis of the JVA. The fact that the JVA is now found to be legally unenforceable cannot mean that JGJ has therefore changed its position. In any case, it is *not* inequitable to require JGJ to make restitution. SRK and TJCI supplied the goods pursuant to the JVA and JGJ had the benefit of the goods. The JVA is now found to be legally unenforceable. It accords with good sense and equity that JGJ should compensate SRK and TJCI a reasonable amount for the goods. Indeed, it would be inequitable otherwise.

---

[271]     S 418 D&CC, at para 15G; S 418 Reply to 2CCD&7CCD Def & 2CCD CC, at para 18.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

*Defence of counter-restitution*

220    JGJ contends that it is entitled to counter-restitution in that:

(a)    SRK is liable to make counter-restitution to JGJ for the benefits that SRK received under the 42M Invoices;[272] and

(b)    SRK and/or TJCI are liable to make counter-restitution for (i) the benefits that the SRK Entities received pursuant to withdrawals made from the JV's Capital Accounts, and/or (ii) any payments or set-offs to be made by/to each of the parties to the JV.[273]

221    JGJ refers to *School Facility Management Ltd and others v Governing Body of Christ the King College and another (Nos 1 & 2)* [2021] 1 WLR 6129 (at [83]–[84]) in support of its submission that the counter-restitution principle operates as a defence to a claim for unjust enrichment where the benefits enjoyed by the claimant are sufficient closely connected with the benefits provided to, and which are sought to be recovered from the defendant, such that justice requires those benefits to be taken into account and credit given for them by the claimant in its claim against the defendant.[274] I agree with the principle.

222    JGJ has paid SRK on the 42M Invoices. However, JGJ's liability to SRK under the 42M Invoices would be for a reasonable amount for the goods supplied under those invoices, similar to its liabilities under the 23M Invoices and the 2.2M Invoices. I agree with JGJ that SRK is liable to make counter-

---

[272]    S 418 D&CC, at para 15H(a).

[273]    S 418 D&CC, at para 15H(b)–(c); S 418 Reply to 2CCD&7CCD Def & 2CCD CC, at para 19.

[274]    JGJ's Closing Submissions, at para 386.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

restitution to JGJ for the amount that SRK has received from JGJ under the 42M
Invoices that exceeds what the reasonable amount should be.

223     I reject JGJ's claim for counter-restitution of withdrawals made by the
SRK Entities from the JV's Capital Accounts. JGJ has not shown what these
withdrawals are and how justice requires these to be taken into account.

224     I also reject JGJ's claim for counter-restitution of payments or set-offs
by/to each of the JV parties. JGJ has also not shown what these are and how
justice requires that they be taken into account. In addition, it seems to me that
this is tantamount to enforcing the JVA, which I have found to be legally
unenforceable.

*Defence of unclean hands*

225     JGJ submits that given its equitable origins, a claim in unjust enrichment
can be defeated if the claimant comes to court with unclean hands.[275] The
submissions before me on this point are thin. In any case, assuming such a
defence is available, I disagree with JGJ's allegation that SRK and TJCI have
come to court with unclean hands. JGJ argues that SRK's and TJCI's pleadings
paint a false narrative of a simple customer-supplier relationship. In my view,
my finding that the BA is a concoction is insufficient reason for a finding that
SRK and TJCI have come to court with unclean hands.

**Expert Calculations in respect of the 23M Invoices, 42M Invoices and 2.2M
Invoices**

226     Having determined that SRK and TJCI are entitled to payment of
reasonable amounts for the goods supplied under the 23M and 2.2M Invoices

---

[275]     JGJ's Closing Submissions, at para 389.

81

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*                    [2024] SGHC 10

respectively, and that JGJ is entitled to counter-restitution in respect of the 42M Invoices, the next question is what are the reasonable amounts payable under these invoices?

227     The starting point in valuing the enrichment is the objective market value, or market price: *Benedetti and another v Sawiris and others* [2014] AC 938 ("*Benedetti*") at [15]. The market value of goods is the price which a reasonable person in the defendant's position would have had to pay for the goods: *Benedetti* at [17].

228     The best proxy for the market value of the goods supplied would be the Cost-Plus Pricing, as it is the summation of the goods priced at cost plus a mark-up to cover other related costs (*eg*, marketing, duties and taxes) and some profit (see [51(c)] above).

229     In his expert report, JGJ's expert, Mr Robert Golden ("Golden"), calculated the total cost-plus amounts in respect of the 42M Invoices, 23M Invoices and 2.2M Invoices at US\$61,762,344.40, comprising the following:[276]

(a)     US\$40,526,969.99 in respect of the 42M Invoices, compared to their face value of US\$42,994,312.66 (see [28(a)] above);

(b)     US\$19,207,527.50 in respect of the 23M Invoices, compared to their face value of US\$23,400,456.25 (see [28(b)] above); and

(c)     US\$2,027,846.91 in respect of the 2.2M Invoices, compared to their face value of US\$2,211,077.91 (see [30] above).

---

[276]     Golden's expert report in S 418, at para 52(c).

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

230     During his oral testimony, Golden conceded that there were some inaccuracies in some of the figures used in his calculations when compared to the source documents.[277] Apparently, Golden had relied on figures in a spreadsheet that was provided to him. In its written closing submissions, SRK stated that after correcting the inaccuracies, Golden's cost-plus figure in respect of the 23M Invoices should be US$20,210,267.04.[278] During oral closing submissions, SRK confirmed that Golden's cost-plus figure in respect of the 23M Invoices should be US$20,006,350.16 instead.[279]

231     SRK has no changes to make to Golden's cost-plus figure in respect of the 42M Invoices. SRK accepts that based on Golden's computations, SRK has to return to JGJ the sum of US$2,467,350.67,[280] which represents the difference between the face value of the 42M Invoices and Golden's cost-plus figure in respect of the 42M Invoices (see [229(a)] above).

232     TJCI has no changes to make to Golden's cost-plus figure in respect of the 2.2M Invoices.[281]

233     Thus, based on Golden's calculations (after SRK's corrections for inaccuracies):

---

[277]   See, *eg*, NE, 27 March 2023, at 28:2–29:21, 33:8–34:11.

[278]   SRK and others' Closing Submissions in S 418, at paras 3 and 180; see, also, SRK and others' Aide-Memoire for Oral Closing Submissions, at para 35.

[279]   NE, 27 April 2023, at 102:16–24.

[280]   NE, 27 April 2023, at 102:25–103:8.

[281]   SRK and others' Closing Submissions in S 418, at paras 3 and 180; see, also, SRK and others' Aide-Memoire for Oral Closing Submissions, at para 35.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

(a)   The quantum of SRK's restitutionary claim in respect of the 23M Invoices, taking into account JGJ's counter-restitutionary claim in respect of the 42M Invoices, is US$17,538,999.49.[282]

(b)   The quantum of TJCI's restitutionary claim in respect of the 2.2M Invoices is US$2,027,846.91.

234   SRK's and TJCI's expert, Mr Tam Chee Chong ("Tam"), was instructed to calculate the amount due and payable by JGJ to SRK and TJCI based on "the purported Cost-Plus Pricing terms envisaged in the purported Accounting Reconciliation exercise in the alleged Joint Venture".[283] Tam adopted a three-step approach:[284]

(a)   Step 1 – Calculate the profit/loss attributable to the sales by SRK-Sachin, TJCI and SRK-BDB to JGJ for the financial years ended 31 March 2016, 2017 and 2018 based on certain profit margins;

(b)   Step 2 – Calculate the cost of sales by SRK-Sachin, TJCI and SRK-BDB to JGJ for the years ended 31 March 2016, 2017 and 2018 based on the profit/loss calculated in Step 1 above;

(c)   Step 3 – Calculate the sales by SRK-Sachin, TJCI and SRK-BDB to JGJ based on the purported Cost-Plus Pricing terms using the cost of sales calculated in Step 2 and applying the profit margins ranging from 5% to 10%.

---

[282]   US$20,006,350.16 – US$2,467,350.67; see, also, NE, 27 April 2023, at 103:10–13.

[283]   Tam's expert report in S 418, at para 16 (Issue 3).

[284]   Tam's expert report in S 418, at para 66.

235     JGJ criticises Tam's methodology in deriving the profit margins under Step 1 above, mainly because Tam had used the profit margins of sales which included sales attributable to the JV, including direct sales to the JDM Entities' end customers, as the proxy for the profit margins of sales to JGJ.[285] There is force in JGJ's criticism. However, it is not necessary for me to deal with Tam's calculations because in its closing submissions, SRK and TJCI have been content to proceed on the basis of Golden's calculations.

### *JGJ's liability in respect of the 23M Invoices and the 2.2M Invoices*

236     Accordingly, JGJ is liable to pay:

(a)     SRK the sum of US$17,538,999.49 in respect of SRK's restitutionary claim under the 23M Invoices (see [233(a)] above); and

(b)     TJCI the sum of US$2,027,846.91 in respect of TJCI's restitutionary claim under the 2.2M Invoices (see [233(b)] above).

