UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>J.G. JEWELRY PTE. LTD.,<br><br>    Debtor in Foreign Proceeding | Chapter 15<br><br>Case No. 26-22156 (SHL) |

### DECLARATION OF JOSEPH P. GOLDBERG, ESQ.

I, **JOSEPH P. GOLDBERG, ESQ.**, being duly sworn pursuant to 28 U.S.C. § 1746, state as follows:

1.      I am a partner at the law firm Hodgson Russ LLP, counsel to Shree Ramkrishna Exports Pvt., Ltd. ("SRK"), The Jewelry Company ("TJCI", collectively with SRK, the "SRK Creditors"), and TJC Jewelry, Inc ("TJCNY").

2.      I have personal knowledge of all procedural facts set forth in this Declaration and am thoroughly familiar with other facts set forth in this Declaration. This Declaration is submitted in support of the Verified Petition and Motion for Recognition filed by the debtor J.G. Jewelry Pte. Ltd. (in Liquidation) ("JGJ"), in response to the Objection filed by JDM Import Co. Inc. ("JDM"), MG Worldwide LLC ("MGW"), Miles Bernard, Inc. ("MBI"), and Asia Pacific Jewelry, L.L.C. ("APJ," and collectively the "JDM Entities"), and for the purpose of marshalling the evidence referenced in the SRK's Creditors memorandum of law submitted herewith.

3.      Below, please find a chart describing the true and accurate copies of documents annexed hereto as exhibits:

| | |
|---|---|
| Exhibit 1 | The Singapore Appellate Court Decision |
| Exhibit 2 | The "Winding Up" Order Of The Singapore Trial Court |
| Exhibit 3 | Schedule G of the JDM's 2015, 2016, and 2017 Form NYC-2 |
| Exhibit 4 | Schedule J of MBI's 2015, 2016, and 2017 form NYC-3L |
| Exhibit 5 | Expert Report of Kelly G. Besaw, CPA, CVA |

| Exhibit 6 | Excerpts From the Deposition of Gurmeher Allagh |
|---|---|
| Exhibit 7 | Michael Kriss / Jeffrey Sacks March 2015 Email Chain |
| Exhibit 8 | Excerpt From the 2019 JDM Consolidated Financial Statements |
| Exhibit 9 | APJ Payables Trial Balance dated January 2, 2020 |
| Exhibit 10 | MGW Payables Trial Balance dated December 31, 2019 |
| Exhibit 11 | JDM Payables Trial Balance dated December 31, 2019 |
| Exhibit 12 | Excerpts From the Deposition of JDM Entities' Controller Ajay Matta |
| Exhibit 13 | Excerpts From the Deposition of JDM Entities' CFO James Goldsborough |
| Exhibit 14 | The Singapore Trial Court Decision |
| Exhibit 15 | Binder & Schwartz's Notice of Motion To Voluntarily Withdraw JGJ's Claims |
| Exhibit 16 | The Foreign Representatives' Letter dated September 8, 2025 |
| Exhibit 17 | Excerpt from Singapore Trial Tr., March 6, 2023 |
| Exhibit 18 | JDM Entities' Second Amended and Supplemental Complaint |
| Exhibit 19 | JDM Entities' First Amended Complaint |

## A. Background

4. The debtor JGJ is organized under Singapore law. Michael and David Kriss (the "Kriss Brothers") own 50%, while the other 50% is owned by Shaileshkumar Manubhai Khunt who is based in Hong Kong and is independent. (**Ex. 1 ¶** 16).

5. The Kriss Brothers are also the owners of JGJ's largest debtors, the JDM Entities. Until June 2025, JGJ's board of directors consisted of the Kriss Brothers, Mr. Khunt, and Singapore Resident Director Michael Ng Chee Whooi ("Whooi"), who acted on the instructions of the JDM Entities' CFO James Goldsborough. (**Ex. 1 ¶** 16).