### Whether the S 418 Counterclaim Defendants are liable to JGJ for inducing breaches of the JVA

237     JGJ's claim against the S 418 Counterclaim Defendants for inducing breaches of the JVA fails in the light of my finding that the JVA is not legally enforceable.

### Whether the S 418 Counterclaim Defendants are liable to JGJ for conspiracy to injure JGJ

238     To establish a claim in unlawful means conspiracy, a claimant must prove the following: (a) that two or more persons engaged in a combination to

---

[285]     JGJ's Closing Submissions, at para 394.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd* [2024] SGHC 10

do certain acts; (b) that those persons intended to cause damage or injury to the plaintiff by those acts; (c) that the acts were unlawful; (d) that the acts were performed in furtherance of the agreement; and (e) that the claimant has suffered loss as a result of the conspiracy: *EFT Holdings, Inc and another v Marinteknik Shipbuilders (S) Pte Ltd and another* [2014] 1 SLR 860 at [112]. The elements of a lawful means conspiracy are the same as the elements of an unlawful means conspiracy save that element (c) requires the claimant to establish that the conspirators carried out lawful acts with the predominant purpose of causing injury or damage to the claimant, which purpose was in fact achieved: *Quah Kay Tee v Ong and Co Pte Ltd* [1996] 3 SLR(R) 637 at [45]; *Ok Tedi Fly River Development Foundation Ltd and others v Ok Tedi Mining Ltd and others* [2023] 3 SLR 652 at [113].

239     JGJ claims that one or more of the S 418 Counterclaim Defendants conspired, through lawful or unlawful means, to injure JGJ and procured:[286]

> (a)     SRK to issue the 23M Invoices and the 42M Invoices at prices that were not based on Cost-Plus Pricing;

> (b)     JGJ to pay the 42M Invoices and SRK to demand payment of the 23M Invoices, despite knowing that JGJ was not liable to make payment on the 42M Invoices and 23M Invoices.

240     In my view, SRK's counterclaim for conspiracy to injure is clearly unmeritorious and must be dismissed.

241     It is true that the prices in the 23M Invoices and 42M Invoices were based on Sell-Minus Pricing and not Cost-Plus Pricing. However, as Michael

---

[286]     S 418 D&CC, at paras 27 and 32.

86

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

testified, the parties agreed to the goods being invoiced based on Sell-Minus Pricing (see [186] above). As for the payment of the 42M Invoices, JGJ's own evidence is that the invoices were merely the mechanism for the transfer of funds requested by SRK (see [196] above). I cannot see how invoicing based on Sell-Minus Pricing or the payment purportedly of the 42M Invoices or SRK's mere demand for payment under the 23M Invoices can support JGJ's conspiracy claim.

**Summary of my findings and conclusions in S 418**

242     In summary, my findings and conclusions in S 418 are as follows:

(a)     The collaboration between the JDM Entities and the SRK Entities (which includes TJCNY) was on the basis of the JV/JVA and the alleged BA is a concoction by the SRK Entities.

(b)     The JVA is not legally enforceable. It follows that the question of JGJ's standing to enforce the JVA does not arise.

(c)     There was no agreement that JGJ was to pay the amounts stated in the 23M Invoices, 42M Invoices and 2.2M Invoices. However, SRK and TJCI are entitled to reasonable compensation for the goods supplied by them.

    (i)     The reasonable compensation under the 42M Invoices is US$40,526,969.99. As US$42,994,312.66 has been paid to SRK, JGJ is entitled to a counter-restitutionary claim of US$2,467,350.67 in respect of the 42M Invoices.

    (ii)     The reasonable compensation under the 23M Invoices is US$20,210,267.04. Taking into account JGJ's counter-

87

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

restitutionary claim in respect of the 42M Invoices, JGJ is liable to pay SRK US$17,538,999.49 in respect of SRK's restitutionary claim under the 23M Invoices.

(iii)    The reasonable compensation under the 2.2M Invoices is US$2,027,846.91. JGJ is liable to pay this amount in respect of TJCI's restitutionary claim under the 2.2M Invoices.

(d)    As the JVA is not legally enforceable, JGJ fails in its counterclaims against the S 418 Counterclaim Defendants for inducing breaches of the JVA.

(e)    JGJ fails in its counterclaim against the S 418 Counterclaim Defendants for conspiracy to injure.

**Parties' cases in S 475**

*Shailesh's claim*

243    Shailesh's pleaded case is as follows:

(a)    As a shareholder of JGJ, he has legitimate expectations that, as directors of JGJ, the Kriss Brothers would act honestly, diligently, in the interests of JGJ, avoid being in positions of conflict of interests and ensure that JGJ's financial statements give a true and fair view of JGJ's financial position.[287]

(b)    The Kriss Brothers acted in breach of their fiduciary duties owed to JGJ and the manner in which they conducted certain acts demonstrates

---

[287]    Statement of Claim (Amendment No 2) in S 475 ("S 475 SOC"), at para 9.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

the commercially unfair manner in which Shailesh was treated, thereby defeating his legitimate expectations.[288]

244     Shailesh's pleaded case complained about several acts by the Kriss Brothers. However, in his closing submissions, Shailesh has pursued only his complaints against the following conduct of the Kriss Brothers, which he says demonstrates commercial unfairness:[289]

(a)     passing the First Resolution (which authorised the commencement of legal action to recover the TJCNY Debt) and the Second Resolution (which authorised the commencement of legal action against SRK and TJCI for overcharging JGJ); Shailesh says these resolutions gave preferential treatment to a total debt of US$23,051,737 owed by the JDM Entities to JGJ;

(b)     manipulating JGJ's accounts by making four unjustified adjustments to JGJ's 2016 FS, and failing to provide documentary evidence and explanations to JGJ's auditors, thereby resulting in a disclaimer of opinion for JGJ's 2016 FS and adverse opinions for JGJ's 2017 FS and 2018 FS; and

(c)     refusing to provide further information to Shailesh and/or engage Shailesh regarding the adoption of JGJ's 2016 FS.

245     Shailesh pleaded various reliefs. However, in his closing submissions, he has pursued only the following reliefs:[290]

---

[288]     S 475 SOC, at paras 44 and 57–58.

[289]     Shailesh's Closing Submissions in S 475, at paras 44, 52, 67–68 and 125.

[290]     Shailesh's Closing Submissions in S 475, at paras 135, 138.

(a) An order that the Kriss Brothers do all that is necessary to effect a restatement of JGJ's 2016 FS, 2017 FS and 2018 FS such that the four adjustments to JGJ's 2016 FS are removed, and that the Kriss Brothers re-submit the restated financial statements to the auditors for a fuller audit, with the audited accounts to be filed with the relevant authorities.

(b) An order that the Kriss Brothers procure and/or cause the JDM Entities to pay the sum of US$23,051,737 to an escrow agent (at the Kriss Brothers' expense) to be held in escrow until further order.

(c) Alternatively, an order that Shailesh be authorised to commence, on behalf of JGJ, legal proceedings against the JDM Entities to recover the debts owed to JGJ.

246 The Kriss Brothers' case is that:[291]

(a) Shailesh is the SRK Entities' nominee shareholder and nominee director in JGJ. He does not have the legitimate expectations as alleged by him. None of his interests have been prejudiced.

(b) Shailesh does not dispute the TJCNY Debt, the recovery of which was authorised by the First Resolution.

(c) The First and Second Resolutions were validly passed in accordance with JGJ's Articles of Association.

---

[291] The Kriss Brothers' Defence (Amendment No 3) in S 475 ("Kriss Brothers' S 475 Defence"), at paras 11A, 15–19, 37A–47.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

(d)      It was in the interests of JGJ to recover the TJCNY Debt from TJCNY and to take action against SRK and TJCI for overcharging JGJ in respect of the diamonds and diamond jewellery sold to JGJ.

(e)      There was no agreement or understanding that Shailesh would be entitled to participate in any of JGJ's management decisions, including decisions relating to the 2018 US Proceedings.

(f)      In the 2018 US Proceedings, JGJ (together with the JDM Entities) are seeking, among other things, their share of the profits owed by the SRK Entities under the JVA. Accordingly, the issues to be determined in the 2018 US Proceedings would also include the veracity of any alleged debts due and owing as between JGJ, the JDM Entities and the SRK Entities. They have therefore not preferred the JDM Entities' interests.

(g)      The four adjustments to JGJ's 2016 FS were made to address inaccuracies that the Kriss Brothers discovered in the 2015 FS. The Kriss Brothers' inability to produce sufficient documentary evidence to the auditors was solely the result of the SRK Entities having wrongfully and improperly retained JGJ's and the JV's accounting books and records upon the termination of the JV.

(h)      The requisite resolutions relating to JGJ's 2016 FS were validly passed in accordance with JGJ's Articles of Association.