6. The SRK Creditors are creditors of JGJ incorporated under the laws of India, and are leading manufacturers and sellers of diamonds and diamond jewelry in India.

7. TJCNY is a debtor of JGJ incorporated in New York in the business of selling and marketing jewelry. TJCNY is a marketing affiliate of TJCI.

## B. The Relationship Between The Parties.

8. Through the debtor JGJ, the SRK Creditors supplied nearly $70 million worth of diamonds and jewelry (the "Goods") to the JDM Entities between January 2015 and August 2017. Operating on a "bill to, ship to" basis, the SRK Creditors invoiced JGJ for the Goods, which they

2

shipped directly to the JDM Entities and their customers. JGJ then was supposed to pay the SRK Creditors from revenues it received on invoices that JGJ issued to JDM Entities for the Goods. Eight years later, nearly $26 million remains outstanding on invoices issued to JGJ by the SRK Creditors. (**Ex. 1** ¶ 4, 173).

9.      On April 23, 2018, SRK filed suit against JGJ in Singapore to collect on the unpaid invoices. Under direction of the Kriss Brothers, JGJ forced a 23-day trial and lengthy appeals on the SRK Creditors' simple invoice claims. JGJ and the JDM Entities initiated another action in New York against the SRK Creditors and TJCNY alleging a purported joint venture, which is still on-going. Subsequently, the Singapore courts found that JGJ had not proved even the most rudimentary elements of a joint venture agreement, including who the parties were and how profits would be shared.

10.     On March 7, 2025, the appellate court in Singapore issued a final, non-appealable judgment in favor of SRK Creditors against JGJ in the amount of approximately $36 million. (**Ex. 1**).

11.     On June 19, 2025, the Singapore court granted the SRK Creditors' application to "wind up" JGJ and appointed the Foreign Representatives. (**Ex. 2**).

12.     The appointment of the Foreign Representatives ended the Kriss Brothers' control of JGJ. For eight years, despite their inherently conflicted interests and their fiduciary duty to JGJ's creditors as directors of an insolvent company, the Kriss Brothers used their domination of JGJ to hinder its creditors to the advantage of their own companies, the JDM Entities. To this day, the JDM Entities have retained the proceeds from selling the Goods to their own customers without paying for the Goods. (**Ex. 1** ¶ 178).

**C. The JDM Entities' Joint Venture Contentions Are A Smokescreen.**

13.     To avoid paying for the Goods, the JDM Entities claim an oral joint venture with the SRK Creditors, which allegedly lasted from January 2015 through August 2017. Although the JDM Entities' contentions have shifted considerably over the years, their latest theory is that the Goods were "capital contributions" to the alleged joint venture, and the JDM Entities therefore have no obligation to pay invoices issued by JGJ.

14.     Their narrative is contradicted by overwhelming evidence:

  i.     the JDM Entities' books state that they owe approximately $17.3 million dollars to JGJ, even after dubious adjustments;

  ii.     the JDM Entities' tax returns affirmatively state that they were **<u>not</u>** members of a joint venture;

  iii.     the JDM Entities' financial statements do not list contributions to a joint venture and do not disclose its existence;

  iv.     the JDM Entities' CFO answered "no comment" on five occasions when asked why their tax returns, financial statements, and books and records do not reflect the alleged joint venture; and

  v.     the JDM Entities' Controller admitted the alleged joint venture is not reflected in their tax returns, financial statements, and books because the parties never agreed to joint venture terms.

  **i.     The JDM Entities State In Their Contemporaneously Prepared Tax Returns That They Are <u>Not</u> Members Of A Joint Venture.**

15.     JDM filed New York City Business Corporation Tax Returns – Form NYC-2 – in 2015, 2016, and 2017. Question 9 on Schedule G of the form NYC-2 asks, "[w]as this corporation a member of a partnership or joint venture during the tax year?" (**Ex. 3**).

4

16.     JDM responded, "no," – that it was **<u>not</u>** a member of a joint venture during tax year 2015 – on its contemporaneously filed form NYC-2 returns for tax years 2015, 2016, and 2017. (**Ex. 3**).