91

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

### *JGJ's counterclaim*

247    JGJ's case is that Shailesh breached his fiduciary duties by:[292]

(a)    refusing and/or failing to sign the First, Second and/or Third Resolutions; in the alternative, refusing and/or failing to abstain from voting on the First, Second and/or Third Resolutions; and

(b)    requesting the following information and documents for collateral and/or ulterior purposes:

(i)    documents in relation to the TJCNY Debt and any other claims;

(ii)    details of current signatories of JGJ's IDBNY Account, details of the transactions pertaining to the account, monthly bank statements and details of any other bank accounts in JGJ's name; and

(iii)    copy of the legal opinion that Ng should have obtained on the validity and strength of the claim to recover the TJCNY Debt and other claims, purchase orders or other similar documents and invoices in relation to transactions amongst JGJ, SRK and TJCI.

248    JGJ seeks declarations that Shailesh has acted in breach of his fiduciary duties, an order restraining Shailesh from seeking information or participating in decisions relating to JGJ's claims against the SRK Entities or defence against the SRK Entities' claims, and damages.

---

[292]    JGJ's Defence and Counterclaim (Amendment No 4) in S 475 ("JGJ's S 475 D&CC"), at paras 14A, 14B, 19A, 19B, 24A, 29A, 29B and 41.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*        [2024] SGHC 10

249    Shailesh denies JGJ's counterclaim.

**The issues in S 475**

250    The issues in S 475 are as follows:

(a)    Whether Shailesh is SRK's nominee shareholder in JGJ?

(b)    If he is, whether he has standing to bring a claim under s 216 of the Companies Act (Cap 50, 2006 Rev Ed) ("CA")?

(c)    Whether Shailesh can claim legitimate expectations that the Kriss Brothers would fulfil their duties as directors?

(d)    Whether the Kriss Brothers' conduct in connection with the First and Second Resolutions was commercially unfair?

(e)    Whether the Kriss Brothers' conduct in connection with the four adjustments to JGJ's 2016 FS was commercially unfair?

(f)    Whether Shailesh breached his director's duties as alleged by JGJ?

(g)    What are the reliefs to be granted (if any) to Shailesh and JGJ?

**Whether Shailesh is SRK's nominee shareholder in JGJ**

251    I find that Shailesh held his shares in JGJ as SRK's nominee. I also find that Shailesh was SRK's nominee director in JGJ.

252    First, when Shailesh became a 50% shareholder in JGJ on 31 March 2015:

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

(a)     he had met Michael only once, when Rahul and Amit introduced him to Michael at a trade show in Hong Kong in March 2015;[293] he did not otherwise know Michael;

(b)     apart from the fact that JGJ would buy diamond jewellery from SRK and sell them to the JDM Entities, he did not know the details of the arrangement between SRK and JGJ or what JGJ's business plans were;[294]

(c)     he did not know what the amount of his investment in JGJ would be although *Rahul* allegedly told him that it could be "around US$700,000 or US$800,000 or US$1 million";[295] there was no evidence that Shailesh asked Michael how much money he would have to contribute to JGJ's capital;

(d)     Shailesh was not asked to make any capital contribution and he did not ask about his capital contribution; and

(e)     there were no discussions or negotiations between Shailesh and the Kriss Brothers even though Rahul had allegedly asked him to speak to Michael.[296]

253     Shailesh's nonchalance about his investment in JGJ is strong evidence that he was acting as a nominee for SRK. The details were for SRK to sort out with the Kriss Brothers and were of no concern to Shailesh. Shailesh's lack of interest in the details of the arrangement between SRK and JGJ, and in JGJ's

---

[293]     Shailesh's AEIC in S 475, at para 20; NE, 21 February 2023, at 84:24.

[294]     NE, 22 February 2023, at 36:17–38:12, 39:21–40:2.

[295]     NE, 22 February 2023, at 39:5–11.

[296]     NE, 22 February 2023, at 38:13–39:1.

94

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

business plans, are particularly telling. Both would affect JGJ's profitability, which would surely have been of great concern to Shailesh if (as he claims) he was making an investment in JGJ. In addition, JGJ was to sell the diamonds and diamond jewellery to the JDM Entities which he knew were controlled by the Kriss Brothers. Yet, Shailesh had no concern about the details (*eg*, pricing) of JGJ's sales to the JDM Entities. Shailesh's explanation that he relied on the fact that Rahul had recommended the investment opportunity to him is too incredulous to believe. This is all the more so when, according to him, Rahul had asked him to speak to Michael about the investment.

254     Second, Shailesh's lack of interest in JGJ's business continued after he became a shareholder.

   (a)     Shailesh did not meet or talk to Michael.[297] Shailesh could not even identify Michael when asked to do so in court.[298]

   (b)     Shailesh never met David.[299]

   (c)     Although Ng was a nominee director for Michael, David *and Shailesh*, Shailesh never communicated with Ng until his lawyers wrote to Ng on 27 February 2018 regarding a board resolution to commence legal proceedings against SRK and/or TJCI.[300]

   (d)     There is also no evidence that Shailesh asked about the capital contribution that was expected from him.

---

[297]     NE, 21 February 2023, at 84:24, 85:5–8, 85:23–86:3.

[298]     NE, 21 February 2023, at 85:10–17.

[299]     NE, 21 February 2023, at 85:18–20.

[300]     NE, 24 February 2023, at 40:14–18; 7 JCB 392–394.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

(e)      Although he was a director in JGJ, Shailesh did not play any active role in JGJ's business until the disputes between the SRK Entities and the JDM Entities started. He was not involved in discussions about JGJ's business dealings with the SRK Entities. He was also not involved in the dealings with AT Adler (JGJ's auditors) for advice on tax-related matters, or with KPMG to review JGJ's accounts, or with BSR for tax and regulatory services. Amit, on the other hand, was involved in all these dealings.

255      Third, Shailesh had no authority to operate or even access JGJ's IDBNY Account. In contrast, SRK's representatives, Amit and Ashish, had authority to operate JGJ's IDBNY Account.

256      Fourth, Shailesh did not receive any director's fees or dividends. Despite his alleged claim that he joined JGJ "just for the investment",[301] he did not raise any issue with this.[302]

257      Fifth, Shailesh's conduct was aimed at protecting SRK's interest rather than his own interest as shareholder.

(a)      Shailesh testified that he did not understand the First or Second Resolutions and he called *Rahul* and spoke to him; Rahul told him there was a problem between SRK and JDM that was not resolved.[303]

---

[301]      NE, 21 February 2023, at 108:11.

[302]      NE, 22 February 2023, at 90:2–16.

[303]      NE, 23 February 2023, at 21:7–15.

96

(b)      Shailesh did not sign the First Resolution which authorised the taking of action against TJCNY to recover the TJCNY Debt (US$3,733,503.43) even though he was aware of the debt.[304]

(c)      Some 11 days after receiving the First Resolution, Shailesh expressed his objections to the resolution, through his lawyers.[305] His main objection was that the Kriss Brothers had not sought recovery of other debts for larger amounts. In my view, this objection was contrived. Shailesh testified that he only learnt about the larger debts from his lawyers when his case was being filed; he did not know about these other debts at the time that he received the resolution.[306] In any case, even if there were other debts owing to JGJ, there was no reason for Shailesh to object to recovery of the undisputed debt from TJCNY.

(d)      Shailesh objected to the Second Resolution, which authorised the Kriss Brothers to commence and manage legal proceedings against SRK and TJCI for manipulating the pricing of goods manufactured and billed to JGJ. Although Shailesh had no knowledge of the details of the business dealings between the SRK Entities and JGJ/the JDM Entities, he "emphatically" denied any such manipulation and described the same as "baseless".[307]

(e)      Shailesh objected to the Fourth Resolution, which authorised the Kriss Brothers to act on behalf of JGJ in defending the claim by SRK in S 418. In his email dated 3 May 2018, Shailesh objected to authority to

---

[304]      Shailesh's AEIC in S 475, at para 40.

[305]      7 JCB 371–373.

[306]      NE, 23 February 2023, at 20:24–21:6, 21:19–23, 25:12–15.

[307]      7 JCB 379–381 (at para 2(f)).

defend against S 418 being vested in the Kriss Brothers because they had a personal interest in not pursuing debts owed to JGJ by the JDM Entities.[308] It is not clear why the Kriss Brothers should not manage the defence against S 418, which was a claim by SRK and TJCI based on the 23M Invoices and the 2.2M Invoices. Shailesh himself had no knowledge of the dealings between the SRK Entities and the JDM Entities. Further, in his AEIC, Shailesh explained that his "impression and understanding, upon perusing the Statement of Claim filed in Suit 418, was that the claim appeared to be legitimate, because the invoices stated therein … were listed in detail".[309] In my view, Shailesh's reliance on the mere fact that the statement of claim in S 418 listed the invoices in detail is incredulous, and smacks of an afterthought. He had no knowledge of the details of JGJ's business, and (by his own admission) had not participated in the management, affairs or business operations of JGJ.[310]

258    The irresistible inference is that Shailesh's objections were aimed at protecting the interests of the SRK Entities. Shailesh was in fact trying to fight the battle on behalf of the SRK Entities.