17.     MBI filed New York City General Corporation Tax Returns – Form NYC-3L – in 2015, 2016, and 2017. Question 8 on Schedule J of the form NYC-3L asks, "[w]as this corporation a member of a partnership or joint venture during the tax year?" (**Ex. 4**).

18.     MBI responded, "no," – that it was **<u>not</u>** a member of a joint venture during tax year 2015 – on its contemporaneously filed form NYC-3L returns for tax years 2015, 2016, and 2017. (**Ex. 4**).

19.     Had JDM, MBI, APJ, and MGW been members of a joint venture, they would have been required to record contributions to the alleged joint venture on Schedule L of IRS forms 1120, 1120-S, and 1065, respectively. None of the JDM Entities reported making any contributions to the alleged joint venture in 2015, 2016, and 2017. (**Ex. 5**, p. 12).

20.     The JDM Entities' own expert on tax returns – Gurmeher Allagh – admits that nothing in the JDM Entities' tax returns suggests the existence of a joint venture. (**Ex. 6** at 41:17-42:8 ["Q. Is there anything in the tax returns that you saw that reflects the existence of the assumed joint venture? . . . . A. I didn't see anything in the tax returns that suggested there is a joint venture"]).

21.     The JDM Entities misrepresent to this Court that they believed the alleged joint venture could evade U.S. tax liability and did not need to file a U.S. Partnership tax return. (Obj. at pg. 8, fn 1).

22.     Even if the JDM Entities were ignorant of joint venture tax obligations (and they were not), that is irrelevant to JDM and MBI affirmatively representing to taxing authorities in

contemporaneously filed tax returns that they were **not** members of a joint venture in tax years 2015, 2016, and 2017. (**Ex. 3** and **Ex. 4**).

23. Further, the JDM Entities were aware that a joint venture would create U.S. tax implications because their advisor told them as much on March 22, 2015. (**Ex. 7** [where Jeffrey Sacks tells Michael Kriss that he needs to speak with his accountant Preshant Prajapati "regarding tax disclosures and other filings that may be required.").

24. Michael Kriss responded to his advisor, "[h]ey a lot this we really don't want to go through but some we do. For now we are in a rush to get a Singapore company open with bank accounts. The rest we can back into." (**Ex. 7**).

### ii. The JDM Entities' Contemporaneously Prepared Financial Statements Do Not Disclose The Existence Of The Alleged Joint Venture.

25. Generally Accepted Accounting Principles ("GAAP") requires a member of a joint venture to disclose in notes to the financial statements, or in a separate statement: (1) that it is a member of a joint venture, (2) the other parties to the joint venture, (3) the ownership percentage of each joint venture member, (4) the accounting policies utilized in the accounting for the joint venture, and (5) any differences between the carrying values and equity in the joint venture. (**Ex. 5**, p. 15).

26. Here, the JDM Import Co., Inc. and Affiliates Combined Financial Statements for 2015 and 2016, which encompass the financial activities of JDM, MGW, and APJ, do not reference the alleged joint venture with the SRK Creditors.[1]

---

[1] The JDM Import Co., Inc. and Affiliates Combined Financial Statements for 2017 states that the JDM Entities have filed a lawsuit in New York State Supreme Court alleging the existence of a joint venture.

27. The JDM Entities' own expert – Mr. Allagh – admits that nothing in the financial statements of the JDM Entities reflects the existence of a joint venture. (**Ex. 6** at 42:4-14 ["**Q.** You did not see anything in the financial statements that you reviewed of the JDM Entities that reflects the existence of the joint venture? **A.** I did not. **Q.** You did not see any such information reflecting the existence of a joint venture in the JDM Entities' financial statements for calendar years 2015, '16 and '17, correct? **A.** That's correct."]).

28. The balance sheets of JDM Entities do not identify any contributions of capital to the alleged joint venture. (**Ex. 5**, p. 17).