259    Sixth, between 11 and 19 May 2016, S Goldi transferred a total amount of US$700,000 to Shailesh, who in turn transferred the same to JGJ (see [24] above). Shailesh says the payment to JGJ was a loan at Michael's request and that he had raised the amount by borrowing from S Goldi.[311] Michael says that

---

[308]    8 JCB 315–316.

[309]    Shailesh's AEIC in S 475, at para 74.

[310]    NE, 21 February 2023, at 105:14–19.

[311]    Shailesh's AEIC in S 475, at paras 30–31.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

the JDM Entities had deposited funds into JGJ's IDBNY Account as part of their 50% capital contribution and that Nirav agreed to inject the sum of US$700,000 into JGJ to equalise the SRK and JDM Capital Accounts in the JV.[312] According to Michael, Nirav said that the funds would be wired by SRK from their Hong Kong office.[313]

260    In my view, the evidence supports Michael's assertion.

(a)      On 11 May 2016, Vikas sent details of JGJ's IDBNY Account to *Nirav*, copying Amit; Nirav then forwarded the same to Shailesh.[314] If Michael had requested Shailesh to make a loan to JGJ (as Shailesh claimed), there is no reason why Vikas would have had to send the details of JGJ's account to Nirav. Nirav and Amit did not offer any credible explanation as to why Vikas had sent JGJ's account details to them.[315]

(b)      It did not make sense that Michael would have asked Shailesh to make a loan (as Shailesh claims) instead of a capital contribution to JGJ. After all, Shailesh had not made any capital contribution to JGJ.

(c)      On 5 October 2017, Rajiv (SRK's CFO) sent a spreadsheet to Anish (an external consultant) and Nirav.[316] Rajiv had prepared the spreadsheet, which included an entry showing an amount of

---

[312]      Michael's AEIC in S 475, at paras 69–72.

[313]      Michael's AEIC in S 475, at para 72.

[314]      2 JCB 414–415.

[315]      NE, 16 February 2023, at 91:9–24; NE, 17 February 2023, at 96:21–97:16.

[316]      7 JCB 315–317.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

US$700,000 described as "Loan by SRK Group in JGJ at Singapore".[317] Anish forwarded the spreadsheet to Ajay Matta (JDM's Financial Controller), for his review.[318] Anish's email was also copied to Rajiv and Nirav. Anish specifically pointed out that the "[c]apital introduction by Singapore JV Partner 700,000" had been included. Anish was not called as a witness. In my view, his reference to "Singapore JV Partner" had to mean "SRK Group" since his comment related to the entry in the spreadsheet that referred to "SRK Group". Nirav agreed that Anish's comment referred to the US$700,000 that Shailesh transferred to JGJ.[319] Nirav also agreed with the description of the US$700,000 as "[c]apital introduction" and asserted that he was trying to recover the amount on behalf of Shailesh because Shailesh had asked him how he (Shailesh) could recover the US$700,000.[320] I reject Nirav's assertion. It is simply unbelievable. There is nothing in the spreadsheet that supports Nirav's assertion. Indeed, the spreadsheet clearly contradicts Nirav's assertion; it described the US$700,000 as "Loan by SRK Group …". Further, Nirav's assertion is not in any of his AEICs.

(d)      The remittance forms merely show that the US$700,000 was remitted by S Goldi to Shailesh. They are not evidence that the funds in fact belonged to S Goldi. There is no objective evidence (*eg*, S Goldi's accounting records) that S Goldi had these funds. S Goldi's annual return for its financial year ending on 30 April 2018 raises doubts. As

---

[317]      7 JCB 317.

[318]      7 JCB 319.

[319]      NE, 17 February 2023, at 54:3–15.

[320]      NE, 17 February 2023, at 54:19–55:23.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

the Kriss Brothers have pointed out, it shows that S Goldi's paid-up capital was HKD5m and that it had an indebtedness of HKD3.98m.[321]

(e)      There is also no objective evidence that the US$700,000 was a loan from S Goldi to Shailesh. S Goldi's accounting records were not produced in evidence. The fact that the funds were remitted by S Goldi is not surprising since S Goldi is the marketing arm of SRK (see [13] above).

261      In my view, the US$700,000 loan in fact came from SRK. This shows that Shailesh was just SRK's nominee in JGJ.

262      Seventh, Shailesh claimed that SRK and the Kriss Brothers decided on the BA under which SRK would supply jewellery/diamonds to JGJ who would then sell the same to the JDM Entities, and that any profits from the arrangement was to be shared equally between him and the Kriss Brothers.[322] I agree with the Kriss Brothers that it is illogical and makes no commercial sense for Shailesh (as a 50% shareholder in JGJ) to claim a half share of the profits from the BA *unless* he was holding his shares in JGJ as nominee for SRK.

263      I should add that in the 2018 US Proceedings which were commenced on 27 March 2018 (see [43] above), JGJ and the JDM Entities pleaded that the SRK Entities' shares in JGJ would be held in the name of their nominee, Shailesh.[323] In a draft "Answer" (similar to a defence), SRK admitted that Shailesh held 50% of the ownership interest in JGJ for the benefit of SRK and

---

[321]      11 JCB 17–25.

[322]      Shailesh's Reply (Amendment No 3) in S 475 to Kriss Brothers' S 475 Defence ("S 475 Reply to Kriss Brothers' S 475 Defence"), at para 5(e)(ii) and (vii).

[323]      10 JCB 669–700 (at para 84).

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

TJCI.[324] The draft Answer is undated. Subsequently on 24 July 2020, SRK filed its Answer in which it denied the allegation that Shailesh held his shares in JGJ as nominee for SRK.[325] The 2018 US Proceedings were commenced before either S 418 or S 475 were commenced and SRK's Answer was filed long after S 418 and S 475 were commenced.

264    The Kriss Brothers submitted that the admission in the draft Answer speaks volumes.[326] In my view, the admission in the draft Answer should be ignored. It was just a draft and a note to the relevant paragraph states "[Client to review]". There is no evidence as to how the admission came about. It would be unsafe to rely on it as evidence that SRK had admitted that Shailesh held his shares in JGJ as its nominee.

**Whether Shailesh has standing to bring a claim under s 216 CA**

265    The persons who can bring a claim under s 216 of the CA are:

(a)    a member of the company;

(b)    a holder of a debenture of the company;

(c)    the Minister (in the case of a declared company under Part 9); and

(d)    a person to whom shares in the company have been transmitted by operation of law.

---

[324]    11 JCB 544–563 (at para 84).

[325]    11 JCB 136–159.

[326]    Kriss Brothers' Closing Submissions in S 475, at para 53.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

See s 216(1) and (7) of the CA.

266     In the case of a private company, a "member" includes a person whose name appears in the electronic register of members kept by the Registrar of Companies under s 196A of the CA: s 19(6) and (6A) of the CA.

267     It cannot be disputed that Shailesh is a member of JGJ. In my view, he is therefore entitled to bring a claim under s 216 of the CA even though he holds his shares in JGJ as SRK's nominee. As the beneficial owner of the shares, SRK itself cannot bring a claim under s 216 of the CA because its name does not appear on the register of members of JGJ and it is therefore not a "member". See, also, Margaret Chew, *Minority Shareholders' Rights and Remedies* (LexisNexis, 3rd Ed, 2017) ("*Minority Shareholders' Rights and Remedies*") at paras 4.187–4.189.

268     Having decided that a nominee shareholder can bring an action under s 216 of the CA, it is necessary to consider what are the matters that a nominee shareholder can complain about. The grounds for an action under s 216 are:

> (a)     that the affairs of the company are being conducted or the powers of the directors are being exercised in a manner oppressive to, or in disregard of the interests of, one or more members or debenture holders (including the complainant); or

> (b)     that some act of the company has been done or is threatened or that some resolution has been passed or is proposed which unfairly discriminates against or is otherwise prejudicial to one or more members or debenture holders (including the complainant).

103

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

269     Section 216 of the CA therefore requires the complainant to show that his interests (as a member in this case) have been adversely affected. In my view, even a nominee shareholder is entitled to complain about matters that apply to all shareholders alike, for example, the holding of AGMs, exercise of voting rights, distribution of dividends, dilution of shares and the accuracy of the company's financial statements. What of matters that affect the interests of the beneficial owner of the shares because of its own circumstances? In *Minority Shareholders' Rights and Remedies* (at para 4.189), the learned author referred to *Atlasview Ltd v Brightview Ltd* [2004] 2 BCLC 191 at [38] and expressed the view that where the complainant is a nominee shareholder, his interests are capable of including the economic and contractual interests of the beneficial owners of the shares.

270     I agree with the above view subject to one reservation. I agree that the economic and contractual interests of the beneficial owners should be considered *where the existence and nature of these interests are known to the defendants* in a s 216 action. The common thread underpinning s 216 is the element of unfairness: *Over & Over Ltd v Bonvests Holdings Ltd and another* [2010] 2 SLR 776 at [70]. It would be unfair if, having accepted (whether expressly or impliedly) the nominee shareholding arrangement, the defendants then commit acts that are unfair to the interests of the beneficial owners which are known to the defendants. However, if the defendants do not know about the nominee shareholding arrangement, it is not clear to me why the interests of the beneficial owners should be considered.