29. The general ledgers of the JDM Entities do not identify any contribution to, or investment in, an alleged joint venture. (**Ex. 5**, p. 17).

### iii. The JDM Entities Books State That They Owe Millions Of Dollars To JGJ For The Goods.

30. The JDM Entities' contention that it does not have to pay JGJ's invoices is undercut by the JDM Entities' own books and records. The JDM Import Co. Inc. and Affiliates Combined Financial Statements and Supplementary Information for the year ending December 31, 2019 states that as of December 31, 2019 JDM, APJ, and MGW owed $17.3 million to an "affiliate," i.e., JGJ. (**Ex. 8**).

31. Similarly, the "Payables Trial Balance" of APJ dated January 2, 2020 states that it owes $11,015,913.47 to JGJ. (**Ex. 9**).

32. The "Payables Trial Balance" of MGW dated December 31, 2019 states that it owes $4,857,260.66 to JGJ. (**Ex. 10**).

33. The "Payables Trial Balance" of JDM dated December 31, 2019 states that it owes $1,508,587.39 to JGJ. (**Ex. 11**).

34.     In other words, the JDM Entities' own books and records demonstrate that they knew that the Goods were not supplied as "capital contributions" and that they were liable for the invoices.

### iv. The JDM Entities' Executives Admit That The Alleged Joint Venture Is Not Recorded In The JDM Entities' Tax Returns Or Financial Statements Because The Parties Never Reached Final Terms Necessary To Form A Joint Venture.

35.     The JDM Entities' Controller Ajay Matta admitted that the alleged joint venture is not properly recorded in the tax returns and financial statements of the JDM Entities because the JDM Entities and SRK Creditors never reached agreement on final terms of a joint venture agreement. (**Ex. 12** at 318:4-16 [wherein Controller Matta states, "I mean, the joint venture – if it was – if I knew the exact terms and conditions, it would have bene recorded accordingly, but I don't think it was finalized to my knowledge"] [emphasis added]).

36.     The JDM Entities' CFO James Goldborough testified "no comment" – on five occasions – in response to questions asking why the JDM Entities' Consolidated Audited Financial Statements failed to state that the JDM Entities were members of a JV:

> "**Q.** Sir, you were a CFO for the JDM entities from 2005 to, I think you said, April of 2023. And is it your testimony you have no understanding, knowledge, information or opinion as to whether or not a disclosure of an alleged joint venture should have been made in the JDM entities' financial statements in calendar year 2015? **A.** No. No Comment. **Q.** Sorry what was your answer. **A.** I have no comment . . . . **Q.** Based on your experience, sir, would you expect that information to be included in a financial statement. **A.** I have no comment. **Q.** Why not? Why do you have no comment on this? **A.** I have no comment. . . . . **Q.** Let me pose the question differently. Assuming that the JDM entities became parties to a joint venture, would you agree with me that would be material information that should be disclosed in audited financial statements? **A.** No comment." [emphasis added]. (**Ex. 13** at 60:21-66:7).

37.     CFO Goldsborough admitted further that he had no explanation for why the alleged joint venture is not reflected in any of the JDM Entities' contemporaneously prepared tax returns

8

or financial statements. (**Ex. 13** at 293:6-16 [**Q.** "if there was a joint venture as you have described it today in cursory terms, is there any reason the alleged joint venture is not reflected in any way, shape, manner, and form in any of the JDM entities tax returns for calendar years ending 2015, '16, and '17?" **A.** No. I have no explanation"]).

38.     While Michael Kriss claims that CFO Goldsborough "knew everything" and was "fully aware of the joint venture and . . . the partnership between us and the SRK Entities," (Ex. J, 327:11-24), CFO Goldsborough admitted: (i) he did not know the terms of the alleged joint venture, (ii) he did not know if the SRK Creditors and JDM Entities ever agreed to final terms of the alleged joint venture, and (iii) he did not understand the terms of the joint venture alleged by the JDM Entities. (**Ex. 13** at 115:19, 335:12-19, 336:21-337:9, 366:7-15).