271     In the present case, it is clear that the Kriss Brothers were aware of and had accepted the nominee arrangement. However, Shailesh faces a different hurdle. He has not pleaded his s 216 claim on the basis that he is a nominee shareholder for SRK. His case is that he is the legal and beneficial owner of the

104

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

shares in JGJ that are registered in his name. I therefore agree with the Kriss Brothers that there is no room for any argument that Shailesh's interests mirror or are co-extensive with the interests of SRK. Thus, in deciding whether the acts complained of (see [243(b)] above) can be said to be commercially unfair to Shailesh, the interests of SRK cannot be considered.

**Whether Shailesh can claim his legitimate expectations as pleaded**

272     Shailesh's pleaded case is that as a shareholder of JGJ, he has legitimate expectations "based on his strict legal rights pursuant to section 157 of the Companies Act (Cap 50), common law and;/or equity" and that these legal rights are "derived from and/or based on the duties owed by the [Kriss Brothers] as directors of [JGJ]" to:[327]

> (a)     act honestly and use reasonable diligence in the discharge of their duties;

> (b)     not make improper use of their position as directors to gain an advantage for themselves or any other person or cause detriment to JGJ;

> (c)     always act in the interests of JGJ and all shareholders;

> (d)     not place themselves in positions of conflict of interests;

> (e)     use their powers for proper purposes and for the benefit of JGJ and all shareholders; and

> (f)     ensure that the financial statements and accounts of JGJ give a true and fair view of the financial position of JGJ.

---

[327]     S 475 SOC, at para 9.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd* [2024] SGHC 10

273 The Kriss Brothers refer to *Ong Heng Chuan v Ong Teck Chuan and others* [2020] SGHC 161 ("*Ong Heng Chuan*"), in which the plaintiff claimed legitimate expectations as to how the company should be run "based on his strict legal rights under the Articles of Association of the Company, Section 157 of the CA, common law and/or equity" and that these legal rights were "derived from and/or based on the duties owed by [the first defendant] as a *de jure, de facto* and/or shadow director and/or [the second defendant] as a *de jure* director at the material time". The High Court found the plaintiff's invocation of the doctrine of legitimate expectations to be misconceived (at [273]). The High Court observed that in the context of minority oppression actions, the doctrine of legitimate expectations generally arises where there is a quasi-partnership (at [274]–[275]) and reasoned as follows (at [277]):

> 277 Indeed, on closer scrutiny, the legal proposition underlying the [plaintiff's] case was essentially this: for the purposes of s 216 proceedings, a minority shareholder should be able to establish a personal wrong against himself merely by characterising the majority's breaches of their directors' duties as breaches of his own "legitimate expectation" that directors should fulfil their legal duties to the company. I did not think this proposition could be correct. If it were, it would make nonsense of the proper plaintiff rule and the reflective loss principle, which underpin the conceptual distinction between personal rights and corporate rights, and the mechanism provided in s 216A for derivative actions would become otiose.

274 The Court of Appeal agreed with the High Court's decision to reject the legitimate expectations argument, and stated as follows:

> 55 … a breach of [the first and second defendants'] directors' duties … would be a corporate wrong, which is *per se* insufficient to ground a claim for oppression. [The plaintiff] has failed to show how this is a real injury suffered by him as a "*shareholder* [that] is distinct from and not merely incidental to the injury which the *company* suffers" [emphasis in original], which an action under s 216 of the Act is aimed at vindicating (*Ho Yew Kong v Sakae Holdings Ltd and other appeals and other matters* [2018] 2 SLR 333 at [120]). In our view, the Judge was correct to reject the legal proposition proffered by [the plaintiff]:

106

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

> namely, that a minority shareholder should be able to establish a personal wrong against himself merely by characterising the majority's breaches of their directors' duties as breaches of his own "legitimate expectations" that the directors should fulfil their legal duties to the company. If accepted, every allegation of a breach of director's duty *simpliciter* would be tantamount to *always* permitting a plaintiff to commence a minority oppression action, and this would obviate the distinction between personal and corporate wrongs. Indeed, this would, in the Judge's words, "make nonsense of the proper plaintiff rule and the reflective loss principle" …

See *Ong Heng Chuan v Ong Teck Chuan and others* [2021] 2 SLR 262 at [55].

275    In the present case, Shailesh's alleged legitimate expectations are strikingly similar to those in *Ong Heng Chuan*. As in *Ong Heng Chuan*, Shailesh does not allege the existence of any quasi-partnership.

276    In the circumstances, I agree with the Kriss Brothers that Shailesh's legitimate expectations claim cannot succeed and must be rejected. However, that is not the end of the matter as the question remains whether the acts complained of are in any event commercially unfair to Shailesh.

**The First Resolution**

277    Shailesh's pleaded case is that the First Resolution is objectionable on the following grounds:[328]

(a)    He was not given time to consider the resolution.

(b)    He was not given access to the relevant documents (*eg*, invoices).

---

[328]    S 475 SOC, at para 17.

107

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

(c)    He was not given an opportunity to discuss the resolution because it was not tabled at a regular meeting of the Board.

(d)    JGJ's resources would be better spent pursuing other claims for much larger sums.

278    For the purposes of s 216 of the CA, Shailesh has to show that the conduct complained of affected him in his capacity as a member. The first three grounds relate to Shailesh's alleged difficulties in properly considering the First Resolution. In other words, they affected him in his capacity as a *director* of JGJ.

279    Where a shareholder is also a director, conduct that affects his role as a director may also affect his interest as a shareholder if he has a legitimate expectation to participate in the management of the company as a director. However, in the present case, Shailesh's pleaded case does not include any legitimate expectation to be involved in the management of JGJ as a director. Further, the evidence does not support such a legitimate expectation. Shailesh confirmed that he had never participated in the management, affairs or business operations of JGJ.[329] He had been content to leave the management to the Kriss Brothers.

280    Shailesh has pleaded that as a shareholder, he had a legitimate expectation that the Kriss Brothers would carry out their duties as directors of JGJ properly. However, as discussed earlier, his claim to such a legitimate expectation fails.

---

[329]    NE, 21 February 2023, at 105:14–21.

108

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

281     Accordingly, the first three grounds are not relevant for purposes of Shailesh's s 216 claim.

282     As for the fourth ground, Shailesh does not dispute the TJCNY Debt. It must be in JGJ's interest to pursue its recovery. In his closing submissions, Shailesh clarified that his case is not that going after the TJCNY Debt, by itself, is wrong; his complaint is that the Kriss Brothers decided to go after the TJCNY Debt but not the other debts (*ie*, the debts owed by the JDM Entities).[330] The substance of this complaint is an allegation that the Kriss Brothers breached their directors' duties by deciding to pursue the TJCNY Debt but not the debts owing by the JDM Entities. However, this relates to a corporate wrong, not a personal wrong. Further, as the Kriss Brothers have explained, the debts owing by the JDM Entities to JGJ would be dealt with in the 2018 US Proceedings (see [246(f)] above). In my view, Shailesh has not shown how this is a real injury suffered by him as a *shareholder* that is distinct from and not merely incidental to the injury which the *company* suffers (see [274] above).

283     In his closing submissions, Shailesh also submitted that Michael's oral testimony revealed that the First Resolution was a retaliatory attack against TJCNY.[331] In my view, this was an overstatement. In his oral testimony, Michael explained that in the 2017 US Proceedings, TJCNY made a fraudulent claim to recover its goods and did not say that it had bought goods from JGJ; the First Resolution was necessary to "counter" TJCNY's claim "and not have the capital of the JV taken by Ashish" and to protect the assets of the JV.[332] In my view, the Kriss Brothers were defending against TJCNY's claim to recover goods that the

---

[330]     Shailesh's Closing Submissions in S 475, at para 52.

[331]     Shailesh's Closing Submissions in S 475, at para 53.

[332]     NE, 2 March 2023, at 78:5–79:4.

109

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

JDM Entities claimed was property belonging to the JV. Bearing in mind the Kriss Brothers' case that there was a JV, their actions cannot be said to be unfair to Shailesh.

284    Shailesh also submitted that the First Resolution is inconsistent with Michael's evidence that the TJCNY Debt was to be part of the accounting reconciliation for the JV.[333] However, this submission is irrelevant because it is not Shailesh's pleaded case that the TJCNY Debt should be accounted for as part of the accounting reconciliation for the JV.

285    Shailesh's case based on the First Resolution therefore fails.

**The Second Resolution**

286    The Second Resolution was to authorise the commencement of legal action against SRK and TJCI to recover charges in excess of US$15m which were alleged to be the result of the SRK Entities manipulating the prices of goods supplied to JGJ, in breach of the JVA.[334] The preamble in the resolution noted that:

(a)    JGJ had been set up as a JV between the Kriss Brothers and SRK;

(b)    Shailesh is SRK's nominee director and holds his shares in JGJ on behalf of SRK; and

(c)    SRK and TJCI "manipulated the pricing of goods manufactured and billed to [JGJ]".