**D. The Singapore Courts Reject The Kriss Brothers' Arguments.**

39.     The JDM Entities mischaracterize the decisions of the Singapore Courts. The Kriss Brothers directed all JGJ's litigation in Singapore until the appointment of the Foreign Representatives in June 2025. (**Ex. 1** at ¶¶ 235-236).

40.     The Kriss Brothers controlled JGJ during the 23-day trial before the Singapore Trial Court beginning February 14, 2023 and ending April 27, 2023, they and numerous officers of the JDM Entities gave testimony testified on behalf of JGJ, and the Kriss Brothers directed JGJ's appeal to the Singapore Appellate Court. (**Ex. 1 –** AD Judgment ¶¶ 235-236).

41.     The Singapore Appellate Court entered a judgment in favor of the SRK Creditors and against JGJ exceeding $36 million. (**Ex. 1**). The Judgment further found that:

i.      there was no dispute that all the Goods were delivered and received or over the quality of the goods (**Ex. 1** at ¶ 32);

ii.     there was no legally enforceable joint venture agreement (**Ex. 14** ¶ 172);

iii.   JGJ failed to prove that the parties had entered a joint venture pursuant to the so-called January 13 memorandum (**Ex. 1** at ¶ 83);

iv.   it is not clear what the terms of the alleged joint venture were or even who all the parties were (**Ex. 1** at ¶ 87);

v.   JGJ failed to prove how profits of the alleged joint venture would be distributed (**Ex. 1** at ¶ 83);

vi.   the Kriss Brothers' argument that the goods supplied by the SRK Creditors were to be treated as "capital" under the terms of the alleged joint venture was "not a coherent one" (**Ex. 1** at ¶ 89);

vii.   JGJ failed to prove that its liability on the invoices would only arise upon an accounting reconciliation by the alleged joint venture, because, among other reasons, it was not plausible that the SRK Creditors would have been prepared to wait for the accounting exercise to be done each year in order to be paid (**Ex. 1** at ¶ 151);

viii.   the goods were to be paid at the "full quantum" of the invoices (**Ex. 1** at ¶ 173); and

ix.   the Kriss Brothers had manipulated JGJ's account records by making multiple unjustified adjustments in their own favor totaling over $15 million USD (**Ex. 1** at ¶¶ 216-220).

42.   In addition, the Singapore Courts held that the Kriss Brothers manipulated JGJ's to favor themselves and their companies, the JDM Entities.

**i.   The Kriss Brothers And Their Captive Director Whooi Adopt The First Resolution Authorizing JGJ To Pursue Debts From Entities Other Than The JDM Entities.**

43.   As of August 2017, JGJ was owed trade debts by numerous customers, including:

i.   A trade debt exceeding $23 million owed by the JDM Entities to JGJ;

ii.   A trade debt of approximately 3.7 million owed by TJCNY to JGJ.

44.   On or about January 22, 2018, Michael Kriss and David Kriss executed a resolution purporting to authorize the Kriss Brothers, on behalf of JGJ, to commence and manage legal

proceedings to collect the trade debt from TJCNY (the "First Resolution"). (**Ex. 1 – AD Judgment** ¶ 235).

45.     By executing the First Resolution, the Kriss Brothers acknowledged that the invoices issued by JGJ to the JDM Entities and TJCNY were valid invoices.

46.     The Kriss Brothers brought suit for JGJ to collect on approximately $3.7 million of invoices JGJ issued to TJCNY for the Goods while simultaneously refusing cause JGJ to collect more than $23 million of invoices JGJ issued to the JDM Entities for the Goods.