---

[333]    Shailesh's Closing Submissions in S 475, at para 54.

[334]    7 JCB 374–375; Michael's AEIC in S 475, at para 132.

110

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

287     Shailesh's pleaded case is that the Second Resolution is objectionable on the grounds that:[335]

    (a)     the allegation that he was SRK's nominee is baseless;

    (b)     the allegation that SRK and TJCI manipulated the prices is baseless; and

    (c)     despite being the single largest shareholder of JGJ, he did not have access to or information about JGJ's IDBNY Account.

288     With respect to the first ground, I have found that Shailesh is in fact SRK's nominee in JGJ. In any event, I do not see how the mere allegation that Shailesh was SRK's nominee (even if untrue) falls within the scope of s 216 of the CA, which refers to the affairs of the company being conducted or the power of the directors being exercised in a manner oppressive to or in disregard of Shailesh's interests as a shareholder, or some act of the company or some resolution which unfairly discriminates against Shailesh as a shareholder or is otherwise prejudicial to him as a shareholder.

289     As for the second ground, the allegation that SRK and TJCI manipulated the prices of the goods sold to JGJ relates to a corporate wrong. Shailesh has not shown how he has suffered an injury as a shareholder. Besides, the evidence shows that Shailesh had no basis for his assertion that the allegation is baseless. Shailesh did not participate in the management of JGJ's business and did not know the details of JGJ's dealings with SRK and TJCI. Shailesh's objection was more about defending SRK and TJCI than about his own interests as a shareholder.

---

[335]     S 475 SOC, at para 20.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd* [2024] SGHC 10

290   The third ground falls outside the scope of s 216 because it affects Shailesh in his capacity as a *director*.

291   Shailesh's case based on the Second Resolution therefore also fails.

**JGJ's 2016 FS**

292   The Kriss Brothers made four adjustments to JGJ's 2016 FS:[336]

(a)   An amount of US$6,056,501.46 described as "Sales Promotion – Rebate" was added as an operating expense (the "Commission Rebate Adjustment").

(b)   The amount recorded as "Purchases–Finished Goods" was reduced by US$7,540,283 (the "Accounts Payable Reduction Adjustment").

(c)   An amount of US$15,488,893 was added as "Due from SRK" (the "SRK Payable Adjustment").

(d)   Two equal amounts of US$7,744,446.50 each were added as "Due to Michael Kriss" and "Due to David Kriss" respectively (the "Capital Repayment Adjustment").

293   JGJ's auditors issued a disclaimer of opinion with respect to the 2016 FS, stating that they did not express an opinion on the 2016 FS because they had not been able to obtain "sufficient appropriate audit evidence to provide a basis for an audit opinion".[337] The auditors also noted that there were

---

[336]   S 475 SOC, at para 50; 7 JCB 358–361.

[337]   9 JCB 276.

112

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

disagreements between the directors who are also the shareholders. This led to the auditors issuing adverse opinions with respect to JGJ's 2017 FS and 2018 FS.[338]

294     Shailesh's complaints are that (a) there is no basis or documentary evidence substantiating the adjustments, and (b) the Kriss Brothers failed to provide documentary evidence and explanations to JGJ's auditors, thereby resulting in a disclaimer of opinion for JGJ's 2016 FS and adverse opinions for JGJ's 2017 FS and 2018 FS.

*Commission Rebate Adjustment*

295     As stated in [129]–[130] above, the then billing arrangement was not sufficient to cover the expenses of the JDM Entities and Volume Rebate Agreements were entered into to reduce the amounts that the JDM Entities had to pay JGJ. Jim explained that Commission Rebate Adjustment reflected the aggregate sum of US$6,056,501.46 arising from the credit notes issued by JGJ pursuant to the Volume Rebate Agreements.[339]

296     Tam, who also gave evidence as Shailesh's expert, testified that JGJ was entitled to recognise and record the adjustment if the adjustment was "validly supported and approved".[340]

297     The evidence is clear: the Volume Rebate Agreements were discussed and agreed upon. Vibhor actively participated in the discussions and the emails

---

[338]     9 JCB 348 and 531.

[339]     Jim's AEIC in S 475, at para 39.

[340]     NE, 21 March 2023, at 142:18–24.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

were also either addressed or copied to Amit.[341] In the circumstances, the Commission Rebate Adjustment cannot be said to be commercially unfair.

### *Accounts Payable Reduction Adjustment*

298    Jim explained that this adjustment was made to decrease the amount payable to SRK because SRK had overbilled JGJ for 2016 and that the reduction was an estimated amount.[342]

299    In my view, the Accounts Payable Reduction Adjustment cannot be justified. There could not have been any overbilling. SRK and TJCI invoiced JGJ based on Sell-Minus Pricing. Michael testified that the parties agreed that the invoices would be based on Sell-Minus Pricing (see [186] above). I find that the Accounts Payable Reduction Adjustment is unjustified and commercially unfair to Shailesh. Even though he is a nominee shareholder, he has an interest to ensure that the company's accounts are correct. It is Shailesh, not SRK, who is legally entitled to complain about inaccuracies in the accounts and to receive any distribution of profits that JGJ may make.

### *SRK Payable Adjustment*

300    Jim explained that this adjustment represented an estimate of the profits of the JV retained by SRK, which should have been distributed to JGJ to be distributed to the shareholders.[343] Jim also explained that the figure that he used

---

[341]    5 JCB 485–486.

[342]    Jim's AEIC in S 475, at paras 42–47.

[343]    NE, 9 March 2023, at 119:6–16,

114

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*                [2024] SGHC 10

was "just a convenient number" and that actual amount could not be determined at the time.[344]

301    In my view the SRK Payable Adjustment is not justified. The adjustment was based on the JVA, which I have found to be legally unenforceable. In any event, the manner in which profits of the JV were to be distributed via JGJ had not been worked out or agreed (see [192] above), and there is also no justification for Jim to make the adjustment using a figure that was simply "convenient". I find that the SRK Payable Adjustment is commercially unfair to Shailesh. As discussed above, Shailesh is entitled to complain about inaccuracies in the financial statements even though he is a nominee shareholder.

*Capital Repayment Adjustment*

302    This adjustment follows from the SRK Payable Adjustment, which represented an estimate of the profits of the JV retained by SRK, which should have been distributed to JGJ to be distributed to the shareholders (see [300] above). It follows that the Capital Repayment Adjustment is also based on the legally unenforceable JVA. In my view, it is also unjustified.

303    Further, it is not clear why the amount from SRK would be distributed to the Kriss Brothers only. Michael said that SRK "took our capital and we were entitled to get it back".[345] However, Michael's explanation cannot be reconciled with Jim's and Jim was the one who had calculated the adjustments. It is at least unclear what the basis for the SRK Payable Adjustment and the Capital

---

[344]    NE, 9 March 2023, at 120:2–9.

[345]    NE, 2 March 2023, at 126:4–22.

115

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

Repayment Adjustment was. Jim could not give a clear explanation on the stand and admitted that he could not explain it and that he did not have an answer.[346]

304    I find that the Capital Repayment Adjustment is not justified and is commercially unfair to Shailesh. Again, as discussed above, Shailesh is entitled to complain about inaccuracies in the financial statements even though he is a nominee shareholder.

*Failure to provide documents and explanations to JGJ's auditors*

305    Michael confirmed that he did not liaise with JGJ's auditors regarding the latter's qualifications to JGJ's 2016 FS and he did not ask Jim to liaise with the auditors either.[347] David admitted that he did not know what the adjustments were about and also confirmed that he did not correspond with the auditors.[348]

306    Jim said that he did speak to the auditors but did not have "email trails", and that the auditors' requests for information used to go to the back-office in India but he did not know whether they responded to the auditors.[349] At any rate, it is clear that as far as the auditors were concerned, they had not been given documents or explanations.

307    Michael and Jim explained that after the termination of the JV, JGJ's accounts and documentation were incomplete and in disarray and that the back-office in India was uncooperative.[350] Nevertheless, it is clear that Jim did not

---

[346]    NE, 9 March 2023, at 92:18–94:3.

[347]    NE, 2 March 2023, at 125:15–126:3.

[348]    NE, 7 March 2023, at 78:10–11, 79:11–17.

[349]    NE, 9 March 2023, at 100:7–21, 102:8–103:9.

[350]    Michael's AEIC in S 475, at paras 86–87; Jim's AEIC in S 475, at paras 35–36.

116

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*        [2024] SGHC 10

send *all* the documents that he had to the auditors.[351] In particular, Jim did not send the Volume Rebate Agreements to the auditor although he believed that Vibhor would have done so; Vibhor left TJCI before the audit was completed.[352]

308     In my view, the Kriss Brothers have not satisfactorily explained why they did not furnish the auditors with all the supporting documents and/or explanations for the adjustments.

309     However, Shailesh's complaint in this respect is based on the Kriss Brothers' duties as directors to ensure that JGJ's financial affairs were properly managed.[353] This complaint falls outside the scope of s 216 of the CA. Again, the Kriss Brothers' breach of directors' duties would be a corporate wrong. Shailesh has not shown how he has suffered a real injury as a shareholder. As discussed earlier, he cannot claim a legitimate expectation that the Kriss Brothers would fulfil their directors' duties.