> **ii. The Kriss Brothers And Their Captive Director Whooi Adopt The Third Resolution Manipulating The Books And Records Of JGJ To Enrich The Kriss Brothers.**

47.     On or about March 6, 2018, Michael Kriss and David Kriss executed a resolution adopting a Revised Financial Statement for JGJ for the year 2016 (the "JGJ's 2016 Revised FS"). JGJ's 2016 Revised FS purported to make three adjustments to JGJ's 2016 Financial Statements that the Singapore Appellate Division has concluded are commercially unreasonable. (the "Third Resolution"). (**Ex. 1 – AD Judgment** ¶¶ 214-228).

48.     The first adjustment – the Accounts Payable Adjustment – sought to reduce the amount recorded as "Purchases-Finished Goods" by $7,540,283. In other words, the Kriss Brothers sought to reduce the amount on JGJ's books due and owing to the SRK Creditors by around $7.5 million. (**Ex. 1 – AD Judgment** ¶ 215).

49.     The second adjustment – the SRK Payable Adjustment – added $15,488,893 as amount "Due from SRK." In other words, in addition to reducing the amount owed to the SRK Creditors by around $7.5 million, the Kriss Brothers also sought to increase the amount owed by SRK to JGJ by around $15.5 Million. (**Ex. 1 – AD Judgment** ¶ 215).

50.     The third adjustment – the Capital Repayment Adjustment – added two equal amounts of $7,744,446.50 each as "Due to Michael Kriss" and "Due to David Kriss," respectively. In other words, the Kriss Brothers sought to unilaterally impose a charge of $15,488,893 on SRK and distribute those proceeds to Kriss Brothers in two equal payments of $7,744,446.50 ($15,488,893 / 2 = $7,744,446.50). (**Ex. 1** – AD Judgment ¶ 215).

51.     The Singapore Appellate Court found that each of these adjustments were done in an "arbitrary and unsubstantiated manner." (**Ex. 1** – AD Judgment ¶ 216 [stating, "[w]e preface our analysis by emphasizing that the Three Adjustments were made by the Kriss Brothers in JGJ's 2016 Revised FS in an *arbitrary* and *unsubstantiated* manner." [emphasis included]).

52.     When asked how the Kriss Brothers determined the SRK Payable Adjustment of $15,488,893, CFO Goldsborough responded that $15,488,893 was a "convenient number." (**Ex. 1** – AD Judgment ¶ 218 [**Q.** Just explain to us more simply, why did you put a number $15.48 mill there, or 'Due from SRK'? **A.** It was a convenient number. It could have been 20 million, it could have been 12 million, it could have been 30 million. It was just a convenient number to use at the time, knowing that there were some level of profits, but the true number was indeterminable at the time."]).

**E.   The Kriss Brothers Have Prejudiced JGJ In The State Court Action.**[2]

53.     On March 27, 2018, the JDM Entities and JGJ, all jointly represented by the law firm of Moses & Singer ("M&S") and taking direction from the Kriss Brothers, filed suit against the SRK Creditors and TJCNY in New York State Supreme Court. The Kriss Brothers retained a

---

[2]     The "State Court Action" refers to the actions between JGJ, the SRK Creditors, TJCNY, and the JDM Entities in New York State Supreme Court bearing Index Numbers 651469/2018 and 657583/2017.

single law firm to represent these parties even though an unwaivable conflict exists between them, i.e., JGJ's claim for more than $23 million against the JDM Entities.

### i. The JDM Entities Seek To Remove JGJ From The Case Following The SRK Creditors Application To Wind Up JGJ.

54. On April 29, 2025 – after commencement of the "winding up" proceeding on April 2, 2025 but while the Kriss Brothers still controlled JGJ – JGJ filed a motion to voluntarily discontinue the claims it asserted against the SRK Creditors, including its claims against TJCNY to recover on approximately $3.7 million of invoices. (**Ex. 15**).

55. The Kriss Brothers and the attorneys representing the JDM Entities and JGJ – Binder & Schwartz LLP – were not acting in JGJ's best interests when they attempted to voluntarily discontinue JGJ's claims with prejudice.[3]

56. Rather, the JDM Entities desired to push JGJ out of the State Court Proceedings before the Kriss Brothers lost control of JGJ, and before JGJ could assert its claims against the JDM Entities.