***Failure to provide information to or engage Shailesh***

310     Shailesh alleges that:[354]

(a)     on 9 April 2018, he received a notice of JGJ's AGM to be held on 19 April 2018 to, among other things, adopt the 2016 FS;

(b)     on 11 April 2018, he received a copy of a JGJ Board resolution to approve the 2016 FS and Directors' Statement; and

---

[351]     NE, 9 March 2023, at 97:21–23.

[352]     NE, 9 March 2023, at 88:2–89:21.

[353]     Shailesh's Closing Submissions in S 475, at para 68.

[354]     S 475 SOC, at paras 47–49.

117

(c)      He had not been provided with any information as to why the 2016 FS were being adopted despite JGJ's auditors' reservations and qualifications.

311     In so far as Shailesh's complaint relates to the Board resolution, that affects him in his capacity as a director and thus falls outside the scope of s 216 of the CA.

312     More importantly, on 11 January 2018, Jim sent to Shailesh the documents showing the four adjustments to the accounts.[355] On 12 January 2018, Jim again wrote to Shailesh, attaching the same documents, and stating that the documents were provided to him for his review and to give him the opportunity to ask questions.[356] Jim also reminded Shailesh that the deadline to file the financial statement had passed and the financial statements needed to be filed "ASAP".

313     Shailesh did not respond to either email until three months later, on 16 April 2018, when he sent an email to Jim objecting to and asking questions about the four adjustments.[357] Shailesh claimed that he had missed the earlier emails from Jim and only had sight of them "sometime in or around April 2018".[358] I do not believe Shailesh's claim. As the Kriss Brothers pointed out, the Company Secretary had also sent an email to Shailesh on 5 March 2018 attaching an email from the auditors and the draft of the 2016 FS (which

---

[355]      7 JCB 338–342.

[356]      7 JCB 348.

[357]      8 JCB 259–260.

[358]      Shailesh's AEIC in S 475, at para 95.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

incorporated the adjustments) and seeking his approval of the same.[359] The Company Secretary specifically drew Shailesh's attention to the auditors' Disclaimer of Opinion and Basis of Disclaimer of Opinion. Shailesh admits receiving the email from the Company Secretary.[360] Yet, he did not query the Kriss Brothers about the adjustments until more than a month later.

314     Shailesh's email dated 16 April 2018 was just three days shy of the AGM. He could and should have attended the AGM to raise his queries but he chose not to. Instead, also on 16 April 2018, he wrote to the Company Secretary, objecting to the AGM and requesting its postponement.[361] The Company Secretary replied on 17 April 2018 that it would be more appropriate for his request to postpone the AGM to be made to the Board.[362] Shailesh did not make any such request to the JGJ Board; he also did not attend the AGM.

315     In my judgment, Shailesh's complaint that the Kriss Brothers failed to provide information to him or to engage him on the four adjustments is not substantiated and fails.

**JGJ's counterclaim against Shailesh in S 475**

*Refusing/failing to sign or to abstain from voting on the First, Second and Third Resolutions*

316     Shailesh did not sign, or abstain from voting on, the First, Second and/or Third Resolutions. JGJ submits that by refusing or failing to do so, Shailesh failed to act in the interest of JGJ.

---

[359]     7 JCB 405–434.

[360]     Shailesh's AEIC in S 475, at para 98.

[361]     8 JCB 261–262.

[362]     8 JCB 267.

119

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

*The First Resolution*

317   The First Resolution was a Board resolution to authorise the commencement of legal action to recover the TJCNY Debt. Jim sent a copy of the resolution (dated 22 January 2018 and signed by the Kriss Brothers) to Shailesh on 27 January 2018.[363] Jim did not provide any explanations and simply asked Shailesh to "sign where indicated". On the same day, Jim followed up by asking Shailesh to return the signed resolution no later than 4pm on 30 January 2018.[364] Jim also advised Shailesh that the resolution was considered as passed since there was a majority approval.

318   On 6 February 2018, Shailesh objected (through his lawyers) to the First Resolution.[365] Shailesh complained that, among other things, he did not have sufficient time to consider the matter, and the resolution was not supported by relevant background documents or information. Shailesh also pointed out that Jim was wrong to say that the resolution had a majority approval because the copy of the resolution that was sent to him was signed by only two directors. On 23 February 2018, Shailesh received a copy of the First Resolution, signed by the Kriss Brothers and Ng, from the Kriss Brothers' lawyers.[366] The Kriss Brothers' lawyers also told Shailesh that the relevant supporting documents would be provided "in due course". No such documents have been provided to Shailesh.

319   In my view, the above facts do not support JGJ's claim that Shailesh acted in breach of his director's duties in connection with the First Resolution.

---

[363]   7 JCB 365–366.

[364]   7 JCB 367.

[365]   7 JCB 371–372.

[366]   7 JCB 382–385.

120

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*  [2024] SGHC 10

*The Second Resolution*

320   The Second Resolution was a Board resolution to authorise the commencement of legal proceedings against SRK and TJCI to recover charges in excess of US$15m which were alleged to be the result of the SRK Entities manipulating the prices of goods supplied to JGJ.

321   On 19 February 2018, Jim sent a copy of the Second Resolution (dated 15 February 2018 and signed by the Kriss Brothers and Ng) to Shailesh.[367] No supporting documents or explanation was given. Again, Jim told Shailesh to "sign where indicated" and to return the signed resolution no later than 4pm on 21 February 2018. Jim also advised Shailesh that the resolution was considered as passed because there was a majority approval.

322   On 21 February 2018, Shailesh objected (through his lawyers) to the Second Resolution.[368] As stated earlier, Shailesh objected to the allegation that he was SRK's nominee and denied the allegation that SRK and TJCI had manipulated the pricing of goods manufactured and billed to JGJ. Shailesh also pointed out the fact that he had no access to information pertaining to JGJ's bank accounts or transactional history. On 7 March 2018, the Kriss Brothers' lawyers responded, stating (in relation to the Second Resolution) that:[369]

  (a)   There were numerous documents evidencing the existence of the JV and the manner in which it functioned and the Kriss Brothers would refer to these documents "at the appropriate juncture, if and where necessary".

---

[367]   7 JCB 376–378.

[368]   7 JCB 379–381.

[369]   7 JCB 438–441.

121

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

(b)      The manipulation in the pricing of the goods was conducted at the factory levels. The factories of SRK and TJC inflated their selling prices to JGJ by billing at a percentage off the ultimate customer's price (*ie*, Sell-Minus Pricing) as opposed to a cost plus a specified markup needed to cover the back-office costs and expected gross profit (*ie*, Cost-Plus Pricing).

323    As stated in [186] above, Michael testified that the parties agreed that the goods would be invoiced based on Sell-Minus Pricing. The allegation that there was price manipulation because the invoices were based on Sell-Minus Pricing instead of Cost-Plus Pricing has no leg to stand on given Michael's unequivocal testimony. In the circumstances, in my view, it cannot be said that Shailesh acted in breach of his director's duties in connection with the Second Resolution.

*The Third Resolution*

324    The Third Resolution was a Board resolution to approve the 2016 FS and to convene the Second AGM of JGJ. The 2016 FS contained the four adjustments made by the Kriss Brothers. I have found that three of the adjustments are unjustified. In the circumstances, it cannot be said that Shailesh acted in breach of his director's duties in connection with the Third Resolution.

**Shailesh's request for information and documents**

325    JGJ claims that Shailesh acted in breach of his fiduciary duties by requesting the following information and documents:[370]

---

[370]    JGJ's S 475 D&CC, at para 41(c) read with paras 30–41 of S 475 SOC.

122

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*        [2024] SGHC 10

(a)     By way of a letter dated 6 February 2018 from his lawyers (see [318] above), Shailesh requested documents in relation to the TJCNY Debt and any other claims.

(b)     By way of a letter dated 21 February 2018 from his lawyers (see [322] above), Shailesh requested details of current signatories of JGJ's IDBNY Account, details of the transactions pertaining to the account, monthly bank statements and details of any other bank accounts in JGJ's name; and

(c)     By way of a letter dated 29 March 2018 from his lawyers,[371] Shailesh requested a copy of the legal opinion that Ng should have obtained on the validity and strength of the claim to recover the TJCNY Debt and other claims, purchase orders or other similar documents and invoices in relation to transactions amongst JGJ, SRK and TJCI.

326     JGJ's pleaded case alleges that the requests were made under the instructions of one or more of the SRK Entities, in the furtherance of the SRK Entities' interests and to defeat, frustrate and/or stymie JGJ's claims against one or more of the SRK Entities.[372] JGJ relies on the allegations that Shailesh was never involved or interested in JGJ's operations and that he only purported to take an interest in the affairs of JGJ after disputes relating to the JV broke out in or around late 2017 or early 2018.