57. On June 19, 2025, the Singapore Court granted the SRK Entities' application to "wind up" JGJ and appointed the Foreign Representatives to serve as JGJ's liquidators.

58. On July 21, 2025, the Singapore Court authorized the Foreign Representatives to engage counsel to assist in legal proceedings in New York.

59. On September 8, 2025, the Foreign Representatives – represented by independent counsel – wrote the New York State Supreme Court that it opposed dismissing JGJ from the State Court Proceedings because, among other things: (1) JGJ had a valid claim against TJCNY based on $3.7 million of invoices JGJ issued to TJCNY, and (2) JGJ needed to investigate its claims

---

[3]   Binder & Schwartz substituted in as counsel for the JDM Entities and JGJ in place of Moses & Singer LLP in April 2024.

13

against the JDM Entities arising out of the more than $23 million of invoices JGJ issued to the JDM Entities. (**Ex. 16** – Foreign Representatives 9/8/25 Letter).

60. Following a conference with the Court, counsel for the JDM Entities agreed to rescind their application to withdraw JGJ's claims from the State Court Action.

61. Thus, the Kriss Brothers abused their position of control over JGJ by seeking to voluntarily withdraw JGJ's claims from the State Court Proceeding before the Court in Singapore could rule on the "winding up" application, and JGJ could retain its own independent counsel to evaluate its potential claims against the JDM Entities.

### ii. The JDM Entities Deprive JGJ Of Its Rights To Take Discovery In The State Court Proceeding.

62. During the eight years that the Kriss Brothers controlled JGJ in the State Court Proceedings, JGJ did not serve any discovery demands on the JDM Entities concerning JGJ's claims against the JDM Entities.

63. The fact discovery period closed in the State Court Proceeding on March 7, 2025.

64. The Foreign Representatives were not appointed by the Singapore Trial Court on June 16, 2025.

65. On November 13, 2025, the JDM Entities filed a Note of Issue and Certificate of Readiness in the State Court Proceedings certifying that all pleadings had been served, all necessary discovery was completed, and the case is ready for trial.

66. On February 5, 2026, New York State Supreme Court Justice Joel M. Cohen issued an Order denying the SRK Creditors' application to vacate Note of Issue.

67. As the result of these and other actions taken by the JDM Entities, JGJ has not had any opportunity to seek discovery against the JDM Entities in the State Court Proceeding, and they have not asserted any cross claims against the JDM Entities.

14

### iii. Binder & Schwartz Refuses To Turnover JGJ's Client File To The Liquidators' On The Basis That It Never Represented JGJ.

68.     In September 2025, the Foreign Representatives – through their prior counsel Foley & Lardner LLP – requested that attorneys the Kriss Brothers retained for JGJ – M&S, and subsequently B&S – turn over their JGJ client files, including all correspondence and emails between JGJ and its counsel. (**Ex. 16** at pg. 2-4).

69.     M&S claimed it turned over its complete file to B&S. B&S, in turn, refused to turnover its correspondence and emails with JGJ. Among other things, B&S initially took the position that it never represented JGJ. (**Ex. 16** at pg. 2-3 [stating, "Binder alleges that rather than sign a standard engagement letter, JGJ only signed a Common Interest and Confidentiality Agreement. . . and, therefore, (i) JGJ was never its client, and (ii) there is no client file that can be provided to the liquidators"]). Binder took this position despite having filed numerous submissions on JGJ's behalf in the State Court Action.

70.     In other words, B&S, the Kriss Brothers' handpicked counsel for JGJ who represented JGJ in the State Court Action for years refuses to share its file with the Foreign Representatives because B&S claims it belongs to its true clients, the JDM Entities.