327     The letters from Shailesh's lawyers requesting the documents and information were in response to or in connection with Jim asking him to sign the First and Second Resolutions. In my view, JGJ has not proved that the

---

[371]     7 JCB 463–464.

[372]     JGJ's S 475 D&CC, at para 41(c) read with para 24A.

123

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

purpose of Shailesh's requests was to defeat, frustrate and/or stymie JGJ's claims against one or more of the SRK Entities.

**Summary of my findings and conclusions in S 475**

328     In summary, my findings and conclusions in S 475 are as follows:

(a)     Shailesh was SRK's nominee shareholder and director in JGJ. However, he has the necessary standing to bring a claim under s 216 of the CA.

(b)     Shailesh cannot claim a legitimate expectation that the Kriss Brothers would fulfil their duties as directors.

(c)     Shailesh's claims based on the First and Second Resolutions, fail.

(d)     With respect to Shailesh's claim in relation to the four adjustments to the 2016 FS:

(i)     The Commission Rebate Adjustment is not commercially unfair but the Accounts Payable Adjustment, SRK Payable Adjustment and Capital Repayment Adjustment are commercially unfair.

(ii)     Shailesh's complaint that the Kriss Brothers failed to provide documents/explanations to JGJ's auditors fall outside the scope of s 216 of the CA.

(iii)     Shailesh's complaint that the Kriss Brothers failed to provide him with documents or to engage him with respect to the four adjustments to the 2016 FS fails.

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

(e)      Shailesh succeeds in his S 216 claim only to the extent that it is based on the Accounts Payable Adjustment, SRK Payable Adjustment and Capital Repayment Adjustment.

(f)      JGJ's counterclaim against Shailesh is dismissed.

**Reliefs in S 475**

329    In the light of my findings on Shailesh's s 216 claim, the only relief that Shailesh is entitled to, and which I now grant is as follows:

An order that the Kriss Brothers are to do all that is necessary to effect a restatement of the 2016 FS, 2017 FS and 2018 FS such that the Accounts Payable Adjustment, SRK Payable Adjustment and Capital Repayment Adjustment are removed, and the Kriss Brothers are to re-submit the restated financial statements to the auditors for an audit to be done, and the audited accounts are to be filed with the relevant authorities.

330    As stated in [245] above, Shailesh also seeks an order that the Kriss Brothers procure the JDM Entities to pay a sum of US$23,051,737 to an escrow agent. This relief relates to Shailesh's case based on the First Resolution, which has failed. In any event, Shailesh has not shown any basis for such an order.

**Conclusion**

331    With respect to S 418:

(a)      JGJ is liable to SRK in the sum of US$17,538,999.49.

(b)      JGJ is liable to TJCI in the sum of US$2,027,846.91.

125

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

(c)      JGJ's counterclaims are dismissed.

332    With respect to S 475:

(a)      Shailesh succeeds in his claim under s 216 of the CA only to the extent that it is based on the Accounts Payable Adjustment, SRK Payable Adjustment and Capital Repayment Adjustment. I make the order set out in [329] above.

(b)      JGJ's counterclaim is dismissed.

333    I will hear parties on costs.

Chua Lee Ming
Judge of the High Court

Nehal Harpreet Singh SC, Tan Zhengxian Jordan (Chen Zhengxian Jordan), Leong Hoi Seng Victor (Liang Kaisheng) and Damien Chng Cheng Yee (Audent Chambers LLC) (instructed), Bazul Ashhab bin Abdul Kader, Chan Cong Yen Lionel (Chen Congren), Chua Yi Ling Ilene and Yuen Zi Gui (Oon & Bazul LLP) for the plaintiff, second defendant in counterclaim, fourth defendant in counterclaim, fifth

defendant in counterclaim, sixth defendant in counterclaim and
seventh defendant in counterclaim in S 418;
Lok Vi Ming SC, Lee Sien Liang Joseph, Jean Chan Lay Koon, Chan
Junhao Justin (Chen Junhao) and Chia Bing Da Edric (LVM Law
Chambers LLC) for the defendant in S 418;
Moiz Haider Sithawala, Samantha Tan Sin Ying and Wong Jing Shen
Darren (Tan Rajah & Cheah) for the third defendant in counterclaim
and eighth defendant in counterclaim in S 418;
Pillai Pradeep G, Simren Kaur Sandhu, Wong Shi Rui Jonas and
Wong Yong Min (PRP Law LLC) for the plaintiff in S 475;
Ling Daw Hoang Philip, Chua Cheng Yew and Priscilla Kang Hui
Wen (Wong Tan & Molly Lim LLC) for the first and second
defendants in S 475;
Lee Sien Liang Joseph, Jean Chan Lay Koon, Chan Junhao Justin
(Chen Junhao) and Chia Bing Da Edric for the third defendant in
S 475.

---

127

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd* [2024] SGHC 10

**Annex 1: Index of entities, trade names and persons referred to in this judgment**

| Entities/trade names | | Judgment |
|---|---|---|
| Advaita Legal | Law firm in India engaged to draft a JV agreement for JGJ. | [127] |
| AP Jewelry | Asia Pacific Jewelry, LLC – incorporated in US. A JDM Entity. | [11] |
| AT Adler | JGJ's auditors. | [33] |
| BSR | BSR & Associates LLP – external consultants engaged to provide tax and regulatory services to JGJ. | [140] |
| Instock Programs or Instock | Trade name of JDM Entities. | [12] |
| JDM Entities | JDM; MG Worldwide; Miles Bernard; AP Jewelry | [11] |
| JGJ | JG Jewelry Pte Ltd – incorporated in Singapore. Defendant and plaintiff in counterclaim in S 418. 3rd defendant and plaintiff in counterclaim in S 475. | [5(b)] [6(d)] |
| KPMG | An Indian partnership and member of the KPMG network – engaged to carry out the accounting exercise. | [26] |
| MG Worldwide | MG Worldwide LLC – incorporated in US. A JDM Entity. | [11] |
| Miles Bernard | Miles Bernard, Inc – incorporated in US. A JDM Entity. | [11] |
| SEEPZ | The Santacruz Electronic Export Processing Zone in Mumbai, India | [8] |
| SRK | Shree Ramkrishna Exports Pvt Ltd – plaintiff and 1st defendant in counterclaim in S 418. Incorporated in India. | [5(a)] |
| SRK-BDB | SRK's office in Bharat Diamond Bourse in Mumbai | [7] |
| SRK Entities | SRK-Sachin, TJCI and TJCNY | [10] |

128

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

| | | |
|---|---|---|
| TJCI | The Jewelry Company – jewellery arm of SRK. 2nd defendant in counterclaim in S 418. Incorporated in India. | [5(c)] [8] |
| TJCNY | TJC Jewelry, Inc –marketing affiliate of TJCI. 3rd defendant in counterclaim in S 418. Incorporated in US. | [5(d)] [9] |

| **Persons** | | |
|---|---|---|
| Ajay Matta | Ajay Matta – Financial Controller of JDM. | [88] |
| Amit | Amit Shah – 7th defendant in counterclaim in S 418. CEO of and partner in TJCI. | [5(h)] |
| Anish | Anish Mehta, Partner, BSR. | [260(c)] |
| Ashish | Ashish Shah – 8th defendant in counterclaim in S 418. CEO and President of TJCNY. | [5(i)] |
| David | David Miles Kriss – 2nd defendant in S 475. 25% shareholder and director of JGJ. Co-owns and controls the JDM Entities. Michael's brother. | [6(c)] |
| Govind | Govind Dholakia – 4th defendant in counterclaim in S 418. Founder and chairman of SRK and SRK Group. | [5(e)] |
| Jim | Jim Goldsborough – CFO of JDM. | [20] |
| Michael | Michael Bernard Kriss – 1st defendant in S 475. 25% shareholder and director of JGJ. Co-owns and controls JDM Entities. David's brother. | [6(b)] |
| Ng | Michael Ng – local resident director of JGJ. | [20] |
| Nirav | Nirav Narola – 6th defendant in counterclaim in S 418. Employee of SRK and partner in TJCI. Govind's grand-nephew. | [5(g)] |

129

*Shree Ramkrishna Exports Pvt Ltd v JG Jewelry Pte Ltd*          [2024] SGHC 10

| | | |
|---|---|---|
| Rahul | Rahul Dholakia – 5th defendant in counterclaim in S 418. <br> Managing Director of SRK and partner in TJCI. Govind's nephew. | [5(f)] |
| Rajiv | Rajiv Shah – CFO of SRK. | [139] |
| Shailesh | Shaileshkumar Manubhai Khunt – plaintiff and defendant in counterclaim in S 475. <br> 50% shareholder and director of JGJ. <br> Director of S Goldi. | [6(a)] <br> [13] |
| Vibhor | Vibhor Jain – employed by SRK but identified himself as CFO of TJCI; handled the accounts of JGJ and the JDM Entities. | [83] |
| Vikas | Vikas Ashokkumar Padhya – employed by TJCI and assigned to handle JDM's back-office functions in India. | [76] |

Certified True Copy



Manager
Judge's Chambers
Supreme Court Singapore

130