### iv. The JDM Entities Continually Shift The Facts Of Their Claims To Meet Their Perceived Needs Of The Moment.

71.     The JDM Entities continually shift the facts of their claims to meet their perceived needs of the moment.

72.     For example, the Kriss Brothers caused JGJ to file its first pleading in the Singapore proceedings in February 2020. This pleading omitted the Kriss Brothers' allegation that the SRK Creditors had agreed that JGJ did not need to pay their invoices because they were contributing Goods as a "capital contribution" to the alleged joint venture. (**Ex. 1** ¶ 110).

15

73.     The Kriss Brothers only took this position one year and ten months later when they amended JGJ's pleading in September 2021. (**Ex. 1 ¶** 110).

74.     Michael Kriss had no explanation for the reason a term so critical to JGJ's defense was only introduced in September 2021.

75.     At trial in Singapore, David Kriss admitted that he was shifting his position on factual assertions because his original position negatively impacted JGJ's case. Specifically, JGJ shifted its position at trial from claiming that the alleged joint venture was formed on January 13, 2015 to claiming that the joint venture was formed on March 31, 2015.

76.     When asked whether he "shifted [his] case from first saying that the JV was concluded on 13 January 2015 to now saying it was concluded on 31 March 2015 because [he] recognize[d] JGJ was not in existence on 13 January," David Kriss responded "Yes." (**Ex. 17** at 17:22-18:5).

77.     The Court clarified the question to David Kriss to ensure he understood the gravity of his admission: "So you agree with that full sentence? . . . There are two parts to it. The first part is that you shifted your case from 13 January to 31 March. The second part is that the reason for the shift is that JG[J] was not in existence in January" David Kriss responded, "Yes." (**Ex. 17** at 17:22-18:5).

78.     In the State Court Action, the JDM Entities amended their complaint on January 30, 2026 to allege that "initial terms" of the alleged joint venture were agreed upon "in or around January 2015," and that these initial terms were "supplemented from time to time." (**Ex. 18 ¶** 79).

79.     The Kriss Brothers have also shifted their position concerning JGJ's role in the alleged joint venture. At the start of the State Court Action, the JDM Entities alleged that JGJ was

the "corporate embodiment" of the alleged joint venture between the JDM Entities and the SRK Creditors. (**Ex. 19** ¶¶ 31, 53, 77).

80.     On January 30, 2026 – following the decisions in Singapore – the JDM Entities shifted their position to claim that not all transactions of the alleged joint venture were funneled through JGJ and that it was merely one "accounting vehicle" for the alleged joint venture. (**Ex. 18** ¶ 31).

81.     At the start of the State Court Action, the JDM Entities alleged that ". . . all income and expenses generated by all participating Joint Venture entities, that is the SRK Entities and the JDM Entities, were for the account of JGJ." (**Ex. 19** ¶ 86).

82.     On January 30, 2026, the JDM Entities shifted their position to allege that the parties were to commit their profits and losses to an alleged joint venture separate and distinct from JGJ. (**Ex. 18** ¶ 88).

### F. SRK Creditors Are Not Funding Liquidators.

83.     The JDM Entities contend that "the SRK Entities have not disputed that they are funding the fees of the Foreign Representatives . . . ." (*See* Obj. ¶ 53).

84.     Since the Foreign Representatives required immediate funding upon their appointment by the Singapore Trial Court on June 16, 2025, SRK caused a debit note in the amount of 35,000 Singapore Dollars to be issued by its Singapore advocates towards "Payment for Deloitte for administrative costs." SRK has not made any other payments to the Foreign Representatives or their counsel; TJCI has made none. (Declarations of Rajiv Shah and Amit Shah).

85.     TJCNY has not made any payments to the Foreign Representatives or their counsel. TJCNY did make a payment deposited into a client trust account for the benefit of JGJ in partial

17

settlement of JGJ's claim against TJCNY on invoices totaling approximately $3.7 million. (Declaration of Ashish Shah).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of March 2026

/s/ Joseph P. Goldberg
Joseph P. Goldberg
